RECORD NO. 13-4576

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## JOHN STUART DOWELL,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## AT HARRISONBURG

———————

## JOINT APPENDIX
## VOLUME I OF II
## (Pages 1 – 332)

———————

R. Darren Bostic
BOSTIC & BOSTIC, PC
409 Virginia Avenue
Harrisonburg, Virginia  22802
(540) 432-1119

*Counsel for Appellant*

Nancy S. Healey
OFFICE OF THE U.S. ATTORNEY
255 West Main Street, Room 130
Charlottesville, Virginia  22902
(434) 293-4283

*Counsel for Appellee*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Complaint**
      filed October 24, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

**Transcript of Arraignment on Superseding**
**Indictment Proceedings before**
**The Honorable B. Waugh Crigler**
      on May 7, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**Transcript of Guilty Plea Hearing before**
**The Honorable Michael F. Urbanski**
      on October 3, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**Transcript of Sentencing Proceedings before**
**The Honorable Michael F. Urbanski**
      on July 18, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**

**Testimony of James M. Fottrell:**

**Direct Examination by Ms. Katzin** . . . . . . . . . . . . . . . . . . . . . . . **67**
**Cross Examination by Mr. Bostic** . . . . . . . . . . . . . . . . . . . . . . . **111**
**Redirect Examination by Ms. Katzin** . . . . . . . . . . . . . . . . . . . . **124**
**Recross Examination by Mr. Bostic** . . . . . . . . . . . . . . . . . . . . . **125**

**Testimony of Alan J. Garretson:**

**Direct Examination by Mr. Bostic** . . . . . . . . . . . . . . . . . . . . . . . **128**
**Cross Examination by Ms. Katzin** . . . . . . . . . . . . . . . . . . . . . . . **141**

**Testimony of Donna Moore:**

**Direct Examination by Ms. Healey** . . . . . . . . . . . . . . . . . . . . . . **198**
**Cross Examination by Mr. Bostic** . . . . . . . . . . . . . . . . . . . . . . . **234**
**Redirect Examination by Ms. Healey** . . . . . . . . . . . . . . . . . . . . **243**

Transcript of Sentencing Proceedings before
The Honorable Michael F. Urbanski
      on July 18, 2013, continued:

**Testimony of Bill Dowell:**

Direct Examination by Mr. Bostic  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

**Testimony of John Dowell:**

Direct Examination by Mr. Bostic  . . . . . . . . . . . . . . . . . . . . . . . . . . 263
Cross Examination by Ms. Healey  . . . . . . . . . . . . . . . . . . . . . . . . . . 274

Judgment in a Criminal Case
      filed July 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Notice of Appeal
      filed August 1, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332

# <u>TABLE OF CONTENTS</u>
## VOLUME II OF II – UNDER SEAL

<u>Appendix Page</u>

**Presentence Investigation Report**
    **revised June 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

CLOSED,APPEAL,FORFEITURE

# U.S. District Court
## Western District of Virginia (Harrisonburg)
## CRIMINAL DOCKET FOR CASE #: 5:11-cr-00045-MFU-1

Case title: USA v. Dowell                          Date Filed: 12/14/2011
Magistrate judge case number: 5:11-mj-00132-BWC    Date Terminated: 07/25/2013

---

Assigned to: District Judge Michael F. Urbanski

Appeals court case number: 13-4576
4CCA

**Defendant (1)**

**John Stuart Dowell**                    represented by    **Joel Christopher Hoppe**
*TERMINATED: 07/25/2013*                                    FEDERAL PUBLIC DEFENDERS OFFICE
                                                            SUITE 106
                                                            401 E MARKET ST
                                                            CHARLOTTESVILLE, VA 22902
                                                            434-220-3380
                                                            Fax: 434-220-3390
                                                            Email: joel_hoppe@fd.org
                                                            *TERMINATED: 03/02/2012*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Public Defender or Community Defender Appointment*

                                                            **Russell Darren Bostic**
                                                            Bostic & Bostic, P.C.
                                                            409 Virginia Avenue
                                                            Harrisonburg, VA 22802
                                                            540-432-1119
                                                            Fax: 540-433-0929
                                                            Email: rdbostic32@gmail.com
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: CJA Appointment*

**Pending Counts**                                          **Disposition**

18:2251A.F- SELLING OR BUYING OF
CHILDREN - 18:2251(a); 2251(e) -
(11/30/10)                                                  CBOP 360 months to run concurrently;
(1s)                                                        S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (12/09/10) (2s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (12/20/10) (3s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/03/11) (4s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/07/11) (5s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/10/11) (6s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/10/11) (7s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/14/11) (8s)

CBOP 360 months to run consecutively; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/25/11) (9s)

CBOP 360 months to run consecutively; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/27/11) (10s)

CBOP 360 months to run concurrently; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (12/27/10) (11s)

CBOP 180 months to run consecutively; S/R Life; S/A $100.00

18:2251A.F- SELLING OR BUYING OF CHILDREN - 18:2251(a); 2251(e) - (1/12/11) (12s)

CBOP 180 months to run concurrently; S/R Life; S/A $100.00

18:2252A.F - ACTIVITIES RE MATERIAL

CBOP 60 months to run consecutively; S/R Life; S/A $100.00

CONSTITUTING/CONTAINING CHILD
PORNO - 18:2252(a)(1); 2252(b)(1)-
(10/31/11)
(13s)

### Highest Offense Level (Opening)

Felony

| Terminated Counts | Disposition |
|---|---|
| 18:2251.F; 18:2251(a); 18:2251(e) -SEXUAL EXPLOITATION OF CHILDREN (10/11) (1) | Dismissed by superseding indictment. |

### Highest Offense Level (Terminated)

Felony

| Complaints | Disposition |
|---|---|
| 18:2251.F, 18:2251(a) & 2251(e); Sexual exploitation of minor (10/11) | |

### Plaintiff

**USA**                    represented by    **Darcy Fanchon Katzin**
U S DEPARTMENT OF JUSTICE -
CRIMINAL DIVISION
CHILD EXPLOITATION AND
OBSCENITY SECTION
1400 NEW YORK AVENUE NW
WASHINGTON, DC 20530
202-353-3420
Fax: 202-514-1793
Email: darcy.katzin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Spodick Healey**
United States Attorneys Office
Room 104
255 West Main Street
Charlottesville, VA 22902
434-293-4283
Fax: 293-4910
Email: nancy.healey@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/24/2011 | 1 | COMPLAINT as to John Stuart Dowell (1). (kld) [5:11-mj-00132-BWC] (Entered: 10/25/2011) |
| 11/07/2011 | 3 | Rule 5(c)(3) Documents Received from USDC Northern District of California at San Jose as to John Stuart Dowell (jat) [5:11-mj-00132-BWC] |
| 11/29/2011 | 4 | NOTICE OF HEARING as to John Stuart Dowell (custody) Initial Appearance set for 12/1/2011 10:00 AM in Charlottesville before Magistrate Judge B. Waugh Crigler.(jat) [5:11-mj-00132-BWC] |
| 11/30/2011 | 5 | E-Notice Rescheduling Hearing as to John Stuart Dowell previously set for 12/1/11 at 10:00 am before Judge Crigler in C'ville: Initial Appearance RESET for 12/1/2011 02:00 PM in Charlottesville before Magistrate Judge B. Waugh Crigler.(kld) [5:11-mj-00132-BWC] |
| 12/01/2011 | 6 | Minute Entry for proceedings held before Magistrate Judge B. Waugh Crigler: Preliminary Hearing as to John Stuart Dowell held on 12/1/2011, Detention Hearing as to John Stuart Dowell held on 12/1/2011, ( Preliminary Examination Hearing continued to 12/8/2011 09:30 AM in Charlottesville before Magistrate Judge B. Waugh Crigler.) (Court Reporter M. Bottiglieri, FTR) (mab)[5:11-mj-00132-BWC] (Entered: 12/02/2011) |
| 12/01/2011 | 7 | ORDER OF DETENTION PENDING TRIAL as to John Stuart Dowell. Signed by Magistrate Judge B. Waugh Crigler on 12/1/2011. (mab) [5:11-mj-00132-BWC] (Entered: 12/02/2011) |
| 12/01/2011 | 8 | Arrest Warrant Returned Executed on 12/1/2011 in case as to John Stuart Dowell. (mab) [5:11-mj-00132-BWC] (Entered: 12/02/2011) |
| 12/01/2011 | 9 | ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to John Stuart Dowell. Entered by Magistrate Judge B. Waugh Crigler on 12/1/2011. (mab) [5:11-mj-00132-BWC] (Entered: 12/02/2011) |
| 12/01/2011 | | Minute Entry for proceedings held before Magistrate Judge B. Waugh Crigler:Initial Appearance as to John Stuart Dowell held on 12/1/2011 (Court Reporter M. Bottiglieri, FTR) (mab) (Entered: 12/20/2011) |
| 12/02/2011 | 10 | NOTICE OF HEARING as to John Stuart Dowell (custody) Preliminary Hearing set for 12/8/2011 09:30 AM in Charlottesville before Magistrate Judge B. Waugh Crigler.(mab) [5:11-mj-00132-BWC] |
| 12/08/2011 | 11 | Minute Entry for proceedings held before Magistrate Judge B. Waugh Crigler:Preliminary Hearing as to John Stuart Dowell held on 12/8/2011 (Court Reporter M. Bottiglieri, FTR) (mab) [5:11-mj-00132-BWC] |
| 12/08/2011 | 12 | ORAL Order Finding Probable Cause as to John Stuart Dowell. Entered by Magistrate Judge B. Waugh Crigler on 12/8/2011. (mab) [5:11-mj-00132-BWC] |
| 12/08/2011 | 13 | ORDER OF DETENTION PENDING TRIAL as to John Stuart Dowell. Signed by Magistrate Judge B. Waugh Crigler on 12/8/2011. (mab) [5:11-mj-00132-BWC] |
| 12/14/2011 | 14 | INDICTMENT as to John Stuart Dowell (1) count(s) 1. (kld) |

| 12/16/2011 | 16 | PRETRIAL ORDER as to John Stuart Dowell. Signed by District Judge Michael F. Urbanski on 12/16/11. (kld) |
|---|---|---|
| 12/19/2011 | 17 | NOTICE OF HEARING as to John Stuart Dowell Arraignment set for 12/20/2011 09:30 AM in Charlottesville before Magistrate Judge B. Waugh Crigler.(mka) |
| 12/20/2011 | 18 | Minute Entry for proceedings held before Magistrate Judge B. Waugh Crigler:Arraignment as to John Stuart Dowell (1) Count 1 held on 12/20/2011 (Court Reporter Joyce Jones, FTR Recording) (jcj) |
| 12/20/2011 | 19 | ORDER OF DETENTION PENDING TRIAL as to John Stuart Dowell. Signed by Magistrate Judge B. Waugh Crigler on 12/20/11. (jcj) |
| 12/27/2011 | 20 | NOTICE OF HEARING as to John Stuart Dowell (custody) Jury Trial set for 2/23/2012 - 2/24/2012 09:30 AM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 01/13/2012 | 21 | Joint Discovery & Inspection Order Filed as to John Stuart Dowell. Signed by District Judge Michael F. Urbanski on 1/13/2012. (jat) |
| 01/24/2012 | 22 | NOTICE OF ATTORNEY APPEARANCE Darcy Fanchon Katzin appearing for USA. (Attorney was just added to our data base)(jat) |
| 01/30/2012 | 23 | First MOTION to Continue-Ends of Justice for Jury Trial by USA as to John Stuart Dowell. (Attachments: # 1 Text of Proposed Order)(Healey, Nancy) |
| 01/31/2012 | 24 | ORDER granting 23 Motion to Continue-Ends of Justice as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 1/30/2012. (jat) |
| 02/01/2012 | 25 | Notice Rescheduling Hearing as to John Stuart Dowell (custody) previously set for 2/23/2012 - 2/24/2012 at 9:30 a.m. before Judge Urbanski in Harrisonburg: Jury Trial reset for 5/29/2012 - 6/1/2012 09:30 AM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 02/27/2012 | 26 | MOTION to Withdraw as Attorney by Joel Hoppe. by John Stuart Dowell. (Hoppe, Joel) |
| 03/02/2012 | 27 | NOTICE OF HEARING ON MOTION in case as to John Stuart Dowell (custody) 26 MOTION to Withdraw as Attorney by Joel Hoppe. : Motion Hearing set for 3/2/2012 02:00 PM in Charlottesville before Magistrate Judge B. Waugh Crigler.(jat) |
| 03/02/2012 | 28 | CJA 20 as to John Stuart Dowell: Appointment of Attorney R. Darren Bostic.. Signed by Magistrate Judge B. Waugh Crigler on 3/1/2012. (mab) |
| 03/02/2012 | 29 | Minute Order for proceedings held before Magistrate Judge B. Waugh Crigler: granting 26 Motion to Withdraw as Attorney. Joel Christopher Hoppe withdrawn from case as to John Stuart Dowell (1); Motion Hearing as to John Stuart Dowell held on 3/2/2012 re 26 MOTION to Withdraw as Attorney by Joel Hoppe filed by John Stuart Dowell. (Court Reporter Heidi Wheeler.) (hnw) |
| 03/27/2012 | 30 | Joint Discovery and Inspection Order Filed as to John Stuart Dowell. Signed by District Judge Michael F. Urbanski on 3/27/2012. (jat) |
| 04/25/2012 | 31 | Superseding Indictment as to John Stuart Dowell (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s-7s, 8s, 9s, 10s, 11s, 12s, 13s. (mab) |

**5**

| 05/04/2012 | 33 | NOTICE OF HEARING as to John Stuart Dowell (custody) Arraignment set for 5/7/2012 10:30 AM in Charlottesville before Magistrate Judge B. Waugh Crigler.(jat) |
| 05/07/2012 | 34 | Minute Entry for proceedings held before Magistrate Judge B. Waugh Crigler:Arraignment as to John Stuart Dowell (1) Count 1s,2s,3s,4s,5s,6s-7s,8s,9s,10s,11s,12s,13s held on 5/7/2012 (Court Reporter Joyce Jones, FTR Recording) (jcj) (Main Document 34 replaced on 5/8/2012) (jcj). |
| 05/07/2012 | 35 | ORDER OF DETENTION PENDING TRIAL as to John Stuart Dowell. Signed by Magistrate Judge B. Waugh Crigler on 5/7/12. (jcj) |
| 05/09/2012 | 36 | First MOTION to Continue-Ends of Justice for Jury Trial by John Stuart Dowell. (Bostic, Russell) |
| 05/10/2012 | 37 | ORDER granting 36 Motion to Continue-Ends of Justice as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 5/10/2012. (jat) |
| 05/10/2012 | 38 | Notice Rescheduling Hearing as to John Stuart Dowell (custody) previously set for 5/29/2012 at 9:30 a.m. before Judge Urbanski in Harrisonburg: Jury Trial reset for 10/1/2012 - 10/5/2012 09:30 AM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 05/24/2012 | 39 | MOTION to Appoint Expert *in Computer Forensics* by John Stuart Dowell. (Bostic, Russell) |
| 06/01/2012 | 40 | ORDER granting 39 Motion for Appointment of Expert as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 6/1/2012. (jat) |
| 08/27/2012 | 41 | MOTION for Bond by John Stuart Dowell. (Bostic, Russell) |
| 08/29/2012 | 42 | NOTICE OF HEARING as to John Stuart Dowell (custody) Bond Hearing set for 9/5/2012 12:45 PM in Harrisonburg before Magistrate Judge James G. Welsh.(kld) |
| 09/04/2012 | 43 | WITHDRAWAL of Motion by John Stuart Dowell re 41 MOTION for Bond filed by John Stuart Dowell (Bostic, Russell) |
| 09/04/2012 | 44 | Notice of Cancellation of Bond Hrg on 9/5/12 as to John Stuart Dowell(kld) |
| 09/10/2012 | 45 | Notice Rescheduling Hearing as to John Stuart Dowell (custody) previously set for 10/1/2012 at 9:30 a.m. before Judge Urbanski in Harrisonburg: Change of Plea Hearing reset for 10/3/2012 04:00 PM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 10/03/2012 | 46 | Minute Entry for proceedings held before District Judge Michael F. Urbanski:Guilty Plea Hearing as to John Stuart Dowell held on 10/3/2012 Plea entered by John Stuart Dowell (1) Guilty Count 1s,2s,3s,4s,5s,6s-7s,8s,9s,10s,11s,12s,13s. Defendant remanded to USM custody. (Court Reporter Sonia Ferris) (jat) (Entered: 10/04/2012) |
| 10/03/2012 | 47 | Guilty Plea Form as to John Stuart Dowell. (jat) (Entered: 10/04/2012) |
| 10/03/2012 | 48 | Factual Basis - Proffer filed by USA as to John Stuart Dowell. (jat) (Entered: 10/04/2012) |
| 10/04/2012 | | Notice of Appearance - Probation Officer: Mike Sheffield as to John Stuart Dowell (ch) |

**6**

| 10/04/2012 | 49 | Judge Urbanski Sentencing Scheduling Order as to John Stuart Dowell. Responses due by 1/9/2013. Signed by District Judge Michael F. Urbanski on 10/3/2012. (jat) |
| 10/04/2012 | 50 | NOTICE OF HEARING as to John Stuart Dowell (custody). Sentencing set for 1/16/2013 02:00 PM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 11/12/2012 | 52 | Interim MOTION for Attorney Fees. (Bostic, Russell) |
| 11/26/2012 | 53 | MOTION for Psychiatric Exam by John Stuart Dowell. (Bostic, Russell) |
| 11/27/2012 | 54 | ORDER granting 52 MOTION for Interim Attorney Fees as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 11/27/2012. (jat) |
| 12/03/2012 | 55 | ORDER Directing Defendant to File Under Seal the Psychological Evaluation as to John Stuart Dowell. Signed by District Judge Michael F. Urbanski on 12/3/2012. (jat) |
| 12/03/2012 | 56 | Psychiatric Report Received (Sealed) as to John Stuart Dowell (jat) |
| 12/14/2012 | 57 | First MOTION to Continue *Sentencing* by USA as to John Stuart Dowell. (Healey, Nancy) |
| 12/18/2012 | 58 | Sealed Document by dft in support of doc 53 (kld) |
| 12/22/2012 | 59 | MOTION for Extension of Time to File *Objections Letter* by John Stuart Dowell. (Bostic, Russell) |
| 12/26/2012 | | *** CJA 20 Voucher Certified for Payment in case as to John Stuart Dowell for attorney Darren Bostic (swc) |
| 01/02/2013 | 60 | Notice Rescheduling Hearing as to John Stuart Dowell (custody) previously set for 1/16/2013 at 2:00 p.m. before Judge Urbanski in Harrisonburg: Sentencing reset for 3/20/2013 09:30 AM in Harrisonburg before District Judge Michael F. Urbanski.(jat) |
| 01/02/2013 | 61 | ORDER granting in part and denying in part 53 Motion for Psychiatric Exam as to John Stuart Dowell (1)( Psychiatric Exam due by 3/20/2013); granting 57 Motion to Continue as to John Stuart Dowell (1); granting 59 Motion for Extension of Time to File as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 1/2/2013. (jat) |
| 01/14/2013 | 62 | Notice Rescheduling Hearing as to John Stuart Dowell (custody) previously set for 3/20/2013 at 9:30 a.m. before Judge Urbanski in Harrisonburg: Sentencing set for 4/3/2013 09:30 AM - 11:30 AM in Harrisonburg before District Judge Michael F. Urbanski. Sentencing Memorandums due 3/27/2013. (jat) |
| 04/05/2013 | 63 | NOTICE OF HEARING as to John Stuart Dowell (custody) Sentencing set for 7/18/2013 09:30 AM in Harrisonburg before District Judge Michael F. Urbanski. Sentencing Memorandums due 7/11/2013. (jat) |
| 05/17/2013 | 64 | Psychiatric Report Received (Sealed) as to John Stuart Dowell (kld) (Entered: 05/20/2013) |
| 07/02/2013 | 65 | First MOTION to Seal *Psychosexual Evaluation* by USA as to John Stuart Dowell. (Attachments: # 1 Text of Proposed Order)(Healey, Nancy) |
| 07/03/2013 | 66 | ORDER granting 65 Motion to Seal Report of Psychosexual Evaluation as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 7/2/2013. (jat) |
| 07/03/2013 | 67 | Sealed Report of Psychosexual Evaluation filed by USA. (jat) |

| 07/11/2013 | 68 | SENTENCING MEMORANDUM by John Stuart Dowell (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Bostic, Russell) |
| 07/11/2013 | 69 | SENTENCING MEMORANDUM by USA as to John Stuart Dowell (Healey, Nancy) |
| 07/12/2013 | 70 | NOTICE of Witnesses and Exhibits (Bostic, Russell) |
| 07/14/2013 | 71 | MOTION to Seal Exhibit by John Stuart Dowell. (Bostic, Russell) |
| 07/15/2013 | 72 | Notice of Correction re 68 Sentencing Memorandum - Sealed Exhibit B in accordance with 18 USC §3509(d)(2). (jat) |
| 07/15/2013 | 73 | ORDER granting 71 Motion to Seal Exhibit B to defense Sentencing Memorandum as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 7/15/2013. (jat) |
| 07/17/2013 | 74 | Letter for Exhibit C to Sentencing Memorandum as to John Stuart Dowell (Bostic, Russell) |
| 07/17/2013 | 79 | SENTENCING EXHIBIT LIST as to John Stuart Dowell. (Attachments: # 1 Exhibit Gov 1, # 2 Exhibit Def 1, # 3 Exhibit Def 2, # 4 Exhibit Def 3, # 5 Exhibit Gov 4)(Sealed exhibits located in the Harrisonburg vault) (jat) (Entered: 07/24/2013) |
| 07/18/2013 | 75 | ORDER DIRECTING FORFEITURE OF PROPERTY as to John Stuart Dowell. Signed by District Judge Michael F. Urbanski on 7/18/2013. (jat) |
| 07/18/2013 | 78 | Minute Entry for proceedings held before District Judge Michael F. Urbanski:Sentencing held on 7/18/2013 for John Stuart Dowell (1), Count(s) 1, Dismissed by superseding indictment.; Count(s) 10s, 1s, 2s, 3s, 4s, 5s, 6s, 7s, CBOP 360 months to run concurrently; S/R Life; S/A $100.00; Count(s) 11s, CBOP 180 months to run consecutively; S/R Life; S/A $100.00; Count(s) 12s, CBOP 180 months to run concurrently; S/R Life; S/A $100.00; Count(s) 13s, CBOP 60 months to run consecutively; S/R Life; S/A $100.00; Count(s) 8s, 9s, CBOP 360 months to run consecutively; S/R Life; S/A $100.00. Defendant remanded to USM custody. (Court Reporter Carol Jacobs) (jat) (Entered: 07/23/2013) |
| 07/19/2013 | 77 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to John Stuart Dowell (ch) |
| 07/25/2013 | 80 | JUDGMENT as to John Stuart Dowell (1), Count(s) 1, Dismissed by superseding indictment; Count(s) 10s, 1s, 2s, 3s, 4s, 5s, 6s, 7s, CBOP 360 months to run concurrently; S/R Life; S/A $100.00; Count(s) 11s, CBOP 180 months to run consecutively; S/R Life; S/A $100.00; Count(s) 12s, CBOP 180 months to run concurrently; S/R Life; S/A $100.00; Count(s) 13s, CBOP 60 months to run consecutively; S/R Life; S/A $100.00; Count(s) 8s, 9s, CBOP 360 months to run consecutively; S/R Life; S/A $100.00. Signed by District Judge Michael F. Urbanski on 7/23/2013. (Attachments: # 1 Order of Forfeiture) (jat) |
| 07/29/2013 | 82 | REPLACEMENT CJA 20 as to John Stuart Dowell: Appointment of Attorney Darren Bostic. Signed by District Judge Michael F. Urbanski on 7/25/13. (kld) |
| 08/01/2013 | 83 | NOTICE OF APPEAL - Final Judgment to 4CCA by John Stuart Dowell (Bostic, Russell) |
| 08/07/2013 | 84 | Transmittal of Notice of Appeal as to John Stuart Dowell to 4CCA re 83 Notice of Appeal - Final Judgment to 4CCA<br>NOTE: The Docketing Statement, Transcript Order Form and CJA-24(s) forms (if you |

**8**

| | | |
|---|---|---|
| | | are court appointed counsel) are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24(s) are applicable, complete items 1-14, 18 for each court reporter from whom you wish to order a transcript, and file each one separately in this case with the event *Appeal Transcript - Proposed CJA 24*. The CJA-24 forms will then be processed by the U.S. District Court Clerk's Office. (jat) |
| 08/08/2013 | 85 | NOTICE of Docketing Record on Appeal from USCA as to John Stuart Dowell re 83 Notice of Appeal - Final Judgment to 4CCA filed by John Stuart Dowell. USCA Case Number 13-4576. Case Manager: Amy Carlheim. (jat) |
| 08/08/2013 | 86 | ORDER of USCA Appointing Russell Darren Bostic as attorney as to John Stuart Dowell re 83 Notice of Appeal - Final Judgment to 4CCA. (jat) |
| 08/20/2013 | | *** CJA 20 Voucher Certified for Payment in case as to John Stuart Dowell for attorney Darren Bostic (swc) |
| 08/21/2013 | 87 | Appeal Transcript-Proposed CJA-24 re 83 Notice of Appeal - Final Judgment to 4CCA by John Stuart Dowell (Bostic, Russell) (Additional attachment(s) added on 8/22/2013: # 1 Transcript Order - FTR Recording, # 2 Transcript Order - Carol Jacobs, # 3 Transcript Order - Sonia Ferris) (jat). |
| 08/22/2013 | 88 | Notice of Correction re 87 Appeal Transcript - Proposed CJA-24 - Transcript Order Request not attached to original entry. (Attachments: # 1 Transcript Order - Carol Jacobs, # 2 Transcript Order - Sonia Ferris) (jat) |
| 08/23/2013 | 89 | USCA Appeal Transcript Order Acknowledgment re 83 Notice of Appeal - Final Judgment to 4CCA Court Reporter: FTR. Appeal Transcript due by 9/30/2013. (Attachments: # 1 Transcript order form filed, # 2 CJA 24 voucher for payment of transcript)(jat) |
| 08/23/2013 | 90 | USCA Appeal Transcript Order Acknowledgment re 83 Notice of Appeal - Final Judgment to 4CCA, Court Reporter: Sonia Ferris. Appeal Transcript due by 9/30/2013. (Attachments: # 1 Transcript Order form filed, # 2 CJA 24 Voucher for payment of transcript)(jat) |
| 08/23/2013 | 91 | USCA Appeal Transcript Order Acknowledgment re 83 Notice of Appeal - Final Judgment to 4CCA, Court Reporter: Carol Jacobs. Appeal Transcript due by 9/30/2013. (Attachments: # 1 Transcript order form filed, # 2 CJA 24 Voucher for payment of transcript)(jat) |
| 08/26/2013 | 92 | Judgment Returned Executed as to John Stuart Dowell on 8/16/2013. (jat) |
| 08/28/2013 | 93 | CJA 24 - Request and Authorization for Transcript (14 calendar days Service) by John Stuart Dowell for proceedings held on 10/3/12 reported by Court Reporter Sonia Ferris, OCR before Judge Urbanski. Transcript due by 9/11/2013.. Signed by District Judge Michael F. Urbanski on 8/28/13. (kld) |
| 08/28/2013 | 94 | CJA 24 - Request and Authorization for Transcript (14 calendar days Service) by John Stuart Dowell for proceedings held on 5/7/13 reported by Court Reporter FTR before Judge Welsh. Transcript due by 9/11/2013. Signed by District Judge Michael F. Urbanski on 8/28/13. (kld) |
| 08/28/2013 | 95 | CJA 24 - Request and Authorization for Transcript (14 calendar days Service) by John Stuart Dowell for proceedings held on 7/18/13 reported by Court Reporter Carol Jacobs before Judge Urbanski. Transcript due by 9/11/2013.. Signed by District Judge |

| | | |
|---|---|---|
| | | Michael F. Urbanski on 8/28/13. (kld) |
| 09/06/2013 | 96 | TRANSCRIPT of Proceedings as to John Stuart Dowell for sENTENCING held on 7/18/2013 before Judge Michael F. Urbanski. Court Reporter/Transcriber: Carol Jacobs, Telephone number carolj@vawd.uscourts.gov NOTICE RE REDACTION OF TRANCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/27/2013. Redacted Transcript Deadline set for 10/7/2013. Release of Transcript Restriction set for 12/5/2013. (cj) |
| 09/09/2013 | 97 | Appeal Transcript filed as to John Stuart Dowell for Guilty Plea Hearing for dates of October 3, 2012 before Judge Michael F. Urbanski, re 83 Notice of Appeal - Final Judgment to 4CCA Court Reporter/Transcriber: Sonia Ferris, Telephone number SoniaF@vawd.uscourts.gov 434.296.9284 Ext. 4. NOTICE RE REDACTION OF TRANCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov *Does this satisfy all appellate orders for this reporter? Yes <br><br>* Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/30/2013. Redacted Transcript Deadline set for 10/10/2013. Release of Transcript Restriction set for 12/9/2013. (sf) |
| 09/10/2013 | 98 | TRANSCRIPT of Proceedings as to John Stuart Dowell for Arraignment held on May 7, 2012 before Judge B. Waugh Crigler. Court Reporter/Transcriber: Exceptional Reporting Services, Inc., Telephone number 361-949-2988 NOTICE RE REDACTION OF TRANCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/1/2013. Redacted Transcript Deadline set for 10/11/2013. Release of Transcript Restriction set for 12/9/2013. (slt) |
| 09/24/2013 | | *** CJA 24 Voucher Certified for Payment in case as to John Stuart Dowell for attorney R. Darren Bostic (C. Jacobs, OCR / 267 pgs @ $4.25 / Sentencing hrg.) (slt) |
| 09/24/2013 | | *** CJA 24 Voucher Certified for Payment in case as to John Stuart Dowell for attorney R. Darren Bostic (Exceptional Reporting, transcriber / 4 pgs @ $4.25 / Arraignment hrg.) (slt) |
| 09/26/2013 | 100 | MOTION for Forfeiture of Property by USA as to John Stuart Dowell. (Attachments: # 1 Exhibit A: Declaration of Publication, # 2 Text of Proposed Order : Final Order of Forfeiture)(Healey, Nancy) |

| 10/10/2013 | 101 | FINAL ORDER OF FORFEITURE granting 100 Motion for Forfeiture of Property as to John Stuart Dowell (1). Signed by District Judge Michael F. Urbanski on 10/10/2013. (jat) |
|---|---|---|

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/16/2013 10:08:44 | | |
| **PACER Login:** | lg0335 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:11-cr-00045-MFU |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

AO 91 (Rev. 08/09)   Criminal Complaint

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED *for filing*

# UNITED STATES DISTRICT COURT
### for the
### Western District of Virginia

OCT 24 2011

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 5:11MJ00132 |
| JOHN STUART DOWELL | ) | |
| d.o.b. 4/28/66 | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __between Nov. 2010 and Oct. 2011__ in the county of __Frederick__ in the
__Western__ District of __Virginia__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251(a) and 2251(e) | employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing or having reason to know that such depiction would be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce; which visual depiction was produced or transmitted using materials that had been shipped or transported in or affecting interstate or foreign commerce by any means; or which visual depiction was actually transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. |

This criminal complaint is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Harvey E. Barlow, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____10/24/2011____

_____
*Judge's signature*

City and state: ____Charlottesville, Virginia____    Hon. B. Waugh Crigler, U.S. Magistrate Judge
*Printed name and title*

*[handwritten notation in top right margin]*

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA    )
                               )
         V.               )      Case No. *511 mj 00132*
                               )
JOHN STUART DOWELL      )

## AFFIDAVIT

1.     I, Harvey E. Barlow, being duly sworn, submit this affidavit in search of an arrest warrant for JAMES STUART DOWELL charging him with Production of Child Pornography in violation of Title 18, United States Code, Sections 2251(a) and 2251(e). DOWELL is a white male, who is believed to have a date of birth of April 28, 1966, Social Security Account Number xxx-xx-8035 (the full SSN is known to your affiant), and his last known address was 151 Bohnen Road, Santa Cruz, California. DOWELL is further described as 5' 11", approximately 140 pounds, with blue eyes with short, brown to greying hair.

2.     I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since September 18, 1983. I am currently assigned to the FBI's Richmond Field Office's Winchester, Virginia Resident Agency and have so been assigned since August of 2005. The information in this affidavit is derived from my own investigation and discussions with other sworn law enforcement officers concerning their investigation of child pornography and DOWELL.

3.     On Wednesday, October 19, 2011, I was advised by the FBI's Jacksonville, Florida Field Office of it's recent receipt of a video containing child pornography from a

complainant who alleged the subject in the video was her brother, the victim child was her grand-niece (with a 2007 date of birth) and the scene where the video was produced was a location in Frederick County, Virginia known to the complainant.

4.    On Thursday, October 20, 2011 two members of the Northern Virginia-District of Columbia Internet Crimes Against Children Task Force (NOVA-DC ICAC) and I participated in a conference call with agents from the Jacksonville FBI in order to obtain details of the FBI's interview of the complainant. During the conference call, still screen shoots of the subject and victim, non-pornographic, taken from the video were e-mailed from FBI-Jacksonville to us for later purposes of identification.

5.    On Friday, the NOVA-DC ICAC agents and I received and viewed the video which the complainant had originally provided FBI Jacksonville. The video depicted the individuals the complainant identified as her brother, JOHN STUART DOWELL, and her three year old great niece (NC). We observed on the video the following:

-    The video begins with a blue screen with white lettering reading:
New Stuff 2011
Videos 001-007 Merged
(004 Missing)
This is the only stuff of this
Girl to be made

-    The video appeared to be a series of different scenarios or videos, each scenario noted by a "sessions" or "video" number which appeared on the video. NC wore different clothing during some of the different scenarios and the male shown during each scenario was DOWELL. During some of the scenarios, DOWELL adjusted the recording device apparently for purposes of recording from different angles including recording straight up from between a naked NC's legs and recording her genitalia.

-       The video depicted DOWELL, in several instances, licking NC's anal and vaginal areas and kissing her buttocks and vagina. DOWELL is also shown rubbing NC's vagina with his finger(s) as well as kissing her stomach and chest. DOWELL is also observed sitting with his penis exposed and is heard asking NC to touch it and kiss it.

6       On Friday, October 21, 2011, I spoke with Matt Dunn, a supervisor with Department of Homeland Security's Homeland Security Investigation's (HSI) Cyber Crime Center. Dunn advised me his office was investigating a child pornography video which had been downloaded in August, 2011 in Denmark of "John Doe" committing child pornography. As we spoke his office had been preparing a nation-wide search for a "John Doe" subject for whom Dunn's office had obtained a "John Doe" Federal arrest warrant the prior day for a charge related to transportation of child pornography in foreign commerce. An agent with the NOVA-DC ICAC who had participated in my Thursday conference call with the FBI-Jacksonville and had seen the screen shots of DOWELL, and identified DOWELL as Dunn's John Doe, prompted Dunn's call to me. Dunn described the video downloaded in Denmark, which he also stated was recently publicly available on Internet sites. Dunn described the Denmark video to me and it sounded similar to the Jacksonville video we had viewed.

7.       Following the call with Dunn, NOVA-DC ICAC agents and I went to a Frederick County, Virginia, residence where we met with family members who, after being shown non-pornographic screen images from the video, identified DOWELL and NC as the individuals depicted in the video. These witnesses also identified the rooms depicted in the video as being rooms in that residence. Witnesses took agents to the depicted rooms and also provided articles of clothing which NC had been shown wearing in the video. The undersigned learned that DOWELL had stayed at this residence between in or about November and December 2010 and

15

also in or about January 2011 and in or about July 2011. NC was also present in this residence during those time periods.

8.    Upon returning from the Frederick County residence, the NOVA-DC ICAC agents and I viewed the video which had been delivered by HSI to NOVA-DC ICAC. I observed the video to depict DOWELL and NC in some of the same scenarios I had previously viewed on the video provided by the complainant to the FBI in Jacksonville. The other scenarios which I had not previously viewed on the original complainant's video depicted additional instances of DOWELL performing similar physical acts on NC as depicted in the video received from FBI Jacksonville.

9.    Your affiant has compared the photograph on file for DOWELL's California Driver's License (D1993043) with the video and with the screen shots shown to the witnesses which they had identified as their relative, JOHN STUART DOWELL, and they appear to be the same individual.

10.    Your affiant believes that the aforementioned information constitutes probable cause to believe that JOHN STUART DOWELL produced, sometime in or between November, 2010 and October, 2011, in Frederick County, Virginia, a visual depiction of a minor engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256 which was available on the world-wide web and had traveled in interstate and/or foreign commerce, in violation of Title 18, United

States Code, Sections 2251(a) and 2251(e). It is therefore hereby requested that this Court issue

an arrest warrant for JOHN STUART DOWELL.


Harvey E. Barlow
Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me this _____ day of October, 2011.


Honorable B. Waugh Crigler
United States Magistrate Judge

17

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  5-11-CR-00045-MFU |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Charlottesville, Virginia |
| | ) | |
| JOHN STUART DOWELL, | ) | Monday, May 7, 2012 |
| | ) | |
| Defendant. | ) | (10:39 a.m. to 10:42 a.m.) |


ARRAIGNMENT ON SUPERSEDING INDICTMENT


BEFORE THE HONORABLE B. WAUGH CRIGLER,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

For Plaintiff:          NANCY SPODICK HEALEY, ESQ.
                        United States Attorney's Office
                        255 West Main Street
                        Room 104
                        Charlottesville, Virginia 22902


For Defendant:          RUSSELL DARREN BOSTIC, ESQ.
                        Bostic & Bostic, P.C.
                        409 Virginia Avenue
                        Harrisonburg, VA 22802


U.S. Probation:         David Bean

Court Recorder:         J. Jones

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

1        **Charlottesville, Virginia; Monday, May 7, 2012; 10:39 a.m.**

2                              **(Call to Order)**

3            **THE COURT:**  Let the record reflect that this is

4    *United States of America versus John Stuart Dowell*, 5:11-CR-45.

5    We're here to arraign the defendant on the Superseding

6    Indictment that has been returned against him; is that correct?

7            **MR. BOSTIC:**  Yes, your Honor.

8            **THE COURT:**  Mr. Dowell, raise your right hand.

9        **(Defendant sworn)**

10           **THE COURT:**  All right.  Mr. Dowell, the grand jury

11   for the Western District of Virginia has returned a Superseding

12   Indictment against you and have named you in thirteen counts of

13   this indictment.  Counts One through Twelve charge you with the

14   production of child pornography, each one of which carry with

15   them a minimum mandatory of thirty years up to -- I mean a

16   minimum mandatory of fifteen years, up to thirty years; a

17   $250,000 fine; supervised release; declaration of being a sex

18   offender; and --

19           **MS. HEALEY:**  Also supervised release between five

20   years and life.

21           **THE COURT:**  And supervised release between five years

22   and life.

23           Count Thirteen charges you with transporting child

24   pornography which also carries with it a minimum mandatory of

25   five years up to twenty; a $250,000 fine; supervision from five

EXCEPTIONAL REPORTING SERVICES, INC

**19**

3

1  years to life; and can you advise the defendant of what charges

2  were either added or amended?

3           **MS. HEALEY:**  Your Honor, the original indictment

4  charged one omnibus production charge while the forensic exam

5  is going to be continuing and what this indictment does now is

6  it breaks down into twelve separate counts various production

7  counts -- charges.  The first ten charge the original minor who

8  was referenced in the first indictment.  The -- Counts Eleven

9  and Twelve then reference a second minor girl and, finally, the

10 transportation charge is a new one as well.

11          **THE COURT:**  Now Mr. Dowell, have you had a chance to

12 talk to Mr. Bostic about how you're going to answer or plead to

13 those charges at this time?

14          **THE DEFENDANT:**  Yes.

15          **THE COURT:**  How do you plead?

16          **THE DEFENDANT:**  Not guilty.

17          **THE COURT:**  Okay.  Is there any request for release?

18          **MR. BOSTIC:**  Judge, we'd just like to reserve our

19 right to bring it back before the Court.  We have looked at a

20 couple of different options and we really don't have a good

21 option at this point.

22          **THE COURT:**  Okay.  Well, being no motion, these are

23 presumption offenses.  I'll detain the defendant on the

24 presumption.

25          **MS. HEALEY:**  Thank you, your Honor.

4

1           **MR. BOSTIC:**  Thanks, Judge.

2           **THE COURT:**  Thank you for coming, Mr. Bostic.  Good

3   to see you.

4       **(Voices off the record)**

5       **(Proceeding was adjourned at 10:42 a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

September 1, 2013_

TONI HUDSON, TRANSCRIBER

```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
 2                      Harrisonburg Division

 3

 4   UNITED STATES OF AMERICA,       Criminal No. 5:11cr00045

 5               vs.                 Harrisonburg, Virginia

 6   JOHN STUART DOWELL,

 7                    Defendant.      October 3, 2012

 8               TRANSCRIPT OF GUILTY PLEA HEARING
           BEFORE THE HONORABLE MICHAEL F. URBANSKI
 9                  UNITED STATES DISTRICT JUDGE

10
     APPEARANCES:
11
     For the United States:
12                                   U.S. Attorney's Office
                                     NANCY HEALEY
13                                   255 W. Main St.
                                     Charlottesville, VA  22902
14
                                     U.S. Dept. Of Justice
15                                   DARCY F. KATZIN
                                     1400 New York Ave NW
16                                   Washington, DC 20530

17   For the Defendant:
                                     Bostic & Bostic
18                                   RUSSELL DARREN BOSTIC
                                     409 Virginia Ave.
19                                   Harrisonburg, VA  22802

20   Court Reporter:                 Sonia R. Ferris, RPR
                                     U.S. Court Reporter
21                                   255 W. Main St. Room 304
                                     Charlottesville, VA 22902
22                                   434-296-9284

23

24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

```
 1              THE COURT: Good afternoon.
 2              Please call the case.
 3              THE CLERK:  Yes, Your Honor.
 4              This is Criminal Action 5:11cr000045, the
 5   United States of America vs. John Stuart Dowell.
 6              THE COURT:  Ms. Healey, Mr. Bostic, good
 7   afternoon.
 8              Mr. Dowell, good afternoon.
 9              I understand we're here today for a Rule 11
10   guilty plea hearing; is that correct?
11              MR. BOSTIC:  Yes, sir.
12              MS. HEALEY:  Your Honor, may I put on the
13   record, we also have here Darcy Katzin with the
14   Department of Justice Child Exploitation Section, and
15   she's my co-counsel in this case as well.
16              THE COURT:  Is she down here from
17   Washington?
18              MS. HEALEY:  She is.
19              THE COURT:  Ms. Katzin, nice to see you.
20              MS. KATZIN:  Thank you.
21              THE COURT:  Is it Katzin, K-A-T-Z-E-N?
22              MS. KATZIN:  Z-I-N.
23              THE COURT:  Z-I-N.
24              Nice to see you.
25              Mr. Dowell, would you come to the podium
```

1    with your lawyer, please, so the Court Reporter can hear

2    you?

3              MR. BOSTIC:  Judge, we are going to request

4    that he be allowed to remain at counsel table.  He does

5    have somewhat of a medical condition.  If he's standing

6    for a lengthy period of time, his blood pressure drops

7    and he somewhat gets vertigo.

8              THE COURT:  He may sit down then.

9              Is that better for you, Mr. Dowell?

10             THE DEFENDANT:  Thank you, Your Honor.

11             THE COURT:  I don't want anybody falling out

12   in the courtroom.  It's stressful enough as it is.

13             Now, Mr. Dowell, it's my understanding

14   you're going to plead guilty to certain charges in the

15   indictment today.  Before I call upon you to plead, I

16   must be satisfied that you possess a sufficient

17   understanding of your circumstances so as to make a

18   knowing, voluntary, intelligent, informed plea.  In that

19   regard, I need to ask you certain questions and you need

20   to answer them under oath.

21             Now, during this proceeding, if there's

22   something that I ask or a statement that's made here in

23   open court that you don't understand, you need to let us

24   know you don't understand it.  Okay?

25             THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  Likewise, if there's something
 2    that you disagree with, something you take issue with,
 3    you need to let us know that as well.
 4              Do you understand that?
 5              THE DEFENDANT:  Yes, sir.
 6              THE COURT:  Now, you can talk to your lawyer
 7    in private at any time during this proceeding.  Let me
 8    know, let him know if there's something you don't
 9    understand or you disagree with.
10              Now, if you don't speak up, I'm going to
11    assume that you understand what's going on and that you
12    agree with it.
13              Are we clear on that?
14              THE DEFENDANT:  Yes, sir.
15              THE COURT:  Ask the clerk to administer the
16    oath to the defendant.
17              (Defendant sworn).
18              Now that you have been sworn, do you
19    understand that you must answer all the questions that
20    are posed to you here in open court, truthfully?
21              THE DEFENDANT:  Yes, sir.
22              THE COURT:  And that if you testify falsely,
23    that could be -- could give rise to a later charge for
24    making a false statement or perjury.
25              Do you understand that?
```

 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Now, I need to ask you some

 3    general background questions to make sure you're capable

 4    of entering a knowing, voluntary and intelligent plea.

 5              Tell me your name.

 6              THE DEFENDANT:  John Stuart Dowell.

 7              THE COURT:  Mr. Dowell, how old are you?

 8              THE DEFENDANT:  46.

 9              THE COURT:  How far did you get in school?

10              THE DEFENDANT:  About five years of higher

11    education.

12              THE COURT:  Is that post high school?

13              THE DEFENDANT:  Yes.

14              THE COURT:  Did you get -- do you have an

15    undergraduate degree?

16              THE DEFENDANT:  I did not get my Bachelor's,

17    no.

18              THE COURT:  But you have five years of

19    college.

20              THE DEFENDANT:  Yes.

21              THE COURT:  What field did you study?

22              THE DEFENDANT:  I started in physics and

23    then I moved to psychology.

24              THE COURT:  What's the last school you

25    attended?

```
 1              THE DEFENDANT:  University of Washington.

 2              THE COURT:  In Seattle?

 3              THE DEFENDANT:  In Seattle, Washington.

 4              THE COURT:  You obviously speak English.

 5              THE DEFENDANT:  Yes, sir.

 6              THE COURT:  Where were you raised?

 7              THE DEFENDANT:  In Virginia.  I was born in

 8   Alexandria and I was raised in the Shenandoah Valley,

 9   Stephens City, Virginia.

10              THE COURT:  Did you go to high school there?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  Graduate from high school in

13   Stephens City?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  You obviously understand English

16   when it's spoken to you.

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  Can you read and write English?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  Are you aware of any condition

21   that you have, mental or physical, that would cause you

22   some difficulty in understanding the words as they're

23   spoken here in open court?

24              THE DEFENDANT:  No, sir.

25              THE COURT:  Have you ever been treated for
```

```
 1   mental illness of any kind?

 2             THE DEFENDANT:  Depression and anxiety.

 3             THE COURT:  Are you currently under

 4   treatment for depression and anxiety?

 5             THE DEFENDANT:  No, sir.

 6             THE COURT:  You're not currently taking meds

 7   for that?

 8             THE DEFENDANT:  No.

 9             THE COURT:  When was the last time you

10   received any treatment for depression or anxiety?

11             THE DEFENDANT:  Maybe two years ago.  I saw

12   a psychologist for a year-and-a-half.

13             THE COURT:  Did you discontinue that

14   treatment?

15             THE DEFENDANT:  Eventually, yes.  I ran out

16   of money for it.

17             THE COURT:  Now, do you understand why

18   you're here today?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  You understand you're here to

21   plead guilty to certain charges in an indictment?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Now, have you been diagnosed by

24   any psychiatrist, psychologist, doctor, health care

25   provider with any emotional or mental problem that might
```

USCA4 Appeal: 13-4576    Doc: 24    Filed: 11/22/2013    Pg: 34 of 336
Case 5:11-cr-00045-MFU   Document 97   Filed 09/09/13   Page 8 of 34   Pageid#: 1223

8

1    impair your judgment, interfere with your thinking, make

2    it difficult for you to understand what's going on here

3    today?

4              THE DEFENDANT:  No, sir.

5              THE COURT:  Have you ever been treated for

6    addiction to alcohol or any narcotic drug?

7              THE DEFENDANT:  No, sir.

8              THE COURT:  How are you feeling today?

9              THE DEFENDANT:  Relatively well, considering

10   the circumstances.

11             THE COURT:  Have you taken any medicines,

12   narcotics, alcohol, any kind of substance that would

13   affect your ability to understand what's going on here

14   in the past few days?

15             THE DEFENDANT:  No, sir.

16             THE COURT:  The reason I'm asking these

17   questions is because this hearing is important to you

18   and I want to make sure you're clear-headed, alert and

19   fully aware of what's going on.

20             Do you understand?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Do those words adequately

23   describe how you're feeling today?

24             THE DEFENDANT:  I feel clear-headed, yes,

25   sir.

1            THE COURT:  Counsel, do you believe your

2    client, Mr. Dowell, is capable of entering a knowing,

3    voluntary and intelligent plea?

4            MR. BOSTIC:  Yes, I do.

5            THE COURT:  Do we have a copy of the

6    indictment in front of Mr. Dowell?

7            MR. BOSTIC:  Yes, sir.

8            THE COURT:  Mr. Dowell, do you have it in

9    front of you?

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  Mr. Bostic, would you like to

12    have the indictment read into the record or would you

13    like to waive its formal reading?

14            MR. BOSTIC:  We'd waive the formal reading,

15    Judge.

16            THE COURT:  Mr. Dowell, have you read that

17    indictment?

18            THE DEFENDANT:  Yes, sir, I have.

19            THE COURT:  Have you had a chance to fully

20    discuss the charges in the indictment with your lawyer?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Do you believe you understand

23    the charges in the indictment?

24            THE DEFENDANT:  Yes, sir.

25            THE COURT:  Do you understand the charges in

```
 1    the indictment are felonies?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  Do you understand that by

 4    pleading guilty to Count 1, Count 2, Count 3, Count 4,

 5    Count 5, Count 6, Count 7, Count 8, Count 9, Count 10,

 6    Count 11, 12, 13, that by pleading guilty to those

 7    charges, you understand that you're agreeing that you

 8    did what's charged in those counts?

 9              THE DEFENDANT:  Yes, sir.

10              THE COURT:  I believe this is a superseding

11    indictment, is it not?

12              MR. BOSTIC:  That is correct.

13              THE COURT:  You have the superseding

14    indictment in front of him?

15              MR. BOSTIC:  That is what is here.

16              THE COURT:  Do you have the plea agreement

17    in front of him, Mr. Bostic?

18              MR. BOSTIC:  Judge, there is no plea

19    agreement.

20              THE COURT:  There is no plea agreement.

21              MR. BOSTIC:  There is no plea agreement.

22              THE COURT:  This is a straight-up plea.

23              MR. BOSTIC:  That is correct.

24              THE COURT:  Let me ask you this question,

25    Mr. Dowell.  Has anybody threatened you, coerced you,
```

1    pressured you, forced you to plead guilty to the charges

2    in this indictment?

3              THE DEFENDANT:  No, sir.

4              THE COURT:  Are you pleading guilty to those

5    charges of your own free will?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Are you pleading guilty to those

8    charges because you are, in fact, guilty of what's

9    charged in the indictment?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Has anybody made you any

12   promises of leniency or special treatment if you plead

13   guilty instead of going to trial?

14             THE DEFENDANT:  Yeah -- well, yes, sir.

15   Just for taking responsibility, I was told I might get a

16   three-point reduction.

17             THE COURT:  Right.  You may get some credit

18   under the guidelines for acceptance of responsibility.

19   I understand that.

20             Other than that, has anybody told you that

21   you need to plead guilty instead of going to trial?

22             THE DEFENDANT:  No, sir.

23             THE COURT:  Has anybody threatened you or

24   coerced you to try to get you to drop your right to

25   trial?

```
 1                THE DEFENDANT:  No, sir.

 2                THE COURT:  Now, the offenses to which

 3     you're charged are felonies and if the plea is accepted

 4     and you are adjudged guilty of those offenses, it can

 5     deprive you of valuable civil rights, including the

 6     right to vote, the right to hold public office, the

 7     right to serve on a jury and the right to possess any

 8     kind of firearm.

 9                Do you understand that?

10                THE DEFENDANT:  Yes, sir.

11                THE COURT:  You are a citizen of the United

12     States?

13                THE DEFENDANT:  Yes, sir.

14                THE COURT:  Now, Counts 1 through 13 of the

15     indictment charge you with a number of violations of

16     federal law.

17                Counts 1 through 12 charge violations of

18     Sections 2251(a) and 2251(e), sexual exploitation of a

19     minor.

20                Count 13 charges a violation of 2252(a)(1)

21     and 2252 (b)(2), which involve transportation of child

22     pornography.

23                Do you understand those are the charges

24     against you in this case?

25                THE DEFENDANT:  Yes, sir.
```

1        THE COURT:  Let me ask the United States to

2   go over the charges, the elements of the offense in

3   Counts 1 through 13.

4        The reason I'm doing this, I just want to

5   make sure that your understanding of the charges are

6   consistent with what the United States understands and

7   your lawyer understands.  If you have any questions, let

8   us know.

9        MS. HEALEY:  Yes, Your Honor.

10       Mr. Dowell, you're charged in Counts 1

11  through 12 of sexual exploitation of a minor, something

12  the government refers to as production of child

13  pornography.

14       The elements are as follows:  First, that

15  the defendant employed, used, persuaded, induced,

16  enticed or coerced a minor to engage in sexually

17  explicit conduct, as defined in federal law, for the

18  purpose of producing a visual depiction of such conduct.

19       And secondly, that the defendant or you knew

20  or had reason to know the visual depiction would be

21  transported using any means or facility of interstate or

22  foreign commerce or transported in or affecting

23  interstate or foreign commerce or which visual depiction

24  was transported using any means or facility of

25  interstate or foreign commerce or was transported in or

```
 1     affecting interstate or foreign commerce or which visual

 2     depiction was produced using materials that had been

 3     mailed, shipped or transported in or affecting

 4     interstate or foreign commerce, by any means, including

 5     by computer.

 6             Finally, we'd have to show that this

 7     occurred at least in part in the Western District of

 8     Virginia.

 9             These particular charges carry with them --

10     they each carry with them a mandatory minimum of

11     15 years and up to 30 years in prison; up to a $250,000

12     fine; a period of supervised release no less than five

13     years and up to life; the possibility of restitution;

14     and the possibility of forfeiture.

15             With respect to the final count in the

16     indictment, which is a transportation of child

17     pornography charge, we'd have to show the following:

18     First, the defendant knowingly transported a visual

19     depiction.

20             Secondly, the production of the visual

21     depiction involved the use of a minor engaging in

22     sexually explicit conduct.

23             Thirdly, that the visual depiction is of a

24     minor engaging in sexually explicit conduct.

25             Fourth, that the transportation was done
```

```
 1    using any means or facility of interstate or foreign

 2    commerce or was in or affecting interstate or foreign

 3    commerce by any means, including by computer.

 4             Finally, that this occurred at least in part

 5    in the Western District of Virginia.

 6             This charge carries a mandatory minimum of 5

 7    years and up to 20 years in prison; up to a $250,000

 8    fine; supervised release, again, between five years and

 9    life; and the possibility of restitution and forfeiture.

10             THE COURT:  Do you understand what you're

11    charged with in Counts 1 through 13?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Do you understand what the

14    government would have to prove to get a conviction in

15    Counts 1 through 13?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Have you gone over with your

18    lawyer the elements of these offenses, what the

19    government would have to prove?

20             THE DEFENDANT:  (No response).

21             THE COURT: Have you had a chance to discuss

22    the charges and what the government would have to prove

23    to get a conviction on those charges, with your lawyer?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Now, and you just heard the
```

```
 1    United States explain the penalties that are involved

 2    with these charges.

 3              For Counts 1 through 12, it's imprisonment

 4    for not less than 15, not more than 30 years per count;

 5    and a fine of not more than $250,000; a period of

 6    supervised release of at least five years; and

 7    registration as a sex offender.

 8              As to Count 13, the penalty is mandatory

 9    minimum of five years and not more than 20 if there's no

10    prior conviction for sexual based offenses.

11              Does he have any convictions for prior

12    sexual based offenses?

13              MS. HEALEY:  None known by us.

14              MR. BOSTIC:  No.

15              THE COURT:  The penalties both on Counts 1

16    through 12 and on 13 go up even higher if there was a

17    prior conviction for a sexual based offense.  But

18    counsel indicates that's not applicable in this case.

19              Now, there are forfeiture provisions.  In

20    other words, materials that are used, child pornographic

21    material, materials that are used, any visual depictions

22    that are unlawful, can be forfeited, as well as property

23    traceable to gross proceeds obtained from the offense or

24    property used in connection with the offense.  Also,

25    there can be a money judgment as well.
```

```
 1              There is a number of computer equipment and

 2    cameras that are set forth.  I take it those are in the

 3    notice of forfeiture in the indictment?

 4              MS. HEALEY:  Yes, Your Honor, and those are

 5    what we would be seeking forfeiture of in this

 6    particular case.

 7              THE COURT:  There's also a special

 8    assessment of $100.

 9              The penalties, Mr. Dowell, for these various

10    charges, are severe.  Do you believe you understand what

11    the penalties are?

12              THE DEFENDANT:  Yes, sir.

13              THE COURT:  Have you talked with your lawyer

14    about them?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  Do you understand these

17    penalties are the consequences of a plea of guilty in

18    this case?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  You've gone over those with your

21    lawyer.

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  Now, the Court, in imposing a

24    sentence in this case, if the Court accepts your guilty

25    plea, will -- we will not know what the sentence to be
```

1    obtained today.  That will be done at a later day, in

2    January, after a pre-sentence report is prepared.  The

3    Court will take the information contained in the

4    pre-sentence report and will do some calculations under

5    the Advisory Sentencing Guidelines and then we'll apply

6    some statutory factors to those guidelines.

7            Have you talked with your lawyer about the

8    Advisory Sentencing Guidelines and how they may impact

9    your case?

10            THE DEFENDANT:  Yes, sir, I have.

11            THE COURT:  Have you talked with your lawyer

12    about the sentencing process?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  You'll be given a chance after

15    today to talk to probation.  Probation will get

16    information from you.  Your lawyer may be present.

17    They'll get information from the United States.  They'll

18    create a pre-sentence report.  That pre-sentence report

19    will be given to you.  You've have a chance to object to

20    it, make any corrections.  The Court will get it and

21    I'll use that, along with sentencing memorandum I get

22    from the United States and from your lawyer, to begin

23    the assessment of the appropriate sentence in this case.

24            Now, as I told you earlier, the starting

25    point these days under the law is the Advisory

1    Sentencing Guidelines.  We won't know today how the

2    guidelines apply in your case because probation hasn't

3    done a pre-sentence report and I haven't calculated the

4    guidelines.  You may have talked to your lawyer about

5    how they shake out in your case, but the guidelines that

6    are applied in your case and the sentence that you

7    ultimately receive in your case has not been determined.

8    So the sentence may be greater than what you expect.

9              Do you understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  The Court will not, under normal

12   circumstances, allow you to withdraw a guilty plea

13   simply because the sentence is greater than you expect.

14             Do you understand that.

15             THE DEFENDANT:  I do, sir.

16             THE COURT:  When I do sentence you, if the

17   plea is accepted, I will consider the nature and

18   circumstance of the offense. I will consider things

19   about you, your history, your characteristics. And I

20   will consider more generalized considerations, such as

21   deterrence, both as to you, to keep you from committing

22   future crimes, to protect the public, and to deter

23   others from committing such crimes.  I will consider the

24   need for the sentence imposed to reflect the seriousness

25   of the offense, to promote respect for the law, to

USCA4 Appeal: 13-4576    Doc: 24    Filed: 11/22/2013    Pg: 46 of 336
Case 5:11-cr-00045-MFU   Document 97   Filed 09/09/13   Page 20 of 34   Pageid#: 1235

20

 1   provide just punishment.  I will consider the

 2   guidelines, the kinds of sentences available and the

 3   need to avoid unwarranted sentencing disparities.

 4          Now, I say that all to you because that will

 5   come later on, but we will -- that will come at

 6   sentencing.  But again, if I accept your guilty plea

 7   today, regardless of what you're thinking as to what

 8   your sentence may be, the sentence in this case is up to

 9   the Court and you're not going to be allowed to withdraw

10   your guilty plea.

11          Do you understand?

12          THE DEFENDANT:  I do, sir.

13          THE COURT:  Do you understand that if the

14   sentence is more severe than you expect or has been

15   estimated by your counsel, you will still be bound by

16   your plea and have no right to withdraw it?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Do you understand in the federal

19   system, there's no parole?  In other words, if I

20   sentence you to a period of imprisonment, you will serve

21   that entire term, less any good time credit earned.  In

22   other words, there's no early out.  There's no parole

23   parole board that gives you an early out.  Do you

24   understand that?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  If you are sentenced to a period

2    of incarceration, it will be followed by a period of

3    supervised release.  If you violate the terms and

4    conditions of supervision while you're on supervised

5    release, you can be subjected to additional penalties,

6    including incarceration.  In other words, if I sentence

7    you to a period of years and thereafter you get out, you

8    will be on supervision and the conditions will be things

9    like you cannot break the law, you cannot possess a

10   firearm, you cannot use illegal drugs.  In your

11   particular case, given the nature of the conviction,

12   there will be rather rigid conditions with regard to

13   what you can and can't do, what your -- with regard to

14   your ability to be around children, those kind of

15   things. They're called tiered sex offender conditions.

16          My point of that is, if you violate any of

17   those conditions, you can be put in jail for an

18   additional period of time, even if you already served

19   the entire sentence I have sentenced you to.

20          Do you understand that?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Now, you're giving up your right

23   to trial by jury.  By pleading guilty, there will be no

24   trial.  Normally, you would have a right to have 12

25   folks sitting in that jury box to see whether the

 1    government has proved its case beyond a reasonable

 2    doubt, but you're giving that up by pleading guilty.

 3              You're giving up your right to the

 4    assistance of counsel in your defense.

 5              You're giving up your right to see, hear,

 6    cross-examine the government's evidence.

 7              You're giving up the right to use the

 8    subpoena power of the Court to bring documents and

 9    things here to assist in your defense.

10              You're giving up your right to remain silent

11    and not have that silence used against you.

12              If you persist in this plea of guilty in

13    this case, there will be no trial and you are waiving

14    your right to a jury trial.

15              Do you understand that?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  Now, understanding the right to

18    jury trial that you are waiving if you plead guilty, do

19    you still intend to do so?

20              THE DEFENDANT:  Yes, sir.

21              THE COURT:  Are you fully satisfied with the

22    advice and representation given to you by your lawyer in

23    this case?

24              THE DEFENDANT:  Yes, I am, Your Honor.

25              THE COURT:  Anything you want to tell me

1    before we continue?

2              THE DEFENDANT:  No, sir.

3              THE COURT:  Ask the United States to present

4    the facts it would be prepared to prove were this case

5    to go to trial.

6              MS. HEALEY:  Your Honor, we have prepared a

7    written statement of facts, which I believe the

8    defendant has signed.  Does the Court wish for me to

9    read it out loud?

10             THE COURT:  The reason I do this, Mr.

11   Dowell, is because I want to hear it in open court and I

12   want you to hear it as well and I want to -- because if

13   there's something in here you don't agree with or is not

14   right, you can let us know.  Okay?

15             MS. HEALEY:  Thank you, Your Honor.

16             In late 2010 and early 2011, the defendant,

17   John Stuart Dowell, stayed at a residence in Frederick

18   County, Virginia, where two young girls, who were then

19   approximately three and five years old were living,

20   among others. During this stay, Dowell sexually molested

21   the three-year-old girl on numerous occasions and

22   videotaped several instances of this abuse.  Dowell

23   additionally made two films that focused on the

24   five-year-old girl's genitals.

25             Law enforcement officers first learned about

1    some of these crimes when they obtained copies of some

2    of the videos depicting the youngest girl, in two ways.

3    First, in August, 2011, the Bureau of Immigration and

4    Customs Enforcement, otherwise known as ICE, was

5    informed by Interpol that Danish law enforcement had

6    downloaded sexually explicit video clips depicting the

7    girl and Dowell from the Internet.  While Dowell's

8    identity was then unknown, it appeared he and the victim

9    were both United States citizens.  The clips contained

10   audio and there were items in the clips that suggested

11   that they were filmed in the United States.

12           ICE obtained a "John Doe" warrant and began

13   on working to identify the adult male in the videos, as

14   Dowell.  At approximately the same time, a relative of

15   Dowell's who resided in Florida turned over a copy of at

16   least some of the same or similar video clips to the

17   Federal Bureau of Investigation, FBI, and identified

18   Dowell, the minor victim, and the residence in Frederick

19   County that is depicted in the video.  The information

20   provided by this relative led to Dowell's arrest in

21   California on October 21st, 2011, where he had been then

22   residing.

23           Prior to arresting the defendant, law

24   enforcement officers observed him with a laptop on his

25   lap and his pants down around his ankles.  Investigators

1    recovered several computers and a camera that belonged

2    to him.

3              A Department of Justice computer forensic

4    examiner from the High Tech Investigative Unit, HTIU, of

5    the Child Exploitation and Obscenity Section examined

6    the recovered digital evidence.  The review revealed

7    multiple videos produced by the defendant which depict

8    the primary three-year-old victim engaging in sexually

9    explicit conduct.  Various videos show the defendant

10   touching the girl's genital area, licking and kissing

11   her genital area, and licking and kissing her buttocks

12   and anus.  The girl referred to the defendant's acts of

13   licking her essentially as "drinking" her body parts.

14   The defendant is seen on one video with his penis

15   displayed and engaging in conversation with the girl

16   about her touching his penis and telling her she could

17   "drink" his penis, too.  Dowell touches and strokes his

18   penis during this video.  Metadata from the videos

19   establishes that the different counts set forth in the

20   superseding indictment are based on separate acts of

21   production.

22             The HTIU examination revealed two notable

23   videos depicting a five-year-old girl, during which

24   Dowell focused on the girl's genital area as, referenced

25   above.  One video shows the defendant focusing on this

1    other girl's clothed, with underpants, genitals.  The

2    second video shows him pulling down the girl's

3    underpants to focus on her genital area.

4            Metadata indicated that the videos were

5    produced using a Canon camera that was consistent with

6    the Canon camera that was recovered from Dowell at the

7    time of his arrest in California.  The Canon camera was

8    manufactured outside of Virginia.  The metadata also

9    provided information concerning the approximate dates

10   and times when the various films were produced.  These

11   dates were consistent with the information received

12   during the investigation concerning when the defendant

13   temporarily resided in the Frederick County home where

14   the films were produced.

15           Investigators visited the Frederick County

16   residence and confirmed it was the same residence

17   depicted in the video clips. They also obtained some

18   articles of clothing from the residence that matched

19   what the younger victim was wearing in some of the

20   videos.  They also met the minor victims.  The minors'

21   parents confirmed the time period Dowell stayed at the

22   residence and explained the circumstances surrounding

23   the sexual abuse, e.g., that Dowell had been left alone

24   with the minors at times.

25           The forensic analysis also revealed programs

1     that allow users to create and edit videos and also

2     revealed a large number of other non-self produced child

3     pornography images and videos.  The transportation of

4     child pornography charge was essentially based on the

5     transportation of the self-produced child pornography

6     from the Western District of Virginia to California.

7              Just as a caveat, obviously we can't charge

8     possession of the images in California.

9              The video clips that were found on the

10    Internet, which are a small subset of the depictions

11    produced by the defendant, are described in more detail

12    below.

13             The video begins with white text on a blue

14    screen.  It reads, "New Stuff, 2011.  Videos 001 to 007

15    Merged," and in parentheses, "004 Missing." "This is the

16    only stuff of this girl to be made."

17             The video begins with the minor girl lying

18    on a bed.  She is lying on her stomach and is naked from

19    the waist down.  Dowell can be seen holding and moving

20    the camera, recording the video.  Dowell begins licking

21    the minor's anal area and kissing her buttocks while

22    periodically moving the camera for filming from a

23    different angle.

24             The minor then stands on the bed and turns

25    around to expose her vaginal area.

1   The minor gets off the bed and lies down on

2   her stomach on the floor, still nude from the waist

3   down.  Dowell begins licking her anal area again.  He

4   then tells her to turn over and he begins intermittently

5   licking her vaginal area and rubbing her vagina with his

6   finger, as well as kissing her stomach and chest.

7   They move from the floor and Dowell moves

8   the camera.  The minor is now fully dressed.

9   Dowell is sitting down with his penis

10  exposed.  He suggests that the minor touch it and kiss

11  it.

12  They then move to the floor again, Dowell

13  carrying the camera, and the minor lies down on her

14  stomach.  Dowell pulls her pants and underwear down and

15  begins licking her anal area and kissing her buttocks

16  again.

17  The video then cuts to the same minor

18  wearing a blue dress. She pulls down her underwear to

19  her knees and lifts her dress to expose her vaginal

20  area. Dowell takes her underwear off of one leg and

21  spreads her legs. He positions the camera to film her

22  vaginal area and begins intermittently licking her

23  vaginal area, kissing her stomach and kissing her thigh.

24  The video cuts to the camera moving and

25  filming the minor lying on her back with her legs spread

1   to expose her genital area.  She has the same blue dress

2   on, but it is pulled up to her chest.  Dowell again

3   begins to intermittently lick her vaginal area and kiss

4   her legs. He then directs her to put her legs up and

5   begins licking her anal area and vaginal area.

6           Dowell then directs the girl to get up on

7   her knees.  She is then on her knees with her head lying

8   on a pillow.  He moves the camera to film her anal and

9   vaginal areas from behind.  He then begins kissing and

10  licking her vaginal and anal areas.  The video moves in

11  a manner that indicates Dowell is holding or moving the

12  camera the entire time.

13          The video cuts to the minor in a pink dress

14  with pink underwear. Dowell maneuvers her so he can film

15  her underwear.  He lays her down and lifts her dress to

16  expose her underwear.  He then begins rubbing her vagina

17  over her underwear.  He then runs his hands over her

18  underwear and up and down her torso and legs.

19          The video then cuts to the minor in pajamas.

20  Dowell helps her remove her clothing. He then places the

21  camera so it is filming from the floor.  He maneuvers

22  the minor so he can film her anal and vaginal areas from

23  below while she was standing.

24          Other videos that were found during the

25  forensic analysis show similar activity.  On all videos,

1    the defendant's face is clearly visible and there's no

2    question that Dowell produced the films and was the man

3    depicted in engaging in sexual acts with the victims.

4            The forensic analysis revealed that the

5    videos charged in each count of the indictment depict

6    the conduct that is described in these charges.

7            THE COURT:  Thank you, Ms. Healey.

8            Mr. Bostic, is that statement of facts

9    consistent with your understanding of the facts

10   applicable to this case?

11           MR. BOSTIC:  Judge if I could address two

12   minor matters of wording?

13           THE COURT:  All right.

14           MR. BOSTIC:  First, on the very first

15   paragraph, I believe it would be the second sentence.

16   It states "during this state, Dowell sexually molested a

17   three-year-girl on numerous occasions and videotaped

18   several incidents of this abuse."

19           When I was speaking with Mr. Dowell, we

20   would actually state any sexual abuse was videotaped.

21   It was not like there was other occasions and then just

22   a small subset or small group that was videotaped.

23           That was the first change.

24           The second one, I guess, is a matter of

25   wording, which is at the very top of page three, which

```
 1   would be the second line.  It states "Dowell touches and

 2   stroke his penis during this video."

 3                My client wanted to make it clear, there was

 4   no masturbation.  He did have a finger on his flaccid

 5   penis. He was not erect at that time, but it was not as

 6   if he was masterbating.

 7                We wanted to make that for clarification

 8   purposes.

 9                THE COURT:  Mr. Dowell, you just heard a

10   summary of the evidence against you and with those

11   corrections made by your lawyer, did you hear anything

12   in that summary with which you disagree?

13                THE DEFENDANT:  No, sir.

14                THE COURT:  Did you read the written

15   statement of facts?

16                THE DEFENDANT:  Yes, I did.

17                THE COURT:  Did you have a chance to go over

18   it with your lawyer?

19                THE DEFENDANT:  Yes, I did.

20                THE COURT:  Is there anything in this

21   written statement of facts with which you disagree?

22                THE DEFENDANT:  No, sir.

23                THE COURT:  Did you sign it?

24                THE DEFENDANT:  Yes, sir, I did.

25                THE COURT:  Does your signature indicate
```

```
1    that you agree that you did what's set forth in this

2    statement of facts?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Did you, in fact, in Virginia,

5    engage in the conduct set forth in the statement of

6    facts with these small children and videotape it?

7              THE DEFENDANT:  Yes, sir, I did.

8              THE COURT:  Are you, in fact, guilty of

9    what's charged in Counts 1 through 13 of the indictment?

10             THE DEFENDANT:  Yes, Your Honor, I'm guilty.

11             THE COURT:  Are you pleading guilty of your

12   own free will?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Counsel, based on your

15   investigation of the facts of this case, your

16   understanding of your client, what took place in

17   connection with the indictment, do you believe your

18   client's plea of guilty is well advised and consistent

19   with those facts?

20             MR. BOSTIC:  Yes, sir.

21             THE COURT:  Mr. Dowell, as to Counts 1

22   through 13, inclusive of this indictment, how do you

23   plead?

24             THE DEFENDANT:  Guilty.

25             THE COURT:  Listen to the clerk while she
```

1    reads you the written guilty plea form.

2              (Guilty plea form read).

3              THE CLERK:  Is this correct?

4              THE DEFENDANT:  Yes, ma'am.

5              (Guilty plea form executed).

6              THE CLERK:  Your Honor, the guilty plea form

7    has been executed.

8              THE COURT:  It is the finding of the Court

9    in the case of United States vs. John Stuart Dowell,

10   that Mr. Dowell is fully competent and capable of

11   entering an informed plea, that he's aware of the nature

12   of the charges and the consequences of his plea.  His

13   plea of guilty to Counts 1 through 13, inclusive, of the

14   indictment is knowing and voluntary -- rather, the

15   superseding indictment -- is knowing and voluntary and

16   supported by an independent basis in fact as to each of

17   the essential elements of the offense.

18             Mr. Dowell, I accept your guilty plea as to

19   all counts and I find you guilty of all 13 counts of the

20   indictment.

21             A written pre-sentence report will be

22   prepared by the probation office to assist me in

23   sentencing. You'll be asked to give information for the

24   report.  You may be present if you wish.  Your lawyer

25   may be present if you wish.

1          The Court will permit the defendant and

2   counsel to read the pre-sentence report before the

3   sentencing hearing.

4          You and your counsel will be given the

5   opportunity to object to and address any objections at

6   sentencing.

7          Any victims will be afforded an opportunity

8   to be heard at sentencing.

9          I refer the matter to the probation officer

10  for the preparation of a pre-sentence investigation

11  report.

12         Sentencing is set for January 16th, 2013, at

13  two o'clock.

14         I remand the defendant to the custody of the

15  United States Marshal pending sentencing.

16         Anything further I need to do for the

17  parties at this time?

18         MS. HEALEY:  No, Your Honor.

19         MR. BOSTIC:  No, Your Honor.

20         THE COURT:  Mr. Bostic, thank you.

21         Ms. Healey and Ms. Katzin, thank you.

22         Mr. Dowell, I'll see you in January.

23  "I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled
24  matter.

25
    /s/ Sonia Ferris                    September 9, 2013"

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF VIRGINIA
 2                       HARRISONBURG DIVISION

 3    UNITED STATES OF AMERICA,

 4                         Plaintiff,
                                           No. 5:11-CR-45
 5         vs.                             Harrisonburg, Virginia
                                           July 18, 2013
 6    JOHN STUART DOWELL,

 7                         Defendant.

 8              TRANSCRIPT OF SENTENCING PROCEEDINGS
             BEFORE THE HONORABLE MICHAEL F. URBANSKI
 9                UNITED STATES DISTRICT JUDGE.

10    APPEARANCES:

11    For the Government:

12    NANCY SPODICK HEALEY          DARCY FANCHON KATZIN
      US Attorneys Office           US Dept. of Justice
13    Room 104                      Criminal Division
      255 West Main Street          Child Exploitation and
14    Charlottesville, VA 22902       Obscenity Section
      434-293-4283                  1400 New York Avenue NW
15                                  Washington, DC 20530
                                    202-353-3420
16

17    For the Defendant:

18    RUSSELL DARREN BOSTIC
      Bostic & Bostic, P.C.
19    409 Virginia Avenue
      Harrisonburg, VA 22802
20    540-432-1119

21    Court Reporter:    Carol Jacobs, Official Court Reporter
                         Registered Diplomate, Realtime Reporter
22                       U.S. District Court
                         1101 Court Street
23                       Lynchburg, VA 24504
                         434-847-5722, ext. 3
24
          Proceedings recorded by mechanical stenography;
25    computer-assisted transcription.
```

```
 1          (Call to Order of the Court at 10:10 a.m.)
 2              THE COURT:  Good morning.  Please call the case.
 3              THE CLERK:  Yes, Your Honor.  This is Criminal
 4     Action No. 5:11-CR-00045, United States of America versus
 5     John Stewart Dowell.
 6              THE COURT:  All right.  Good morning.  Let me see
 7     counsel.
 8              (At sidebar.)
 9              THE COURT:  On the issue of audio, okay, is there
10     -- I'm told -- I don't want to close the courtroom unless I
11     have to.  I'm told there's no way to shut off the speakers
12     that are out there in the public area.  I wanted to do that,
13     but we can't do that.  So is there a need to play the audio?
14              MS. KATZIN:  Well, in terms of really clearly
15     demonstrating the grooming process that was at play -- you
16     know, initially the child, when he pulled down her
17     underpants, "Stop it.  Why are you pulling down my
18     underpants," that sort of thing.  And then in later videos,
19     when you see them chronologically, she is initiating the
20     conduct and saying, "Drink my body," things like that.  So
21     the videos demonstrate that.  And, in addition, in terms of
22     evidence informing as to the vulnerable victim, just
23     hearing --
24              THE COURT:  No, I understand that issue.  I'm just
25     trying to figure out what makes sense.  I don't -- the
```

```
 1   Court's concern is identification of a minor victim.  And I
 2   don't want -- I don't want someone to be able to identify
 3   this minor victim from their voice.  I don't know -- I
 4   haven't seen these.  I don't know whether they mention name
 5   in any respect.
 6            MS. KATZIN:  No.
 7            THE COURT:  They do not?
 8            MS. KATZIN:  I can't specifically remember if he
 9   ever says his name, but her name is not mentioned.
10            MS. HEALEY:  That's true.  I don't think he ever
11   says her name.
12            THE COURT:  Does she say like "XXXXX" or anything
13   like that?
14            MS. KATZIN:  No.
15            MS. HEALEY:  Just "John."
16            THE COURT:  All right.  What do you-all think is
17   appropriate, given this issue?
18            MS. KATZIN:  You mean for closing the courtroom or
19   not?
20            MR. BOSTIC:  I don't have any problems closing the
21   courtroom.
22            THE COURT:  Mr. Bostic, do you have any issue with
23   that?
24            MR. BOSTIC:  No.
25            MS. KATZIN:  Then I think that's the safest.
```

```
 1              THE COURT:  All right.  I'm going to do that.  I'm
 2   going to close the courtroom just during the playing of the
 3   video.  Can we do that all at one time so that we don't --
 4              MS. HEALEY:  Yeah.
 5              MS. KATZIN:  Yeah, it doesn't --
 6              THE COURT:  All right.  Let's do that.  Just let me
 7   know before that and I'm going to get everybody to leave.
 8              MS. KATZIN:  Right at the end of the forensic
 9   examiner's testimony.
10              THE COURT:  Okay.  I don't want to do that, but I
11   think it is the most prudent thing to do, to make sure that
12   we guard against any possibility of identification of the
13   minor victim.
14              And we'll do it without objection from the
15   defendant.  Correct?
16              MR. BOSTIC:  That will be good.
17              MS. HEALEY:  We very much appreciate it.
18              THE COURT:  Okay.
19         (End of discussion at sidebar.)
20              THE COURT:  Okay.  Good morning.  We are here for
21   sentencing in this case.
22              Is the United States ready to proceed?
23              MS. HEALEY:  Yes, Your Honor.
24              THE COURT:  All right.  Is the defendant ready to
25   proceed?
```

1          MR. BOSTIC:  Yes, sir.

2          THE COURT:  All right.  Mr. Dowell, do you remain

3    fully satisfied with the advice and representation provided

4    by your counsel in this case?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  Let me recap where we are.  The

7    defendant pled guilty to 13 counts of this indictment.  The

8    first -- Counts One through Thirteen.  The first 12 counts

9    are similar -- actually, the first ten counts involve one

10   victim.  Counts Eleven and Twelve involve another victim.

11   And those are all -- all of those charge the involvement of

12   minors in the production of visual depictions.  And then

13   Count Thirteen is transportation of visual depictions using

14   any means of interstate commerce.

15         A change of plea hearing was held on October 3rd,

16   2012.  The defendant pled guilty to Counts One through

17   Thirteen.  The Court accepted the guilty plea at that time.

18   There's no plea agreement in this case.

19         I have read the presentence investigation report.  I

20   have read the sentencing memorandums in this case.  I

21   thought they were excellently done.  I appreciate all of the

22   time and effort that counsel put into it.  I have read all

23   of the letters that have been provided on behalf of

24   Mr. Dowell.  I have read the victim impact statements that

25   were provided by the United States.  I have read everything

1   that has been filed in this case and looked over the

2   docket.  I have studied the objections to the presentence

3   report.  I have read the case law that relates to these

4   objections concerning -- with regard to the presentence

5   report.  And I assume we will hear a bunch of evidence and

6   argument today on these objections.

7            And so let me just start by asking, has each side

8   had a full and complete opportunity to go over the

9   presentence investigation report?  And -- has the United

10  States done that?

11           MS. HEALEY:  Yes, Your Honor, we have.

12           THE COURT:  And, Mr. Bostic, have you had a chance

13  to go over the presentence investigation report with your

14  client and to prepare appropriate responses and objections?

15           MR. BOSTIC:  Yes.

16           THE COURT:  Okay.  Now, does the United States wish

17  to put on evidence with regard to any of the objections

18  raised in the presentence report before the Court does the

19  guideline calculations?  And just -- just so we're all on

20  the same page, as I see it, the -- and I want you-all to

21  help me if I'm wrong -- the objections fall into a number of

22  categories.  One, there's -- the government believes and

23  -- in the amended presentence report -- and you have seen

24  that amended presentence report; correct, Mr. Bostic?  And

25  you-all have had a chance to go over that?

 1          MR. BOSTIC:  Yes.

 2          THE COURT:  The government objected to the original

 3    presentence report and indicated that a two-level

 4    enhancement should be given under 3A1.1 for a vulnerable

 5    victim, following the Ninth Circuit decision in *United*

 6    *States versus Wright*, 373 F.3d 935, and the Fifth Circuit's

 7    decision in *United States versus Jenkins*, 712 F.3d. 209.

 8    And so there's that issue.  The U.S. objected to that.

 9    Probation amended the presentence report to add that

10    two-level enhancement.  The -- and so I assume we'll hear

11    some evidence and argument on that today.

12          Second -- and that deals with a number of

13    paragraphs in the presentence report.  That deals with

14    paragraph 24, that deals with paragraph 31, that deals with

15    paragraph 38, that deals with paragraph 46, that deals with

16    paragraph 53, that deals with paragraph 60, that deals with

17    paragraph 67, that deals with paragraph 75, and that deals

18    with paragraph 83, deals with paragraph 90.  And I think

19    those are the ones.  Okay?

20          Now -- and it is the same issue as to all -- well,

21    actually -- yeah, it is the same issue as to all of them.  I

22    don't think that issue -- does that issue apply to Counts

23    Eleven or Twelve?  I don't believe so.  There is no

24    vulnerable victim enhancement as to Eleven or Twelve.  It is

25    just One through Ten.

```
1              MS. HEALEY:  That's correct.
2              THE COURT:  And it is in each one of those counts.
3    So that's one issue.
4              The second issue, just so that we're all on the
5    same page, is the enhancement for two levels for
6    distribution.  And that is in Count Thirteen, under
7    paragraph 110.  So we have that issue as well.
8              And then we have the argument that the defendant
9    makes that the enhancement in paragraph 112 and 126 is
10   double counting; the five-level enhancement for each of
11   those is double counting.  And so we have that argument as
12   well.
13             So I want to take up those.  And I also want to
14   hear any other argument that you-all want to make.
15             Mr. Bostic?
16             MR. BOSTIC:  Judge, if I could just address the
17   Court.
18             With respect to the vulnerable victim, that also is
19   in Count Thirteen.  It is paragraph 115.
20             THE COURT:  Oh, I'm sorry.  Hold on.  You bet.  I
21   missed that one.  Thank you, Mr. Bostic.  It is in 115.
22   Yeah, it is in Counts One through Ten and Count Thirteen.
23   It is just not in Eleven and Twelve.  Right?
24             MR. BOSTIC:  (Nods head.)
25             THE COURT:  Okay.  So let's hear evidence on any
```

```
1   and all of these objections, in whatever manner you want to
2   put it on.  And then if there are other objections or other
3   issues you want me to hear evidence on, let's do that.  And
4   then we'll do the argument.  Okay?  Okay.
5              MS. HEALEY:  Your Honor --
6              THE COURT:  So let's hear first from the United
7   States.  Ms. Healey.
8              MS. HEALEY:  Your Honor, we are going to put on
9   evidence relating to what was found in the videos that would
10  address both the distribution issue as well as, to some
11  extent, the vulnerability of the youngest victim, through a
12  forensic examiner.
13             As discussed in chambers, I think the Court's
14  preference is that we put on our witness to testify not only
15  to that but anything else he would have testified to during
16  this hearing, so it will cover other issues.
17             THE COURT:  Sure.  You know, just for the sake of
18  efficiency, so we don't have to have witnesses coming back
19  and forth, put on -- I'm capable of parsing it, so put on
20  whatever evidence you want to put on and we'll go from
21  there.
22             MS. HEALEY:  And that's fine.  Of course, I think
23  probation agrees that both of these enhancements are
24  appropriate.  I did want to state that.
25             THE COURT:  The distribution and the vulnerable
```

```
 1  victim, that's right, they do.
 2          MS. HEALEY:  So to some extent, while it might be
 3  appropriate for Mr. Bostic to go first, we are more than
 4  happy to put our witness on first and then have the defense
 5  witness --
 6          THE COURT:  Let's have the government put on
 7  whatever evidence you want to put on as to these --
 8          MS. HEALEY:  Objections.
 9          THE COURT:  -- the objections.  And then we'll hear
10  from Mr. Bostic as to these objections.  Let's just do it
11  that way, if that suits you.
12          MS. HEALEY:  That's fine.  We will reserve our
13  psychologist for the later argument that has to do with what
14  is a reasonable sentence within --
15          THE COURT:  Under 3553(a), absolutely.
16          MS. HEALEY:  Yes.  Thank you, Your Honor.
17          THE COURT:  Okay.
18          MS. KATZIN:  So the government calls James
19  Fottrell.
20          JAMES FOTTRELL, GOVERNMENT'S WITNESS, SWORN
21          THE COURT:  Good morning, Ms. Katzin.
22          MS. KATZIN:  Good morning, Your Honor.
23          THE COURT:  Good morning, sir.
24          THE WITNESS:  Good morning, Your Honor.
25
```

FOTTRELL - DIRECT

```
1              DIRECT EXAMINATION
2    BY MS. KATZIN:
3    Q.   Good morning, Mr. Fottrell.
4    A.   Good morning.
5    Q.   Can you please state your full name, and spelling it
6    for the record, please?
7    A.   My name is James Michael Fottrell.  The last name is F,
8    as in "Frank," O-T-T-R-E-L-L.
9    Q.   And, Mr. Fottrell, can you tell us where you work?
10   A.   I work at the child exploitation and obscenity section
11   within the Department of Justice in Washington, DC.
12   Q.   And what is your position there?
13   A.   I'm the director of the high technology investigative
14   unit.
15   Q.   And can you tell us what is the high technology and
16   investigative unit?
17   A.   There's a group of computer forensic specialists and
18   digital investigative analysts who work with prosecutors in
19   our office and around the country in conducting computer
20   examination of seized materials, conducting an analysis and
21   writing reports and testifying in court.
22   Q.   And specifically what kind of cases does the child
23   exploitation section and the high tech investigative unit
24   work on?
25   A.   On child exploitation cases and adult obscenity cases.
```

FOTTRELL - DIRECT

1  Q.   And when you say "child exploitation," what kind of
2  child exploitation cases?
3  A.   Typically it is Internet investigations where minors
4  are engaged in sexually explicit conduct with adults and
5  other minors.
6  Q.   So cases involving child pornography?
7  A.   Yes.
8  Q.   And can you briefly describe your duties and
9  responsibilities as the director of the high tech
10 investigative unit?
11 A.   I oversee a number of computer forensic specialists
12 that work for me.  And I am responsible for divvying up
13 assignments and caseload among the people there in my
14 office.  And I kind of coordinate with the trial attorneys,
15 to make sure that all of the cases are handled properly and
16 the assignments are completed in a timely manner.
17 Q.   And do you also conduct forensic examinations yourself?
18 A.   Yes, I do.
19 Q.   How long have you worked at the child exploitation
20 section?
21 A.   About 11 years.
22 Q.   And can you just very briefly summarize your work
23 experience prior to joining the Department of the Justice?
24 A.   Prior to joining the Department of Justice, I worked
25 for the U.S. Customs Service, which became the Immigration

FOTTRELL - DIRECT

 1  Customs Enforcement, doing very similar cases, child

 2  exploitation cases for the U.S. Customs Service, as well as

 3  other crimes, general smuggling crimes, fraud cases,

 4  financial crimes.  So I did a more broad degree of crimes

 5  when I was with the U.S. Customs Service.

 6  Q.   Okay.  And can you tell us what your educational

 7  background is?

 8  A.   I have a bachelor's degree from the State University of

 9  New York at Oswego, in New York.

10  Q.   Have you received specialized training in forensic

11  examination of computers?

12  A.   Yes, I have.

13  Q.   And have you yourself provided training to other

14  forensic examiners as well as law enforcement officers who

15  work on child pornography cases?

16  A.   Yes, I have.

17          MS. KATZIN:  And just in the interests of time, and

18  because I understand that the defense is stipulating to

19  Mr. Fottrell's qualifications as an expert, I'm just going

20  to offer into evidence what has been marked as Government's

21  Exhibit No. 1, which is Mr. Fottrell's curriculum vitae,

22  which lays out all of his experience and training.

23          MR. BOSTIC:  No objection.

24          THE COURT:  All right.  Government Exhibit No. 1

25  will be received without objection.

FOTTRELL - DIRECT

1          (Government's Exhibit No. 1 was marked for

2    identification and received in evidence.)

3    BY MS. KATZIN:

4    Q.   All right.  Mr. Fottrell, in the course of your work at

5    the child exploitation section, have you become familiar

6    with the legal definition of child pornography?

7    A.   Yes, I have.

8    Q.   And, in fact, have you seen child pornography images?

9    A.   Yes, I have.

10   Q.   And do your duties include reviewing collections of

11   images and flagging specific images you believe fit that

12   definition?

13   A.   Yes, they do.

14   Q.   And do you do this on a daily basis?

15   A.   Yes.

16   Q.   Have you previously been qualified as an expert in

17   computer forensic examination in child pornography cases?

18   A.   Yes.

19   Q.   Approximately how many times?

20   A.   Between 20 and 30 times in federal court.

21   Q.   Have you ever been denied qualification as an expert?

22   A.   No.

23          MS. KATZIN:  So I understand there's a stipulation,

24   but I just ask that Mr. Fottrell be deemed an expert in

25   computer forensic examination in child pornography cases.

FOTTRELL - DIRECT

```
 1              MR. BOSTIC:  No objection.
 2              THE COURT:  All right.  Without objection, and
 3     based on review of the evidence that has been presented here
 4     today and the Court's examination of Mr. Fottrell's resume,
 5     Government's Exhibit 1, the Court accepts Mr. Fottrell as an
 6     expert in those areas.
 7              Please proceed.
 8              MS. KATZIN:  Thank you.
 9     BY MS. KATZIN:
10     Q.   Mr. Fottrell, directing your attention to approximately
11     January of 2012, was your high tech investigative unit asked
12     to examine evidence in the case of the *United States versus*
13     *Dowell*?
14     A.   Yes, it was.
15     Q.   And in preparation for this proceeding, did you
16     personally review all of the evidence in the case?
17     A.   Yes, I did.
18     Q.   And did you also familiarize yourself in general terms
19     with the facts of the case?
20     A.   Yes, I did.
21     Q.   What items did you examine which contained evidence
22     that is relevant to this sentencing?
23     A.   There were a number of computer items that were seized
24     in this case.  There was a Gateway laptop computer, a
25     Toshiba laptop computer, and a Western Digital external hard
```

FOTTRELL - DIRECT

1    drive.

2    Q.   And I'm first going to ask you some questions about

3    what was found on those devices.  And then I'll ask you more

4    specific questions about the images that underlie the

5    production counts in this case.

6         So, first, turning to the collection of child

7    pornography.  As part of your examination in this case, did

8    you review the images that the defendant had on his

9    computers and hard drive?

10   A.   Yes.

11   Q.   And did you, in fact, identify child pornography and

12   child erotica images?

13   A.   Yes, I did.

14   Q.   On all three devices that you listed?

15   A.   Yes.

16   Q.   And in looking at the dates associated with those

17   devices, is it fair to say that it appeared that the

18   defendant first had the Gateway laptop, then switched some

19   time in 2011 to the Toshiba laptop, and that the external

20   hard drive spanned his use of both laptops?

21   A.   Yes.

22   Q.   And just for clarification, can you just tell us what

23   an external hard drive is.

24   A.   So the external hard drive is an external stage -- a

25   box, if you will, a small box.  And then you have the

FOTTRELL - DIRECT

1    capability -- you can then plug that thing in by a USB cord
2    or a cable connection to a computer.  And you can view the
3    contents of that hard drive on one computer, and you can
4    unplug it and plug into another computer and then view the
5    contents on another media.  It's a portable storage device
6    that allows me to view the contents of that storage device
7    on multiple computers.
8    Q.   Now, regarding pornographic images that you identified
9    on all three devices -- and first I want to direct your
10   attention to all of the pornography, adult and child
11   alike -- can you approximate what percentage of the total
12   number of images that he had depicted either child
13   pornography or child erotica?
14   A.   Yes.  Approximately 75 percent.
15   Q.   And are you familiar with the term "anime"?
16   A.   Yes, I am.
17   Q.   Can you tell us what is anime?
18   A.   Anime originates from a Japanese term, where it depicts
19   cartoon drawings.  It is not actual pictures.  It is
20   drawings or cartoons that depict minors.  And in this case
21   it is minors engaging in sexually explicit conduct.
22   Q.   And what percentage of all of the images you found were
23   of anime?
24   A.   Approximately 10 percent.
25   Q.   Okay.  So is it fair to say that -- 75 percent plus the

1    10 percent anime, so 85 percent of his collection depicted

2    minors engaged in some sort of sexually -- sexualized image?

3    A.    Yes.

4    Q.    And regarding the child pornography that is 75 percent,

5    can you tell us a corresponding -- an approximate

6    corresponding actual number of images that made up that 75

7    percent?

8    A.    Approximately 70,000 images and videos.

9    Q.    Now, did the defendant have any images of adult

10   pornography on his computers?

11   A.    Yes, he did.   Approximately --

12            THE COURT:   Did you say 70,000 images and videos?

13            THE WITNESS:   Yes, in total.

14            THE COURT:   In total.

15            THE WITNESS:   In total, yes.

16   BY MS. KATZIN:

17   Q.    And regarding adult pornography, what percentage of the

18   collection was adult pornography?

19   A.    Approximately 10 percent was adult pornography.

20   Q.    So 85 plus 10, we're at 95 percent.   Can you tell us

21   what made up the remaining 5 percent of his collection?

22   A.    The remaining 5 percent I would characterize as fetish

23   videos.   And they depicted what are called scat videos and

24   bondage videos.   And basically those would be scatological,

25   where they are incorporating feces into sexual acts, and

FOTTRELL - DIRECT

1  bondage, where people are using whips, chains, or some kind

2  of -- inflicting physical pain on the participants.

3  Q.   And regarding the scat videos, did you identify any

4  videos that appeared to depict the defendant?

5  A.   Yes, I did.

6  Q.   Can you just briefly describe that.

7  A.   There's an image of the defendant -- what appeared to

8  be the defendant basically stripping and laying a clear

9  plastic cloth on a bed and defecating on that clear plastic

10  cloth and rubbing the feces on himself.

11  Q.   Now, in examining the defendant's computers, were you

12  able to determine what at least some of the technologies

13  were that the defendant used to obtain the child pornography

14  and erotica images?

15  A.   Yes.

16  Q.   Can you first just list out those technologies?  Then

17  I'll ask you to explain each of them briefly.

18  A.   Sure.  Usenet newsgroups is one of the technologies

19  that was used.  One second.  BitTorrent is another one.

20  Freenet is another one.  And Tor is another one.  So those

21  are four different Internet technologies that were used to

22  collect child pornography on the defendant's seized

23  materials.

24  Q.   And so first directing your attention to the evidence

25  of Usenet newsgroups, can you tell us what Usenet newsgroups

1  are?

2  A.    Sure.    Usenet newsgroups are a different technology

3  from other types of technologies.    So it is different from

4  websites; it is different from email.

5         And if I could just kind of briefly explain what it

6  is.    The concept of newsgroups is similar to a newspaper,

7  where there is different sections of a newspaper that you

8  can subscribe to.    I might subscribe to the sports section

9  or the national news section.    So a newspaper is divided

10  into a number of sections, just like the newsgroups are

11  divided into a number of sections.    Some of those newsgroups

12  are regarding sports, regarding gardening.    There's 30,000

13  different newsgroups that span the human endeavor.    So

14  there's newsgroups for all different topics that exist,

15  including adult pornography and child pornography.    So

16  there's just lots of different groups that are available

17  through Usenet newsgroups.

18         The other distinction that I want to make with

19  newsgroups is that it is similar to email messages, where

20  email is like I'm communicating from one person to another

21  person, and those are called email messages.    The concept of

22  a newsgroup is anybody can be an author and -- it is called

23  an article.    I could submit an article to a section.    So,

24  for example, if I want to talk about a football team, I

25  would submit an article to a particular newsgroup called DC

FOTTRELL - DIRECT

1   Redskins or whatever it would be called.  And then anybody

2   else who chooses to read that newsgroup or read that section

3   can read those articles.

4        So it is not a one-on-one communication.  It is a

5   one-to-many communication where I post it to a particular

6   topic area, and whoever subscribes to that section of the

7   newspaper can read those articles that are published in that

8   area.

9   Q.  And in addition to posting articles, can one post

10  pictures?

11  A.  Yes.  So predominantly the idea is very similar to

12  newspapers.  Newspapers can include textual material.  And

13  those -- just like an email message, you can include

14  attachments to a textual story.  And those attachments can

15  be pictures, can be videos, can be any kind of computer

16  media.

17       So it is very common on newsgroups where there's -- in

18  some newsgroups there's not a lot of conversations that are

19  going on.  Some newsgroups are just people posting images,

20  posting content to it, especially in child pornography

21  newsgroups.  So there's child pornography newsgroups.

22  There's not a lot of discussion going back and forth; people

23  are just using newsgroups to distribute child pornography

24  images and videos.

25  Q.  And are there search features as part of using

FOTTRELL - DIRECT

1  newsgroups?

2  A.   Yes.   So basically there's search features where you

3  are choosing which newsgroups that you want to receive,

4  which sections of the newspaper are -- so you can look at I

5  want to get the sports section or the adult pornography

6  section or the child pornography section.   So you can search

7  for those newsgroups, specific newsgroups, and then browse

8  the content, and then download the content associated with

9  those particular newsgroups.

10 Q.   And in this case did you find examples of the kinds of

11 groups that the defendant was accessing?

12 A.   Yes.

13 Q.   And can you tell us about that?

14 A.   So there was a number of newsgroups that are named

15 -- some of the names are very generic.   Some of the names

16 are very specific.   So, for example, there's a newsgroup

17 called Glad Models.   And that's a particular website.   And

18 there's certain images that are associated with that

19 website.   People have downloaded those images and they are

20 posting them into that particular area.   So there's a number

21 of different newsgroups where specific content is being

22 located.   Another one that I recall was called BD Company.

23 And BD Company stands for branded dolls.   And that was a

24 commercial child pornography website.   And it is a very

25 specific type of content.   And so people that would be

FOTTRELL - DIRECT

1   posting the material in the BD Company newsgroup are posting
2   the same type of material that was available on the branded
3   dolls website.
4   Q.   And did you find evidence of specific images that the
5   defendant downloaded from some of these newsgroups?
6   A.   Yes.
7   Q.   And did those images include child pornography?
8   A.   Yes.
9   Q.   Now, turning to -- you mentioned BitTorrent was another
10  technology the defendant used?
11  A.   Yes.
12  Q.   Can you please describe what BitTorrent is?
13  A.   So BitTorrent is a relatively new technology, one of
14  the new kids on the block.  It is a very effective
15  technology.  And the idea is, with BitTorrent, it allows me
16  or allows a user to download files not from one person but
17  from multiple people who have that file simultaneously.  So,
18  for example, if a hundred people have a video that is being
19  shared on the BitTorrent network, and I wished to download
20  it, it is going to be very efficient and very quick because
21  I'm not just downloading it from one person; I'm
22  simultaneously reaching out to multiple computers and I'm
23  downloading bits and pieces of it from multiple people
24  simultaneously, and that allows me to download videos or
25  images very quickly.  So BitTorrent is a very high-speed

FOTTRELL - DIRECT

1    protocol that allows me to download content very quickly
2    from multiple locations.
3    Q.   And did you identify specific child pornography images
4    or videos that the defendant had accessed using BitTorrent?
5    A.   Yes.  I found definitely images and videos that were
6    downloaded through BitTorrent and the log records associated
7    with when those file transfers occurred.
8    Q.   And you mentioned Freenet.  Can you describe what that
9    is?
10   A.   So Freenet is a very different -- Freenet has been
11   around for a long time, probably for about 15 years.
12   Freenet is a project -- it was a website, the
13   freenetproject.org, where it's the concept of -- it is an
14   anonymous version of the Internet.
15        So here is this network that exists that allows two
16   things:  It allows individuals, when they are accessing the
17   Internet, to basically do that anonymously.  So it is not
18   really keeping track of their true location.  And then
19   number two part of Freenet is that the websites -- the
20   locations on the Internet that the individuals are going to,
21   it is not -- it is not identifiable where those things
22   physically exist.
23        So Freenet is a separate Internet, if you will, which
24   is very difficult for law enforcement to, A, find where
25   these illegal sites are; and then, number two, where the

FOTTRELL - DIRECT

1    individuals who are accessing these websites are located.

2        So basically I have been aware of a number of Freenet

3    investigations over the years that are very frustrating for

4    law enforcement because we don't have good evidence as to

5    where the sites are located and where the individuals are

6    who are accessing Freenet.

7        So we typically don't proactively learn about those

8    cases.  We learn about them reactively, after a computer has

9    been seized from some other offense, and then we find

10   evidence associated with Freenet, which is what happened in

11   this case.

12   Q.   And in this case did you identify specifically child

13   pornography images that the defendant had accessed using

14   Freenet?

15   A.   Absolutely.  There was websites and there was some

16   sites that were accessed on Freenet.  And there was great

17   transactional log records of that content being downloaded

18   on the defendant's computers.

19   Q.   And finally you mentioned Tor.  What does Tor stand

20   for?

21   A.   Tor stands for The Onion Router.  It is very similar to

22   the Freenet project that I just talked about, but it is its

23   big brother.  So Tor is the big kid on the block right now.

24   There has been a mass migration since 2010 where offenders

25   are using Tor in child pornography investigations.

FOTTRELL - DIRECT

1    And the concept of Tor is -- I'm kind of repeating

2    myself, but it is the same point.  Point one is I'm using

3    -- I download and install the Tor software, and I go to a

4    website, and if that website doesn't have my IP address or

5    any information about where I'm physically located and able

6    to -- if I take down that website, the website doesn't

7    really keep track of my IP address, where I came from.  So

8    I'm being anonymized as I'm passing through the Tor network.

9    That's the first part of the problem.

10    The second part of the problem with the Tor network is

11    the websites themselves are on this Tor network.  So law

12    enforcement does not know geographically where they are

13    located.  So we're involved in a number of websites right

14    now that have child pornography on them, we can access them

15    and see that it is child pornography, but there's no method

16    for law enforcement to track down the location of that

17    website, because it is not referenced by an IP address or

18    any identifier that ties back to where it is physically

19    located.  So it is -- only in a few instance have law

20    enforcement gotten lucky and we are able to identify where

21    those websites were physically located.

22    Q.  And in this case did you find child pornography images

23    that the defendant had accessed using Tor?

24    A.  So I did see the Tor software on the defendant's

25    computer.  And there was saved bookmarks and saved

FOTTRELL - DIRECT

1  references to accessing child pornography websites on the
2  Tor network, yes.
3  Q.   And in addition to these four technologies you have
4  described, did you also find any Google searches relating to
5  child pornography?
6  A.   Yes, I did.
7  Q.   Can you describe that evidence?
8  A.   So there was just some Google searches -- so, for
9  example, one of them was like "underage prostitutes
10  Detroit."  So there was just like specific terms associated
11  with different locations regarding underage, or they might
12  have a certain year, "10YO," ten-year-old, or certain search
13  terms that were related to child pornography terms.
14  Q.   Now, based on all of this evidence of the technologies
15  that the defendant used, are you able to form an opinion
16  regarding how sophisticated a user the defendant was in
17  relation to other cases that you have worked on?  And also
18  tell us the significance of that level of sophistication.
19  A.   This is a very sophisticated offender who is using
20  multiple technologies.  So in some instances -- in the
21  majority of our cases the offenders are only using one
22  technology.  It might be a peer-to-peer technology or a
23  commercial website technology.  Here is an instance where we
24  have multiple technologies, four or five different
25  technologies.  We have newsgroups, which are fairly unknown

FOTTRELL - DIRECT

1   by the general population.  And this is an individual that

2   is using a relatively lesser-known technology.  So

3   newsgroups is a signal of sophistication.

4          What really tips it is both Freenet and Tor.  So

5   those are fairly sophisticated technologies that are used by

6   a more sophisticated offender, A, to hide their identity and

7   to access websites that are difficult for law enforcement to

8   investigate and take down.

9   Q.  Now I want to turn to asking you some questions about

10  the videos that underlie the production counts in this

11  case.

12         THE COURT:  All right.  Before you do that, let me

13  ask you, on BitTorrent -- which I understand is a peer-to-

14  peer network?

15         THE WITNESS:  Correct.

16         THE COURT:  -- was the defendant's sharing feature

17  turned on on BitTorrent?

18         THE WITNESS:  No.  There was no -- there was no

19  evidence of the BitTorrent stuff being shared.  I don't have

20  complete information because there's not transactional log

21  records -- there's not complete transactional log records.

22  What I mean by that is when the videos or images are being

23  downloaded, during that process, even though I don't possess

24  the entire video, let's say I have only downloaded half of

25  it and I'm in the process of downloading the other half,

FOTTRELL - DIRECT

```
 1   during that period I am sharing the half of the file or the
 2   partial file that I possess.  I'm still sharing it with
 3   other BitTorrent members.  But once the download completes
 4   and the person turns off the BitTorrent program, then it is
 5   no longer being shared; it is no longer being distributed.
 6   So it is only being distributed or being available while the
 7   BitTorrent program is active.  It's just the nature of how
 8   the software works.
 9             THE COURT:  So when the defendant is downloading
10   child pornography using BitTorrent, and it is coming from a
11   number of computers --
12             THE WITNESS:  Yes.
13             THE COURT:  -- to make the download fast --
14             THE WITNESS:  Correct.
15             THE COURT:  -- other people can access, through
16   BitTorrent, that same download that he has downloaded -- the
17   piece of the download that he has downloaded?
18             THE WITNESS:  Absolutely correct.  So if he has
19   downloaded the first ten pieces of it and while he's
20   downloading the next ten pieces of it, he's downloading --
21   those first ten ones --
22             THE COURT:  Somebody else can come in BitTorrent
23   and grab them.
24             THE WITNESS:  And those parts as well.
25             THE COURT:  Okay.  All right.  Thank you for that.
```

FOTTRELL - DIRECT

1           Let's -- do any of these mechanisms that you have
2    talked about, any of these -- you know, Freenet and
3    BitTorrent and Tor, was the defendant's -- was he -- I mean,
4    you have talked about him downloading from these sources.
5    Was he making the images, the 70,000 images that he had on
6    his computer, available to others to access?
7           THE WITNESS:  There's much less evidence of that,
8    so I don't have a complete picture.  So there's some
9    evidence of that, but not a lot.  So he's more of a person
10   who is just downloading and receiving stuff.  There's much
11   less evidence of him actually distributing stuff to other
12   people in this particular case.
13          THE COURT:  Well, when you say "much less" --
14          THE WITNESS:  Yes.
15          THE COURT:  -- is there any evidence of him doing
16   that?  I mean, obviously, by the nature of BitTorrent,
17   there's some of that.
18          THE WITNESS:  Right.
19          THE COURT:  But other than BitTorrent, is there
20   evidence in this case that he was distributing child
21   pornography to others?
22          THE WITNESS:  Yes.  I mean, I would answer that
23   question by looking -- by using Freenet as an example of
24   that.  So Freenet, by the fact that you are using Freenet --
25   when I am downloading and installing Freenet, part of that

FOTTRELL - DIRECT

1   agreement is that you are setting aside a certain portion of
2   your hard drive for storage for the Freenet network.  So you
3   have no idea -- you may not know specifically what is being
4   stored on your little segment that you are making available
5   to the Freenet community, but you are.  So you are making a
6   portion of your hard drive available for storage on the
7   Freenet network.
8            THE COURT:  Okay.  All right.  Just so -- you know,
9   just so the Court understands, when you participate in
10  Freenet, part of that participation in Freenet means that
11  part of your hard drive on which this person has images is
12  by definition accessible to others?
13           THE WITNESS:  Yes.
14           THE COURT:  Go ahead.
15           Thank you.
16  BY MS. KATZIN:
17  Q.   All right.  Mr. Fottrell, regarding the videos that
18  form the basis of the production counts in this case, did
19  you review those videos?
20  A.   Yes, I did.
21  Q.   And is it accurate that the creation dates associated
22  with those videos range from November of 2010 through
23  January of 2011?
24  A.   Yes.
25  Q.   And were those videos on the defendant's computers?

FOTTRELL - DIRECT

1    A.   Yes, they were.

2    Q.   Can you tell us -- because you mentioned three devices

3    before, the two laptops and the external hard drive -- which

4    devices did you find these videos on?

5    A.   So they were on the Gateway laptop computer and they

6    were on the external Western Digital hard drive.  But at the

7    point in time where the Toshiba computer was seized, they

8    were not on the Toshiba laptop computer.

9    Q.   But were you able to find evidence on the Toshiba that

10   they had previously been there?

11   A.   Yes.  So there was -- on the Toshiba laptop computer,

12   there's -- Internet Explorer has some logs that indicate

13   that the videos, or certainly those file names of those

14   videos, existed on the Toshiba computer at a prior point in

15   time.

16   Q.   Now, are you aware that a compilation video containing

17   several of these self-produced videos was found by law

18   enforcement on the Internet and turned over to DHS or ICE?

19   A.   Yes.

20   Q.   Have you seen that compilation video?

21   A.   Yes, I have.

22   Q.   And did you look for a copy of that compilation video

23   on the defendant's computers and hard drive?

24   A.   Yes, I did.

25   Q.   And did you find it?

FOTTRELL - DIRECT

1  A.   No, I did not.

2  Q.   Are you aware that the FBI also came into possession of

3  the clips that make up that compilation video?

4  A.   Yes, I am.

5  Q.   Okay.  And so the FBI didn't come into possession of

6  the compilation video itself; is that correct?

7  A.   Correct.  They only have the components, the five or

8  six pieces of the compilation video, not the entire video.

9  Q.   Okay.  And those clips that the FBI came into

10 possession of are the same as the self-produced videos you

11 found on the defendant's computers?

12 A.   Yes.

13        THE COURT:  Do you know how the FBI got access to

14 these clips?

15        THE WITNESS:  No, I don't have that direct

16 information as to how that happened.

17 BY MS. KATZIN:

18 Q.   Well, having familiarized yourself with the facts of

19 the case, have you learned as much as we know about how the

20 FBI got it?

21 A.   Yes.

22 Q.   Can you tell us that?

23 A.   So they -- somebody from the FBI received a piece of

24 media, whether it was a CD or a thumb drive, from a family

25 member, that contained these videos.

FOTTRELL - DIRECT

1   Q.   From the defendant's family member?

2   A.   Yes.

3   Q.   And was that in Florida?

4   A.   Yes.

5   Q.   Okay.

6         THE COURT:  All right.  I'm not sure I understand.

7   Does that mean -- just help me with this.

8         THE WITNESS:  Okay.

9         THE COURT:  You examined these computers and you

10  saw that there were these video clips on there.  Okay.

11        The FBI, therefore, got from a family member in

12  Florida these CDs or thumb drives.  And that is -- those

13  came, obviously, from a computer that was not the

14  defendant's computer; is that correct?

15        THE WITNESS:  I don't have complete information.

16  It may have been the defendant's computer.  It may have been

17  another computer.  I just don't have any information about

18  that.

19        THE COURT:  Okay.  All right.  So the family member

20  may have been, in fact, physically given a thumb drive or a

21  CD by the defendant?

22        THE WITNESS:  Right.

23        THE COURT:  Or the other possibility is the

24  defendant may have transferred those video files over the

25  Internet and the family member may have put them itself on a

1    CD or a thumb drive, correct?

2            THE WITNESS:  Correct.

3            THE COURT:  You just don't know the answer to that

4    question?

5            THE WITNESS:  Yes.

6            THE COURT:  All right.  I'm sorry.

7            MR. BOSTIC:  Judge, I believe there's further

8    information on that.

9            THE COURT:  Well, if they want to put other

10   evidence on, that's fine.  I'm just asking questions.

11           MS. HEALEY:  Your Honor, may I just proffer

12   something, just for the Court's information?

13           THE COURT:  Yes.

14           MS. HEALEY:  The way this case came about were

15   through tips from ICE and from FBI.  As I understand what

16   happened was FBI in Florida got word that a family member, a

17   sibling of the defendant's, had received a copy either of a

18   thumb drive or a disk.  What she told the FBI at that time

19   was that she received -- she was a therapist.  She received

20   it from a patient.  Originally she would not state much more

21   than that.  She said she recognized the people in the

22   videos, both the defendant and the victim in the videos.

23   She also ended up recognizing the location in the videos.

24           Eventually FBI was able to get her to give more

25   -- and the ICAD, was able to get more information from this

FOTTRELL - DIRECT

1    woman about what was depicted, who -- where and who it was

2    that was depicted in the videos.  However, to this date she

3    has refused to give information as to more specifics of how

4    she came into possession of that.

5            Does that make any sense, Judge?

6            I don't think -- do you have any problem with my

7    proffer?

8            MR. BOSTIC:  No.  That is an accurate proffer.  And

9    what I really wanted the Court to be aware, this is not

10   something where Mr. Dowell was sending something over -- to

11   somebody in Florida and that's how it was received there.

12           THE COURT:  Well, I think what the government is

13   proffering and what the witness says is they don't know how

14   the person got it and the government doesn't have any

15   evidence to show that the defendant sent this over the

16   Internet, at least that I have heard.

17           Is that consistent, Mr. Bostic?

18           MR. BOSTIC:  Yes.

19           THE COURT:  Please proceed.

20           MS. KATZIN:  Okay.

21           All right.  So getting to that point with

22   Mr. Fottrell.

23   BY MS. KATZIN:

24   Q.  Did you examine the defendant's computer for any

25   evidence showing whether he had ever uploaded any of these

FOTTRELL - DIRECT

1  self-produced videos to the Internet?

2  A.  Yes, I looked for evidence of that and I did not find

3  any evidence of that.

4  Q.  And can you just briefly tell us where did you look,

5  how did you look, and what did you find?

6  A.  So in this case it was easy; I could search by file

7  name.  So I knew the file names of the components, I had the

8  file name of the video, I could do a search for any

9  information related to those file names and find if it

10 -- and look for instances where it was related to some kind

11 of transactional log record for being uploaded.  For

12 example, an FPT log, an email log, a web server log.  So I

13 was just looking for any kind of evidence associated with

14 file-transfer activity associated with particular file

15 names.  I looked for that and I did not find any evidence of

16 that.

17 Q.  Okay.  And are you aware that the defendant has

18 suggested in this case that either a hacker or a virus that

19 compromised his computer on approximately July 25th of 2011

20 may have been responsible for uploading the self-produced

21 videos to the Internet?

22 A.  Yes, I'm aware of that.

23 Q.  And when you became aware of that, did you examine the

24 computer for evidence to either support or refute that

25 claim?

FOTTRELL - DIRECT

1   A.   Yes, I did.

2   Q.   And can you tell us what did you do and what did you

3   find?

4   A.   So the first thing that I would look at it is -- in a

5   virus analysis, is is there antivirus software on the

6   defendant's computer, how is it configured, is it updated

7   correctly, is it functioning normally.  So that's the first

8   step that I looked for.  In this case there was no antivirus

9   software on the defendant's computer.

10      He did have antimalware software that looks for

11  malicious software, but for some reason there was no

12  antivirus software on the defendant's computer, so there was

13  no records associated with its functionality.

14      The second step that I would take is, taking the

15  defendant's computer, in this case the Toshiba laptop

16  computer, I would use my antivirus software.  So I used

17  Microsoft Security Essentials.  And I updated it with the

18  most recent virus definitions.  And then I scanned the

19  defendant's Toshiba computer, to look for evidence of any

20  viruses as of a more recent point in time, like a month

21  ago.  And I did that.  And in this case I found

22  approximately 29 viruses.  So I did find viruses on the

23  defendant's computer.  A lot of them were related to Java

24  and programming issues.  But there was and I documented in

25  my report all of the instances of the viruses that I found

FOTTRELL - DIRECT

```
 1   on the defendant's Toshiba computer.
 2   Q.   Now, the viruses that you did find, did any of those
 3   viruses have the capability of reaching into the defendant's
 4   computer, taking files and uploading them to the Internet?
 5   A.   No, in my analysis I did not find any evidence of what
 6   their capabilities were.
 7            THE COURT:  You just don't know one way or the
 8   other?
 9            THE WITNESS:  Absolutely correct.  I don't have
10   perfect information -- I don't have complete information to
11   answer that question.
12   BY MS. KATZIN:
13   Q.   But just to clarify, are there viruses out there or
14   hacking capabilities out there that would allow somebody to
15   come into your computer, grab certain files, and remove them
16   to the Internet?
17   A.   Yes.  Yes, there are those types of viruses.  Correct.
18   Q.   And did you find any evidence of any of those kind of
19   viruses?
20   A.   No.
21   Q.   But we also know that shortly after the defense is
22   suggesting the computer was hacked or compromised, there was
23   a CCleaner program that was run on the computer; correct?
24   A.   Yes.
25   Q.   Can you tell us what CCleaner is and what it does?
```

FOTTRELL - DIRECT

1  A.   So CCleaner is a program that is distributed by a

2  company called Puraform.  It's a very popular program.  And

3  what it does is it does a lot of housekeeping utilities for

4  your computer.  It basically deletes and removes temporary

5  files that are used by different programs on your computer.

6      So your web browser creates and stores temporary files,

7  your operating system does.  So there's a number of

8  different locations on the computer where the operating

9  system stores files temporarily.  The CCleaner program

10  deletes them and -- basically identifies those files and

11  deletes them from your computer.

12  Q.   So is it fair to say that that CCleaner program could

13  have deleted whatever evidence there was of a virus or a

14  hacking attack, if that had happened?

15  A.   Yes.  So typically in virus instances, the most common

16  way that a virus gets on a computer is through a web

17  browser.  So there are temporary Internet files associated

18  with your web browser.  That's the first place you'd look

19  for viruses and information related to viruses.

20      In this case, once the CCleaner program had run, all of

21  those files were deleted and removed.  So it kind of removed

22  any capability of me identifying any viruses that were

23  there.  So I don't have any files to look at to see if they

24  are viruses or not.

25  Q.   And, likewise, if there had been any evidence on the

1  computer of any of these videos being uploaded to the

2  Internet, would running the CCleaner possibly have erased

3  those entries in the Internet history?

4  A.   Yes.

5  Q.   So ultimately what, if anything, are you able to say

6  about whether the defendant's computer was compromised --

7  A.   I don't have any information that it was.  I can't say

8  one way or another whether it was infected with a virus.  I

9  just don't have any evidence of that, other than statements

10 that were made.  There's no physical evidence that I can

11 point to that says it was infected with a virus.  I just

12 don't have complete information.

13 Q.   Okay.  But just to clarify, running the CCleaner may

14 explain -- if the self-produced videos had been uploaded

15 from the defendant's computer, if that had ever happened,

16 running the CCleaner program may explain why you are not

17 finding evidence of that action?

18 A.   Yes.

19 Q.   Now, did the defendant's computer, any of his

20 computers, have any video-editing software on them?

21 A.   Yes, it did.

22 Q.   Which computer was that?

23 A.   On the Gateway computer.

24 Q.   And what software was on the Gateway computer?

25 A.   Microsoft Windows Moviemaker.  So it is a video-editing

FOTTRELL - DIRECT

1  software that is part of the Microsoft Windows operating
2  system.
3  Q.   And can you just briefly describe its capabilities?
4  A.   It is a very common video-editing software.  It allows
5  a person to slice together two or more videos to make a
6  compilation.  It allows you to truncate videos and edit
7  them, as normal video editing would allow you to do.  It
8  allows you to add different soundtracks or add different
9  music files or just add different audio components, mixing
10 different video files and audio files to make a new video.
11 Q.   And could that software be used to make a compilation
12 like the one that was -- that you reviewed that had been
13 found on the Internet?
14 A.   Yes.
15 Q.   And was there any evidence that the defendant, in fact,
16 had used that editing software to manipulate the self-
17 produced videos?
18 A.   Yes, there was.
19 Q.   Can you briefly describe that?
20 A.   So Microsoft Windows Moviemaker has these files; they
21 are known as project files.  So in the course of editing a
22 video, you can save your work along the way, and you get
23 these files called "project files."  And there was a number
24 of project files that were identified and recovered on the
25 computer, I think four or five of them.

FOTTRELL - DIRECT

1    And those project files, if you look at the contents of
2    those project files, it corresponds to other files that
3    existed on the computer that contained the compilation of
4    those clips.  So there is clear evidence that the person was
5    using the video-editing software to produce a compilation
6    -- a larger piece of a video, but not the larger video that
7    was found on the Internet.  So there was evidence that the
8    video-editing software was being used, but not evidence of
9    it being used for the larger compilation video.
10   Q.  But just to clarify, it was being used to manipulate
11   the self-produced videos that underlie the production counts
12   in this case?
13   A.  Yes.
14   Q.  Now, just getting back to the compilation video
15   recovered by ICE and the clips recovered by the FBI, did you
16   compare the compilation video with the clips that the FBI
17   had?
18   A.  Yes.
19   Q.  And did you notice anything of significance regarding
20   the file names of the video clips in those two pieces of
21   evidence when you compared them?
22   A.  Yes.
23   Q.  And can you describe that?
24   A.  So the compilation video that was downloaded and
25   obtained by the ICE investigators, at the beginning of this

FOTTRELL - DIRECT

1  compilation video there's a blue screen where there's some

2  textual information.  And the text that is included says,

3  "New stuff, 2011."  And then there's some "parts one through

4  seven," and then there's a parentheses, you know, "part 0004

5  is missing."  So there's that textual information that

6  exists on the compilation video.

7      If we look at the components that the FBI agents

8  received, they don't -- the FBI agent only has those parts

9  of the video; it doesn't have the full video.  But those

10  file names for the component match that text.  So the file

11  names include "New stuff 2011," and then there's some

12  numbers, "1, 2, 3, 4, 5, 7," with 4 missing, and then it has

13  parentheses and then those file names of the underlying

14  original content.  So the file names of those components

15  match the text at the beginning of the compilation video.

16  Q.  And regarding these particular file names, where they

17  start with "new stuff" and then have the number, were these

18  videos saved on any of the -- either the laptops or the

19  external hard drive under those file names starting with

20  "new stuff"?

21  A.  No.  So on the seized material -- on the seized

22  computers, none -- the file names "New stuff 2011" don't

23  exist.  I don't see them on the Toshiba, the Gateway laptop,

24  or the external Western Digital hard drive.

25  Q.  And just to sort of put that together, can you just

FOTTRELL - DIRECT

1    tell us whether that sheds any light on the hacker claim
2    that has been put forth here?
3    A.   I mean, I think it is -- the evidence is -- those file
4    names are good evidence that it is linked to the compilation
5    video.  So it has lessened -- the hacker would have
6    downloaded only the underlying file name, 006.AVI or 007; it
7    would not have the "new stuff" file name.  The only time
8    where you see the "new stuff" file name is on that media
9    that was turned over to the FBI, not on the computer, and it
10   was linked to the compilation video that was downloaded by
11   law enforcement over the Internet.
12   Q.   So it suggests, then, that the compilation video was
13   made from the clips that were turned -- the unique clips
14   that were turned over to the FBI?
15   A.   Yes.  So those unique clips that were turned over to
16   the FBI exactly match the content of the compilation video.
17   Q.   At this time, Mr. Fottrell, I'm going to show what has
18   been marked as Government's Exhibit No. 2 for
19   identification.
20            MS. KATZIN:  May I approach the witness?
21            THE COURT:  Oh, absolutely.  Please.
22            No need to ask.  Just go ahead.  I'm sorry.
23   BY MS. KATZIN:
24   Q.   Can you tell us what that is?
25   A.   This is a printout of a sample of a number of child

FOTTRELL - DIRECT

```
 1   pornography images that I produced from the defendant's
 2   computers.  I just took a sample of some of those images.
 3   Q.  So these are images you recovered from the defendant's
 4   computer?
 5   A.  Yes.
 6           MS. KATZIN:  And at this point I would move
 7   Government's Exhibit No. 2 into evidence under seal,
 8   please.
 9           THE COURT:  Any objection?
10           MR. BOSTIC:  No objection.
11           THE COURT:  It will be received in evidence under
12   seal.
13      (Government's Exhibit No. 2 was marked for
14   identification and received in evidence under seal.)
15   BY MS. KATZIN:
16   Q.  Mr. Fottrell, can you just briefly go through those,
17   just to say --
18           MS. KATZIN:  And, Your Honor, obviously, if you
19   wanted to view the images yourself, you can.
20   BY MS. KATZIN:
21   Q.  But, Mr. Fottrell, can you just look through them and
22   just describe them to the Court.  I believe there are 12
23   images in there.
24   A.  Okay.  I'm just going to go through a sample of them.
25           So one of the images depicts an infant girl, a minor
```

FOTTRELL - DIRECT

1  female, who is approximately one or two years old.  She's

2  lying naked.  And an adult male is performing oral sex on

3  her.

4      There's another picture where -- there's a number of

5  pictures that fit that category.  There's certainly a

6  picture of a minor girl, who is probably one or two years

7  old, and there's an adult penis pressed against her vagina.

8      There's some other pictures towards the end that are

9  more commercial child pornography, where it hadn't -- the

10 image also includes a website logo that I testified about

11 earlier.  So, for example, one of the images includes the

12 text www.bdcompany.com, which stands for branded dolls.

13 This is an example of an image that was previously

14 downloaded -- at some point downloaded from the commercial

15 website BD Company.  And the depictions there are a little

16 more different.  There the minors are dressed up in

17 costumes.  They are dressed up in different stockings.  They

18 are wearing makeup.  They are a much more professional

19 quality than other pictures that are more of an amateur-

20 produced quality or self-produced material.

21     So there's a combination of different types of

22 material.

23 Q.  Thank you.

24     And now, Mr. Fottrell, I'm going to show what has been

25 marked as Government's Exhibit No. 3 for identification.

FOTTRELL - DIRECT

```
 1              THE COURT:  Just so I understand Exhibit 2, those
 2    -- that book, Exhibit 2, are examples of things that the
 3    defendant downloaded off the Internet; correct?
 4              THE WITNESS:  And possessed, correct.
 5              THE COURT:  And possessed?
 6              THE WITNESS:  Correct.
 7              THE COURT:  Those aren't images he produced
 8    himself?
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  Okay.  Good.  All right.
11    BY MS. KATZIN:
12    Q.  All right.  So looking at Government's Exhibit No. 3,
13    can you tell us what that is?
14    A.  It is a CD that I created that contains a compilation
15    video that I created of the produced materials that the
16    defendant produced.
17              MS. KATZIN:  Okay.  And at this time I would move
18    Government's Exhibit No. 3 into evidence, also under seal.
19              THE COURT:  Any objection?
20              MR. BOSTIC:  No objection.
21              THE COURT:  All right.  Let me just understand what
22    it is.  It will be received -- Exhibit 3 will be received
23    without objection.
24         (Government's Exhibit No. 3 was marked for
25    identification and received in evidence.)
```

FOTTRELL - DIRECT

1          THE COURT:  We have talked about compilations.

2    Okay.  There was a compilation that ICE got from Denmark.

3          THE WITNESS:  Yes.

4          THE COURT:  Is this the compilation that is on

5    Exhibit 3?  As I understand it, it is different.

6          THE WITNESS:  It is different, Your Honor.  This is

7    a compilation that I created.  So there was a number of

8    videos that were seized from the defendant's computer that

9    has those two minors, minor one and minor two, on them --

10         THE COURT:  This is a group -- okay, to use a

11   different term, this is a group of video clips that you have

12   taken from the defendant's seized computers that are the

13   videos that he produced?

14         THE WITNESS:  Yes, Your Honor.

15         THE COURT:  Okay.  All right.  Go ahead.

16   BY MS. KATZIN:

17   Q.  And did you prepare this just for purposes of

18   sentencing so that -- as an exhibit for the Court to review?

19   A.  Yes.  I didn't want to include all of the videos.

20   There were, you know, many 30, 40, 50 minutes long.  This is

21   a much shorter video -- it is only seven minutes long -- of

22   the progression of the materials.  So it is just an excerpt,

23   if you will, a highlight reel of those produced material.

24         THE COURT:  Let me ask you.  You watched all of

25   these?

FOTTRELL - DIRECT

1          THE WITNESS:  Yes, I did, Your Honor.

2          THE COURT:  Okay.  How many videos were there that

3    the defendant produced of his encounter with these two minor

4    victims?

5          THE WITNESS:  There were multiple locations, Your

6    Honor.  So in one case -- my numbers might be slightly

7    wrong -- there was, like, 12 to 15, a smaller number, on the

8    Gateway computer, for example, that was located in one

9    place.  On the external hard dive there was the similar

10   materials, so certainly it was backed up and it was stored

11   in multiple locations, but there was this other program

12   called VLC Player that allows you to view videos.

13          One of the functionalities of VLC is, kind of like

14   this, you can make a highlight reel.  You can make a

15   highlights video.  So there was instances where -- we have

16   the -- if you will, we have the uncut footage that was

17   produced.  And then we have different periods of time where

18   excerpts of it were produced and extracted, if I'm

19   explaining that clearly.  So it existed in multiple

20   locations at multiple different points --

21          THE COURT:  Can you tell from looking at the videos

22   how many different occasions these videos were produced in?

23          THE WITNESS:  I know it was a number.  It certainly

24   wasn't one particular occasion, because the participants are

25   wearing different clothes and you can clearly see that it is

 1    different days.  Do I have a number?  I don't have a

 2    specific number --

 3            THE COURT:  There's ten counts in the complaint on

 4    specific days to which the defendant has admitted and pled

 5    guilty.

 6            A different question, all right, you talk about the

 7    uncut footage.

 8            THE WITNESS:  Right.

 9            THE COURT:  Okay.  What is the universe in terms of

10    the time that this uncut -- in ballpark terms, that this

11    uncut footage encompasses?

12            THE WITNESS:  I would estimate about like 60 to 70

13    minutes of uncut footage.

14            THE COURT:  All right.  Thank you.  Go ahead.

15            MS. KATZIN:  And I just also want to clarify.

16    BY MS. KATZIN:

17    Q.  On that -- does that excerpt that you prepared --

18    A.  Created.

19    Q.  -- or created include video both of Minor A and Minor B

20    in this case?

21    A.  Yes, it does.

22    Q.  Okay.  And where do the Minor B clips fall?

23    A.  At the very end.  So basically, the first part of it --

24    the majority of it is depicting Minor A.  Only the last

25    maybe 30 seconds or the last 40 seconds includes Minor B.

FOTTRELL - DIRECT

1          MS. KATZIN:  And, Your Honor, that's all I have at

2    this time.  I don't know if we -- you know, we do want to

3    play the video for the Court.  I don't know if we want to do

4    that now or after cross?  Now?

5          THE COURT:  Do you want to play it now?

6          MS. HEALEY:  I think we should, Your Honor, because

7    it is government's evidence.

8          THE COURT:  Okay.  All right.

9          I have -- is there a motion, therefore, by the

10   United States, that we do this under seal?

11         MS. KATZIN:  Yes, Your Honor.

12         THE COURT:  That they are played under seal?

13         MS. KATZIN:  Yes.

14         THE COURT:  Any objection from the defendant?

15         MR. BOSTIC:  No objection.

16         THE COURT:  All right.  As we have talked -- as

17   counsel have talked about here at the bench, the Court is

18   going to review these videos under seal.  And because there

19   is both video and audio associated with these videos and to

20   make sure that there's no possibility of identification of

21   the minor victims, during the playing of these videos the

22   Court is going to clear the courtroom.  All right?  Because

23   I want to make sure that there is no possibility that these

24   minor victims can be identified.

25         So I am going to -- except for the government

FOTTRELL - DIRECT

1   agents in this case and the court personnel and the

2   defendant, obviously, I'm going ask the other folks who are

3   here to step outside for the seven or so minutes while the

4   Court views these videos.

5          Thank you all.

6      (Courtroom cleared.)

7          MS. HEALEY:  Judge, do you have a problem if our

8   case agent runs it and Mr. Fottrell sits up there --

9          THE COURT:  No.  Whatever you can do to move this

10  along.

11         MS. KATZIN:  And Mr. Fottrell copied the disk onto

12  the computer, so we can just run it off the computer, if

13  that's acceptable.

14         THE COURT:  Okay.  Any objection, Mr. Bostic?

15         MR. BOSTIC:  No objection.

16         THE COURT:  Okay.  Please proceed.

17         MR. BOSTIC:  Judge, if I can have just one minute

18  -- I guess we don't really need this now.  We had kind of

19  physically worked out how we were going to do it --

20         THE COURT:  Yeah.  And as we talked about, there

21  was one -- we wanted to make sure that the videos weren't

22  accessible to the folks in the audience who did not need to

23  see them.  The concern that we talked about with the Court

24  and counsel was whether -- I asked whether or not we needed

25  to hear the audio.  The government said they wanted the

FOTTRELL - DIRECT

1  Court to hear the audio.  And so, therefore, to make sure

2  there's no issue with victim identification, that is why I

3  have asked the folks to step outside while we play the

4  audio, because the clerk tells me that we can't restrict the

5  audio to simply the Court; it would have been played in the

6  entire courtroom.  And so, out of an abundance of caution,

7  without objection from the defendant, that's why I have done

8  that.

9        Please proceed.

10  (Government's Exhibit No. 3 was attempted to be

11  published to the Court by audio and video.)

12        THE COURT:  Is there supposed to be a video on the

13  screen?  Because none of us can see it.

14        THE WITNESS:  May I help, Your Honor?

15        THE COURT:  You may stand down to -- Mr. Fottrell,

16  we have it.

17        (Pause.)

18        THE WITNESS:  I'm going to start it again.

19  (Off-the-record discussion between counsel and the

20  clerk.)

21  (Government's Exhibit No. 3 was published to the Court

22  by video and audio.)

23        MS. KATZIN:  Just for the record, this clip and the

24  next one of Minor B.  These are Minor B now.

25  (Government's Exhibit No. 3 was further published to

FOTTRELL - CROSS

```
1    the Court by video and audio.)
2            MS. HEALEY:  Your Honor, do you want to us open the
3    door and let --
4            THE COURT:  Oh, yeah.  Yeah.  Yeah.  That's fine.
5    Yes.
6            Is that the end of the clips?
7            MS. KATZIN:  That is, Your Honor.
8            THE COURT:  Okay.  Thank you.
9            MS. KATZIN:  And, just for the record, they did
10   play a little -- they were a little more choppy than they
11   have appeared on other media.  But hopefully they were
12   sufficient for you to see the sexually explicit conduct.
13           THE COURT:  All right.  Any cross-examination?
14           MR. BOSTIC:  Yes, sir.
15                           CROSS-EXAMINATION
16   BY MR. BOSTIC:
17   Q.  Investigator, let me go back to a little bit when you
18   were talking about BitTorrent and how that works and Freenet
19   and how that works.
20   A.  Okay.
21   Q.  It is my understanding from listening to everything
22   that you have said up until now, the file-sharing feature
23   for Mr. Dowell's computer was cut off; correct?
24   A.  I'm not sure what you mean by that.  So the BitTorrent
25   program -- when the BitTorrent program is running, you are
```

FOTTRELL - CROSS

1    sharing files that are in the designated BitTorrent folder.

2    They are available to other BitTorrent users.

3    Q.  But as to files that were on his computer, there was

4    not a file-sharing program that was cut on at that point in

5    time or when any of the videos were downloaded, as far as

6    you can tell?

7    A.  Correct.  I have very little information about the

8    totality of the sharing information through BitTorrent.

9    There is just very little information available.  There's no

10   transactional log records associated with the BitTorrent

11   program.

12   Q.  And the BitTorrent, the way that actually works, just

13   to make sure I understand it, is as you are downloading

14   something, other people have access to that same file?

15   A.  Correct, to the portions of the file that you had

16   already downloaded.  So, for example, if a file, as an

17   example, is broken up into a hundred components, after you

18   have downloaded the first 50, you are still in the process

19   of downloading the last 50, those parts of the file that you

20   have successfully downloaded are available for other

21   BitTorrent users to get those parts of the file.

22   Q.  So they would physically have to come in and get that

23   from the program as well?

24   A.  It is built into the program.  So it is a built-in

25   capability of the program that that file is available.  So

FOTTRELL - CROSS

1   the BitTorrent protocol recognizes the unique

2   characteristics of that file, and that file is being

3   available for other BitTorrent users to access.

4   Q.   And as soon as that file does get downloaded onto a

5   computer, in this case Mr. Dowell's, then that file sharing

6   is no longer available and that file or any part of that

7   file is not available?

8   A.   No.  It depends on how the BitTorrent program is

9   configured.  So as long as -- if, for example, the

10  BitTorrent program was configured to share the MyShare

11  folder directory, as long as the BitTorrent program is

12  active, even though he is no longer downloading stuff -- it

13  is idle, if you will, but the BitTorrent program is still

14  running on the computer, then those things are still being

15  shared.  If the person moves them out of that common share

16  folder and puts them into another location that is not

17  accessible by the BitTorrent program, then they would not be

18  sharing them.  So it does depend on the specific

19  configuration of the BitTorrent program.

20  Q.   Or if he actually cut off the BitTorrent program?

21  A.   Yes.  Absolutely.  As soon as you turn off the

22  BitTorrent program, it is no longer being shared.

23  Absolutely correct.

24  Q.   And there was no evidence that he continued to run it

25  or that other people continued to come in and get parts of

FOTTRELL - CROSS

1  different files?

2  A.   Correct.  There's no -- correct.  I have no information

3  about that.  I have no transactional log records to show the

4  duration of when it is being used and when it is not being

5  used.  I just don't have any transactional log records

6  associated with that.

7  Q.   Thank you.

8       As to Freenet, you indicated that there's a portion of

9  a computer, when somebody has Freenet on their computer,

10 that is specifically designated for Freenet users?

11 A.   Yes.

12 Q.   And do you know what portion of Mr. Dowell -- which

13 computer was on and what portion of the hard drive was

14 designated for that?

15 A.   So there's a configuration folder.  I don't recall the

16 specific folder name.  It is the default folder that is

17 associated with the Freenet program.  It is going to create

18 a data folder.  And in that data folder is this storage

19 container that is available to the Freenet group, the

20 Freenet project or the Freenet software, for this common

21 sharing.

22 Q.   So even if Mr. Dowell -- or me, for example, if I

23 wanted to -- I had Freenet, downloaded something into that

24 particular section --

25 A.   Correct.

FOTTRELL - CROSS

1  Q.   -- even if I don't have the file-sharing aspect of the

2  program on, people can still come into my computer?

3  A.   Yes.   Absolutely.   So as long as the Freenet program

4  -- it is kind of the agreement when you install the Freenet

5  program.   So part of the installation process of Freenet is

6  that it designates this folder for storage on the Freenet

7  program.   You can't look at this.   Even the defendant can't

8  navigate to that folder and see this is a picture or this is

9  an image, because it is stored in a proprietary format, but

10  that folder is available for storage generically through the

11  -- through the Freenet project.   And that's --

12  Q.   You said the agreement of doing this.   Is this a

13  written agreement?   Is this something that you click on

14  "Yes, I agree to allow part of my computer to be used" or it

15  just automatically comes up as part of the program?

16  A.   It is an automatic feature of the program.   When I

17  download and install and run the Freenet program, it is kind

18  of the default configuration for how it operates.   It is one

19  of the components that makes Freenet work.

20       THE COURT:   And was this defendant's computer

21  configured according to the default configuration?

22       THE WITNESS:   Yes, very standard configuration.

23       THE COURT:   All right.   Let me ask you this

24  question.   This defendant obviously had these videos, clips

25  of just -- clips of which I just saw; okay?

FOTTRELL - CROSS

1           THE WITNESS:  Yes.

2           THE COURT:  And you said there was around 60 to 70

3    minutes of it --

4           THE WITNESS:  Yes.

5           THE COURT:  -- of the raw footage on his hard

6    drive; correct?

7           THE WITNESS:  Yes.

8           THE COURT:  Now, the information that is accessible

9    to Freenet on his hard drive, is that just information that

10   this defendant got from Freenet or would -- by means of

11   accessing Freenet, is some of this raw footage that he took

12   in these files accessible to Freenet?

13          THE WITNESS:  No.  Absolutely not, Your Honor.

14   That's a good point.

15          So the Freenet software designates a folder for

16   storage.  So it is just looking for a storage mechanism.

17   Let's just say it is ten megabytes in size.  So part of the

18   Freenet program is -- the default configuration is I'm going

19   to reserve ten megabytes of disk space for storage for the

20   Freenet.  It is certainly not related to his images,

21   certainly not related to anything else on his computer, and

22   it is certainly not related to anything that he

23   specifically, if he did, physically uploaded to Freenet.

24   That might be stored on somebody else's computer.  It is

25   just a storage location for the entire Freenet program.

FOTTRELL - CROSS

1           THE COURT:  Okay.  So that unless he moved
2  -- unless there was evidence that he moved the images that
3  he produced that we just saw a video of to Freenet, then
4  there's no way for the other Freenet users to access it?
5           THE WITNESS:  Correct, Your Honor.  Correct, Your
6  Honor.
7  BY MR. BOSTIC:
8  Q.   And, in fact, there is no evidence that he ever moved
9  any of the individual videos onto the Freenet area?
10 A.   That is correct.
11 Q.   One other thing that -- in response to the question the
12 judge just asked you, you indicated ten megabytes is -- that
13 is the maximum --
14 A.   No, I'm just using ten megabytes as a reference.  I
15 don't recall what the specific number is.  But just a
16 concept, if you will.  The Freenet system, the Freenet
17 network, requires storage for web pages, for information
18 associated with Freenet.  So the Freenet software -- all of
19 us collectively using Freenet -- all of the Freenet users
20 collectively need disk space.  And they need redundant disk
21 space.  So that if I'm using Freenet for a day or a week and
22 then I disconnect from the Freenet network, I don't want to
23 lose that data.
24      So the agreement is, as using Freenet, I'm going to
25 basically be using a -- designated a portion of my hard

```
 1   drive for storage.  And the Freenet software is going to
 2   replicate that content on multiple computers.  It is
 3   replicated so that one or more -- one or more of those
 4   Freenet users can disconnect from the Freenet network and
 5   the network still survives.  There's enough redundancy in
 6   the software that the information is stored on multiple
 7   computers and it can withstand multiple failures, multiple
 8   people withdrawing from the Freenet network.
 9       So as long as there's still a body, a corpus of people
10   using Freenet, the contents there are still associated with
11   it, but it's not tied to a specific person.
12       I know -- there's no way that Mr. Dowell could know
13   what content was -- what specific content was stored on his
14   computer, but just generically that content was stored on
15   his computer.
16   Q.   But there's no information or no evidence whatsoever
17   that the individual files or the compilation file, for that
18   matter, ever ended up on Freenet?
19   A.   Correct, I did not find that.
20   Q.   Now, when you -- the individual videos that you have
21   been talking about, those videos, if you actually look at
22   them by file name, essentially go by numbers; is that
23   correct?
24   A.   Yes.
25   Q.   And I believe 0, 01, 002, .avi?
```

FOTTRELL - CROSS

1   A.   Correct.

2   Q.   And all of these are avi files?

3   A.   Yes.

4   Q.   And what was actually found on Mr. Dowell's computer

5   were the individual videos of 001.avi, 002, 003, -4, -5, -6,

6   -7?

7   A.   Correct.

8   Q.   And what ultimately ended up on -- as part of the

9   compilation video ended up with a completely different file

10  name?

11  A.   Correct.

12  Q.   Is that correct?

13  A.   A new file name, a new 2011 file name.

14  Q.   And, in fact, that file name is file -- F-I-L-E --

15  space name dot wmv; correct?

16  A.   Correct.

17  Q.   And you did a complete exhaustive search of the -- each

18  of the hard drives, each of the computers?

19  A.   Yes, I did.

20  Q.   And was that particular file ever found on any of

21  Mr. Dowell's computers or hard drives?

22  A.   No, it was not.

23  Q.   Okay.  Now -- and that would indicate to you that that

24  particular file never actually existed on any of those

25  computers?

FOTTRELL - CROSS

1  A.   I just don't have information.  It was not there at the

2  point in time that it was seized.  At the point in time when

3  the evidence was seized, that file name does not exist.

4  That doesn't tell me -- it may have existed there at a

5  previous point in time and been moved or deleted.  I just

6  don't have -- at the point in time it was seized, that file

7  name did not exist on the computer.

8  Q.   And when you are actually doing a search of these, you

9  are not actually doing by file name necessarily; you are

10  also using a MD5 hash value?

11  A.   Correct.  There's multiple ways that I could search for

12  the file.  I could search for it by file name, which may or

13  may not give me the answer that I'm looking for.  But I also

14  have -- from a forensic point of view, every file name has a

15  unique hash value associated with it.  So I could look for

16  that particular hash value.  If the person renamed the

17  file -- if I changed the name of it or changed part of the

18  file name, I will still find the file by the unique contents

19  of that file as designated by the hash value; that's

20  correct.

21  Q.   So if what is listed as compilation video file space

22  name .wmv, if that was on his computer under a different

23  name, it still would have had the same hash?

24  A.   I would have found it; correct.

25  Q.   Okay.  And there was no -- the hash value for that

1  particular file name was never found on any of Mr. Dowell's

2  computers?

3  A.   That's correct.

4  Q.   Okay.  Now, there was -- in looking at his computer,

5  there was a couple of different things as far as when

6  programs were actually activated.

7  A.   Okay.

8  Q.   Correct?

9  A.   Yes.

10  Q.   And I want to turn your attention to July 25th of

11  2011.

12  A.   Okay.

13  Q.   And July 25th, his particular computer -- if you look

14  under one of the names, I believe John Tosh -- did not show

15  that the laptop camera had been activated.  But if you go

16  under a different user name, which I believe was like

17  MCX-John Tosh -- so it was a separate user name -- it does

18  show that the video camera was, in fact, activated.  Is that

19  correct?

20  A.   No, I'm not really sure, but let me just clarify.

21      There's a user of the computer on the -- we're talking

22  about the Toshiba computer.  So when you install the

23  operating system, they ask you for a user name.  And there

24  was a user John Tosh; that was a user of the computer.  He

25  referenced another user name, "MCX_JohnToshPC."  MCX stands

FOTTRELL - CROSS

1  for Microsoft Windows media extender.  So basically

2  Microsoft Windows has this new feature called media

3  extender, so that your PC could be sharing files with your

4  Xbox or your other device in your house.

5      So as part of the operating system, this media extender

6  user is defined.  So, basically, if I have videos on my

7  computer, they would be available to my Xbox or my other

8  personal devices in my house.  That's different than two

9  different users' accounts on the computer.

10          So to answer your second point, there's some

11  discussion about the video camera being turned on.  And my

12  analysis there was there was Google searches that the

13  defendant had typed.  And I'm going to paraphrase it, "Why

14  is my camera turned on?"  There was Google searches that

15  had, you know, "Blue light video camera Toshiba,"

16  indicating, you know, why is my video camera turned on?  And

17  there was certainly other Google searches related to -- I'm

18  going to paraphrase, you know, "Was my webcam being hacked?"

19  or "Was my web camera being turned on?"  The defendant was

20  clearly doing Internet searches for information related to

21  his computer being hacked and his webcam being hacked on or

22  about that date that you mentioned, July 25th, 2011.

23  Q.  On.  Now -- and you also -- when you used the -- when

24  you went under -- it was MCX?

25  A.  MCX, right.

FOTTRELL - CROSS

1  Q.   And when you went under that and you made a
2  determination CCleaner, in fact, was executed on July 27th;
3  is that correct?
4  A.   I don't recall -- right.  I don't recall the exact
5  date, but right around that time.  So, yes, there was clear
6  evidence that the person had gone out to the Internet,
7  downloaded the CCleaner program, and then run it right
8  away.  So there was clear evidence on a particular -- right
9  around that time the person downloaded and ran the CCleaner
10 program.
11 Q.   And, in fact, there was also evidence that the
12 particular videos of the 001.avi through the 007.avi, that
13 all of those were accessed immediately prior to the CCleaner
14 being executed?
15 A.   Yes, it was.
16 Q.   Okay.  So that would indicate to you that somebody had
17 -- whether it was Mr. Dowell or his computer was hacked,
18 somebody had accessed those videos, and then immediately
19 after that Mr. Dowell ran the CCleaner video program?
20 A.   Correct.  Correct.
21      And so what we're looking at, we're looking at
22 Microsoft Internet Explorer entries, log entries.  To
23 further answer your question, the person accessed those
24 videos through the Windows Explorer program.  So like the --
25 part of the operating system navigated to the folder where

FOTTRELL - REDIRECT

1  those videos were and looked at the contents of those

2  folders.

3      It doesn't tell me -- it is not clear if the person

4  played them, because it's a short window of time.  It is

5  only a few seconds.  All of those file names have the exact

6  same time stamp information.  So it's certainly not enough

7  time for the person to play and view those videos.  But it

8  is enough time to navigate to a folder and look at the

9  contents of a folder at that particular point in time.

10              MR. BOSTIC:  I have no further questions, Judge.

11              THE COURT:  Thank you, Mr. Bostic.

12              Any redirect?

13              MS. KATZIN:  I just have one.

14              THE COURT:  Please, take your time.

15                      REDIRECT EXAMINATION

16  BY MS. KATZIN:

17  Q.   Mr. Fottrell, regarding the -- what Mr. Bostic was just

18  asking you about, about the self-produced videos, there

19  being an indication that they were accessed on July 27th,

20  right before CCleaner was run --

21  A.   Yes.

22  Q.   -- when we use the term "accessed," I just want to

23  clarify, was there any indication that those videos were

24  uploaded to the Internet?

25  A.   No.  I have no -- I have no information about those

FOTTRELL - RECROSS

1  videos being uploaded.  And the fact that the CCleaner

2  program was downloaded and run would have deleted some of

3  that evidence that would have documented -- that potentially

4  could have documented where it was located.  But I just have

5  no evidence, nothing that I can look to that says those

6  files were uploaded or downloaded.  I just have no evidence

7  to answer that.

8  Q.   But regarding the access that we do see, are you able

9  to conclude that that does not reflect anybody moving those

10  files off of the computer?

11  A.   Correct.  That is just somebody navigating to the

12  folder and displaying the contents of the folder and looking

13  at those videos that were there.  It is accessing, not even

14  viewing.  It is navigating your computer to the folder that

15  those videos were in.

16  Q.   So, for example, if you were in that folder and

17  highlighted all six videos at one time, that could account

18  for that entry in the Internet Explorer history?

19  A.   Yes, it could have.

20  Q.   Thank you.

21        THE COURT:  Any recross?

22        MR. BOSTIC:  Judge, just about two quick questions.

23              RECROSS-EXAMINATION

24  BY MR. BOSTIC:

25  Q.   When you say they were activated, it could also have

FOTTRELL - RECROSS

1   been that somebody actually pulled them up, looked at them

2   momentarily, shut them down, and then actually downloaded

3   them off the computer?

4   A.   I don't think that's enough time to actually view

5   them.  If you look at that record, it is all with the same

6   second.  It is all the same time stamp information.  So I

7   have no -- there's no progression of time between the first

8   one and the last one in the series.  It all has the same

9   time stamp.  So, based on that, I can't draw any information

10  of them actually viewing anything.  It is just navigating to

11  a folder at a particular moment in time.

12  Q.   Actually access.  Okay.

13          MR. BOSTIC:  No further questions, Judge.

14          THE COURT:  Okay.  Any further questions for this

15  witness?  May he be excused?

16          MS. KATZIN:  Yes, Your Honor.

17          THE COURT:  Thank you.  You may stand down,

18  Mr. Fottrell.

19          Call your next witness.

20          MR. BOSTIC:  Judge, my client has requested a break

21  after the witness got done.

22          THE COURT:  Okay.  We can do that.  We can also

23  take -- let's just see.  It is ten minutes until 12.

24          What would the government propose to put on as your

25  next bit of evidence?

 1          MS. HEALEY:  Judge, the only other witness that we

 2    will have will be Dr. Moore.  And she goes more towards the

 3    reasonableness of the sentence and our sentencing

 4    recommendation.  I think we're prepared to argue --

 5          THE COURT:  Okay.  Do you have evidence that you

 6    want to put on with regard to these guidelines issues?

 7          MR. BOSTIC:  With -- I do have one witness I do

 8    wish to call very briefly to clarify a couple of things that

 9    Mr. Fottrell said.

10          THE COURT:  Okay.  Let's do this.  Let's take a

11    ten-minute recess.  We'll hear whatever evidence, we'll deal

12    with the guidelines issues, and then we'll proceed from

13    there.  Okay?

14          MS. HEALEY:  Thank you.

15          THE COURT:  So let's recess until 12 noon.

16          Ask the marshal to declare a recess.

17       (Recess at 11:50 a.m.)

18       (Call to Order of the Court at 12:05 p.m.)

19          THE COURT:  Okay.  On the issue of the -- that

20    we're talking about, these objections to the presentence

21    report and the guideline calculations, does the government

22    have any other evidence you want to put on?

23          MS. HEALEY:  Not evidence, Your Honor.  Just

24    argument.

25          THE COURT:  Okay.  How about the defendant?

GARRETSON - DIRECT

```
 1              MR. BOSTIC:  The defense does have one witness.

 2              THE COURT:  Okay.  Call your witness.

 3              MR. BOSTIC:  Your Honor, we would like to call

 4   Mr. Alan Garretson.

 5              THE COURT:  All right.

 6               ALAN GARRETSON, DEFENSE WITNESS, SWORN

 7              THE COURT:  Good afternoon, sir.

 8              THE WITNESS:  Good afternoon.

 9                          DIRECT EXAMINATION

10   BY MR. BOSTIC:

11   Q.   State your name for the Court.

12   A.   Alan James Garretson.  It is A-L-A-N, James,

13   G-A-R-R-E-T-S-O-N.

14   Q.   Mr. Garretson, you currently do have a computer

15   investigation firm?

16   A.   Yes, I do.  I'm self-employed, but as a computer

17   forensic and cell phone forensic examiner.

18   Q.   And as part of that, do you also have a curriculum

19   vitae that has been prepared?

20   A.   Yes, I do.

21   Q.   And does that go into all of the prior experience and

22   training that you have had as a --

23   A.   Yes, it does.

24   Q.   -- computer forensic analyst?

25   A.   Yes.
```

GARRETSON - DIRECT

```
 1            MR. BOSTIC:  Your Honor, I have marked as Defense
 2     Exhibit No. 1 -- if I could approach?
 3            THE COURT:  Certainly -- yes.  Certainly.  Go
 4     ahead.
 5     BY MR. BOSTIC:
 6     Q.  And if you would describe to the Court, is this the
 7     curriculum vitae?
 8     A.  Yes, it is.
 9     Q.  And that does accurately state what your credentials
10     are?
11     A.  Yes, sir.
12            MR. BOSTIC:  Your Honor, we move to have this
13     admitted as Defense Exhibit No. 1.
14            THE COURT:  Any objection?
15            MS. KATZIN:  No, Your Honor.
16            THE COURT:  It will be received without objection.
17        (Defense Exhibit No. 1 was marked for identification
18     and received in evidence.)
19     BY MR. BOSTIC:
20     Q.  Now, Mr. Garretson, I do want to go through a couple of
21     your qualifications.  If you can just briefly outline what
22     your career is, dating back, I believe, all of the way to
23     1968, in the computer field?
24     A.  Right.  In the late '60s I was employed by IBM as a
25     systems engineer, designing computer systems for customers;
```

GARRETSON - DIRECT

1   then became an FBI agent, was in the field for seven years,

2   transferred to headquarters, the technical service division,

3   where I did redesign the NCIC network, was in charge of

4   developing the major case investigative system, attended

5   numerous training and schools from other government agencies

6   during that time for computer forensics.

7       After that I was on the -- assigned TDY to the west

8   coast, actually undercover, selling stolen computer secrets

9   from IBM to various people.  And during that time I was back

10  with IBM, learning some -- again, there are trade secrets,

11  if you will, on computers.  Next time I was back in

12  computers I was back in the Washington field office on the

13  foreign counterintelligence side of the House and ran a

14  squad where we did technical penetrations, and as a result

15  of that did a lot of work with computers and PCs and file

16  systems.  And I think the rest of that is classified.  But,

17  anyway, spent a lot of time working with computers and file

18  systems during that.

19      After that went back to IBM, doing all of their theft

20  of technology, industrial espionage cases all over the

21  world.  Retired from there and set up a business

22  approximately ten years ago.  And have attended numerous

23  weeks of training from, like, Guidance Software, the makers

24  of EnCase; Forensic Toolkit from AccessData; Paraben Network

25  E-mail Examiner, weeks of training there; and several weeks

GARRETSON - DIRECT

1  of training every year at annual conferences up through this

2  point.

3  Q.  Is a lot of what your current occupation is in the

4  computer forensics examination?

5  A.  That's almost 100 -- 100 percent is in computer and

6  cell phone forensics.

7  Q.  And have you ever been certified -- excuse me.

8     Have you ever been declared as an expert in the field

9  of computer forensics?

10 A.  Yes, in state courts in Mississippi and North Dakota.

11 Q.  And have you ever been denied --

12 A.  No, I have not.

13       MR. BOSTIC:  Your Honor, we would move to have him

14 declared as a computer forensic specialist.

15       THE COURT:  Any objection?

16       MS. KATZIN:  No.

17       THE COURT:  Yes, he'll be received as a computer

18 forensics specialist expert.

19       MR. BOSTIC:  Expert.  Excuse me.

20 BY MR. BOSTIC:

21 Q.  I want to turn your attention to a lot of the testimony

22 of Mr. Fottrell.  A lot of the opinions that he gave on the

23 stand are things that you would confirm; is that correct?

24 A.  I'm sorry, that I would what?

25 Q.  A lot of the conclusions that he drew on the stand are

GARRETSON - DIRECT

1  things that you would confirm; is that correct?

2  A.   Absolutely.

3  Q.   Now, there was a couple of things that I just wanted to

4  hit on quickly.  We went into it with Mr. Fottrell and I

5  want to go through it with you as well.

6      When you did your examination, you actually obtained

7  what is called a forensic image of each of the computer hard

8  drives of Mr. Dowell?

9  A.   That's correct.

10 Q.   And how -- when you went about doing that, you did not

11 get the actual videos or visual images; is that correct?

12 A.   No, sir.  They would have been -- they were on the

13 forensic image.  I had the forensic image of each of the

14 systems.  And the forensic image contains everything that

15 was on the computers.  I never opened or viewed any of the

16 video files or picture files.  I operated strictly from file

17 names and MD5, or message digest 5, hashes.  And I reviewed

18 event logs, registry entries, but never looked at or viewed

19 any of the images or videos.

20 Q.   And where was that --

21 A.   Those exams were conducted at the Frederick County

22 Sheriff's Office.

23 Q.   Okay.  And you currently don't have any of those videos

24 or pictures; correct?

25 A.   That's absolutely correct.

GARRETSON - DIRECT

1   Q.   Okay.  Now, when you were doing your examination, you

2   actually did put on your computer all of the -- what I

3   believe you have referred to as digital signatures; is that

4   correct?

5   A.   Yes.  The process is that you have to create a case, so

6   to speak.  And I used a tool called Forensic Toolkit, FTK.

7   And in creating that case, the only thing I did was expand

8   the compound files, any container files that would have been

9   zipped files or PSDs, files like that, and created a digital

10  fingerprint, a 32-digit character called an MD5 hash, for

11  each of the files.  And there were like 3,224,000 files in

12  total that I created the digital fingerprint for.

13  Q.   Now, just to go ahead and move this along.  You had the

14  MD5 hash value for each of the individual videos; is that

15  correct?

16  A.   Yes, I did.  Mr. Fottrell had furnished me the file

17  names and the MD5 hash of the individual videos as well as

18  an MD5 hash of the compilation video and the file name of

19  the compilation video.

20  Q.   And the compilation video is the one that was actually

21  discovered in Denmark, as far as you understand?

22  A.   As far as I understand.  I don't have any direct

23  knowledge of that.

24  Q.   Okay.  Now, you did a complete search of all of the

25  hard drives that Mr. Dowell had; is that correct?

GARRETSON - DIRECT

1    A.    Yes, sir.

2    Q.    And were you able to find each of the individual videos

3    on those hard drives?

4    A.    Yes.  The individual videos were located both by file

5    name and by the MD5 hash value.

6    Q.    And the one video which is -- actually goes by file

7    name space or file space name dot wmv, you also had that as

8    well as the MD5 hash value?

9    A.    That -- I had that file name and I had the MD5 hash

10   value furnished by Mr. Fottrell, yes, sir.

11   Q.    And you did a complete search of all of the hard drives

12   of Mr. Dowell's computers?

13   A.    Yes, I did.

14   Q.    And were you able to find that --

15   A.    No, that --

16   Q.    -- anywhere?

17   A.    -- that file was not on any of the -- any of the three

18   million pieces of evidence -- or three million files, was

19   not there.

20   Q.    Okay.  Now, I want to turn your attention to around

21   July 25th to July 27th of 2011.  You did a search of the

22   computer concerning that particular time frame and the web

23   camera execution and the CCleaner execution; is that

24   correct?

25   A.    That's correct.  And the -- you do that by analyzing

GARRETSON - DIRECT

1    the Internet -- temporary Internet files, the Internet
2    cache, and -- for program execution, the registry, which is
3    basically the database that makes your whole system run.
4    Q.  Okay.
5              MR. BOSTIC:  Your Honor, could I approach the
6    witness?  I have two exhibits.
7              THE COURT:  Certainly.  Absolutely.
8    BY MR. BOSTIC:
9    Q.  Now, I want to show you what has been marked as Defense
10   Exhibit No. 2 and also what has been marked as Defense
11   Exhibit No. 3.  If you would identify those to the Court and
12   describe what they show.
13   A.  Okay.  Defense Exhibit No. 2 came from the registry of
14   the Toshiba computer.  And under what is called the user
15   assist key, it indicates that a program called
16   twebcamera.exe was executed the first time on July 25th,
17   2011 at 2100 hours UTC time.  And that program had been
18   executed two times.
19        Exhibit No. --
20   Q.  The most recent one would be the July 25th time; is
21   that correct?
22   A.  That would be the -- that would be the first time that
23   it was activated.  So it was --
24              THE COURT:  July 25th?
25              THE WITNESS:  Of 2011 at 2123 UTC time.

GARRETSON - DIRECT

```
 1              THE COURT:  Okay.
 2    BY MR. BOSTIC:
 3    Q.  Now, the second exhibit shows that the CCleaner was
 4    activated and run on July 27th; is that correct?
 5    A.  Yes, it did.  And it came again from the user assist
 6    key from the user's ntuser.dat file.  And it was executed
 7    one time, on July 27th, 2011, at 3:26 UTC time.
 8    Q.  Now, on both of those, how did you come about getting
 9    those, as far as -- did you use a print screen?
10    A.  I used a print screen, yes.  I used a program from
11    AccessData called Registry Viewer, which allows you to view
12    the contents of static registries.  And I drilled down to
13    this key and value.  And when this came up, I did a print
14    screen to obtain these.
15    Q.  And what that basically shows is that the webcam on the
16    laptop was executed on July 25th; correct?
17    A.  There's a program on there called twebcamera.exe that
18    was executed at that time, yes, sir.
19    Q.  And that is what would activate the web camera?
20    A.  Yes, sir.
21    Q.  And there's also -- it shows the CCleaner.exe was run
22    on July 27th, 2011?
23    A.  That's correct.
24    Q.  And that basically means -- when we were talking
25    earlier about the program was accessed, it was actually
```

GARRETSON - DIRECT

1   accessed at that time?

2   A.   Yes, sir.  It was actually run at that time.

3   Q.   Okay.

4   A.   Executed.

5        MR. BOSTIC:  Judge, we would move to admit Defense

6   Exhibit 2 and 3 into evidence.

7        THE COURT:  Any objection?

8        MS. KATZIN:  No, Your Honor.

9        THE COURT:  Received without objection.

10       (Defense Exhibit Nos. 2 and 3 were marked for

11   identification and received in evidence.)

12  BY MR. BOSTIC:

13  Q.   Now, the last matter I wanted to get to, you reviewed

14  Mr. Dowell's computer to determine whether or not it was

15  operating continuously from July 25th to July 27th; is that

16  correct?  In other words, from the time --

17  A.   Right.  I'm trying to recall the last boot -- the last

18  boot session indicated it was turned on on the 25th, I

19  believe.  Right.

20  Q.   Okay.  And when was -- and do you have any evidence to

21  show that the computer was cut off after that?

22  A.   Not until -- when you review a file called the

23  setupapi.dev.log file, it would show the next activity was

24  approximately two days later.  There was not another boot

25  session between that time.  So that would indicate the

GARRETSON - DIRECT

1   computer remained on during that time.
2   Q.   And -- so if the web camera had been activated on the
3   25th and it had not been shut off, it would have continued
4   on until the 27th?
5   A.   It could have.  I don't know whether it -- whether it
6   was turned off after that time or not.  This just shows you
7   the time the program was executed that would turn it on.
8   Q.   Okay.  And as Mr. Fottrell testified in his testimony,
9   that log does not show when it was actually cut off; it just
10  shows when it was accessed?
11  A.   Right.
12  Q.   Okay.
13       (Pause.)
14  Q.   Now, let me just back you up.  When we actually
15  originally talked about having you do this, we went over and
16  met with Mr. Dowell; is that correct?
17  A.   Yes, sir.
18  Q.   And in conversations we had with Mr. Dowell, did he
19  describe to you what had actually happened as best he could
20  from his --
21  A.   Yes.  As best he could remember, he was in the Detroit
22  area, at an Extended Stay Hotel in late July or early August
23  of 2011.  And one evening, when he had his computer on, the
24  webcam activated and a black box appeared on the screen,
25  which he described as a telnet box, which would appear as a

GARRETSON - DIRECT

1    black box come up.  And there were words displayed on his

2    computer to the effect of "Don't turn this machine off," or

3    words to that effect.  And he said that that freaked him

4    out.  He did not know what caused that.  He was -- did have

5    his Xbox that he was sharing with his computer at that time,

6    but he -- he did not know what caused that activity.

7    Q.   Okay.  He stated to you he did not actually take any of

8    the individual videos and ever upload that; is that correct?

9    A.   Yes.  He was very adamant that he had never uploaded

10   any videos to the Internet.

11   Q.   Okay.  And essentially the -- he also advised you that

12   he had immediately downloaded or run the CCleaner after that

13   event occurred?

14   A.   Yes, he did.

15   Q.   Soon after that?

16   A.   Yes, sir.

17   Q.   Now, there were also --

18        MR. BOSTIC:  If I could have one second, Judge.

19   (Pause.)

20   BY MR. BOSTIC:

21   Q.   Now, Mr. Dowell also advised you that at some later

22   date he was actually talking to a -- via the Internet, by

23   instant messaging, Morgan Dowell; is that correct?

24   A.   Yes, he had a Google chat with Morgan Dowell.

25   Q.   And as part of that he actually told you that he had

GARRETSON - DIRECT

1    mentioned to Morgan that his computer had been hacked?
2    A.   That's correct.  He said right after that happened he
3    had a video chat and it was -- he described what had
4    happened with his webcam and the black box popping up on his
5    computer to Morgan Dowell.
6    Q.   And were you able to go into his Gmail account and
7    actually download a printout version of that?
8    A.   There's -- not directly from his Gmail account.  I
9    didn't go into his Gmail account, but -- no -- yes, there is
10   a printout version of that that came from a cache file.
11   Q.   Okay.
12        MR. BOSTIC:  Your Honor, I have already previously
13   filed with the sentencing memorandum Defense Exhibit No.
14   -- Defense Exhibit A, which is -- has a printout version of
15   the chat with Morgan Dowell in which he mentions that his
16   computer was hacked.
17        THE COURT:  Yes.  And I read that.  And it is
18   already in the record.
19        MR. BOSTIC:  Okay.  Thank you.
20        Judge, I don't believe I have any further
21   questions.
22        THE COURT:  Thank you, Mr. Bostic.
23        Any cross-examination?
24        MS. KATZIN:  Just a couple of questions.
25

```
 1                    CROSS-EXAMINATION
 2   BY MS. KATZIN:
 3   Q.   Good afternoon.  I just have a few follow-up questions,
 4   just to clarify a couple of points.
 5        Regarding that entry in the Internet history from July
 6   25th, where you see that the webcam was executed --
 7   A.   Right.
 8   Q.   -- looking at that entry, you can't tell how the webcam
 9   was activated on the computer?
10   A.   That's correct.  It just shows that the program was
11   executed.
12   Q.   So if the user of the computer had chosen to use the
13   webcam, you would see the same sort of entry on the Internet
14   Explorer history?
15   A.   That actually came from the registry, the user assist
16   key of the registry.  And, yes, it just shows the program
17   was executed at that time.
18   Q.   Okay.  And regarding this, like, black box message that
19   Mr. Dowell described to you, you don't know exactly what
20   that is or what that meant, do you?
21   A.   I have no idea.
22   Q.   Okay.  And, in fact, when you reviewed the computers,
23   you didn't find any evidence that there had been a virus on
24   the computer or that the computer had been hacked; correct?
25   A.   I didn't run any virus scans on the evidence files.
```

GARRETSON - CROSS

1  Q.  Well, it is true that in your report, as part of your

2  conclusion, you stated, "I did not find any evidence that

3  would support or refute Dowell's claim that his Toshiba

4  laptop was taken over by an unknown person while he was at

5  the hotel in Detroit"; is that correct?

6  A.  That's correct.

7  Q.  And even hypothetically, just for the purpose of the

8  question, if we say that there was a virus or that the

9  computer was compromised in some way by a hacker at some

10 point, we have no idea what virus that was or what the

11 capabilities of the hacker would have been; correct?

12 A.  That's correct.

13 Q.  And also there's no evidence showing that even

14 -- there's no evidence showing that the self-produced videos

15 were ever uploaded from any of Mr. Dowell's computers to the

16 Internet; correct?

17 A.  Are you -- if you are referring to the .001 through

18 007, those files?

19 Q.  Correct.

20 A.  Yes, I have no evidence to show that.

21 Q.  Okay.  Thank you.

22         THE COURT:  All right.  Any redirect?

23         MR. BOSTIC:  No redirect.

24         THE COURT:  Thank you, Mr. Garretson.  Appreciate

25 you being here.  You may stand down.

```
 1              THE WITNESS:  Okay.
 2              THE COURT:  Okay.  Mr. Bostic, any other evidence
 3    on these guidelines issues?
 4              MR. BOSTIC:  No other evidence on the guidelines
 5    issues.
 6              Judge, could I release him as a witness?
 7              THE COURT:  Oh, absolutely.
 8              Thank you.  You are free to go.
 9              And I'll admit all of your exhibits --
10              MR. BOSTIC:  Thank you, Judge.
11              THE COURT:  -- if I haven't already done that.
12              Okay.  All right.  Let's hear argument on the
13    guidelines issues.
14              MS. KATZIN:  Your Honor, I'll briefly address the
15    distribution issue and then Ms. Healey will address the
16    other issues.
17              Regarding the distribution enhancement, I think it
18    is clear from the testimony that we can't say exactly how
19    these videos got onto the Internet or into the custody of
20    the defendant's sister in Florida, but we do know a number
21    of things.
22              We know, first, that the defendant obviously
23    produced all of the videos.  We also know that on his
24    computer he had the video-editing software which has the
25    capability of creating compilations --
```

1          THE COURT:  The distribution enhancement is only in
2    paragraph 110.
3          MS. KATZIN:  Right.
4          THE COURT:  And that's related to Count Thirteen.
5          MS. KATZIN:  Right.
6          THE COURT:  Okay.  And as I understand it, the
7    factual basis for Count Thirteen is that the defendant had
8    all of these images on his computer and he traveled to
9    California; correct?
10         MS. KATZIN:  Correct.
11         THE COURT:  All right.  That's the factual basis
12   for Count Thirteen.
13         MS. KATZIN:  And including the self-produced --
14         THE COURT:  Including the self-produced images.
15   Okay.  All right.  Go ahead.
16         MS. KATZIN:  Right.
17         So regarding -- at least -- well, what we're
18   focused on -- because we don't have -- we don't have
19   definitive evidence of distribution of any particular file,
20   so basically our argument is circumstantial evidence of the
21   distribution --
22         THE COURT:  Well, why doesn't the two-point
23   enhancement apply simply by virtue of the BitTorrent, that
24   Mr. Fottrell testified to, or the Freenet software?  Why
25   doesn't that plainly apply as to that?

1      MS. KATZIN:  Well, in general terms it could, Your

2  Honor.  We don't have the evidence to point to a specific

3  image that was distributed.  So in general terms, that

4  capability was on the computer.  But in terms of being able

5  to identify a particular image that --

6      THE COURT:  Isn't it reasonable to assume, given

7  the fact that he had over 70,000 images on his computer and

8  he was downloading these images, that that information would

9  have been freely -- freely accessible?  I mean -- and he was

10  on BitTorrent; that's peer to peer.  When he's downloading

11  stuff, other people can take it from him.  When he's on

12  Freenet, a part of his hard drive is available for others to

13  come in and access.  And when you have got 70,000 images on

14  your computer in the percentages that you talked about

15  earlier, why isn't it reasonable to assume that such images

16  were transported?

17      MS. KATZIN:  I think it is reasonable to assume

18  that some images would have been at some point.  Just for

19  purposes of -- I don't want to mislead the Court, because we

20  cannot point to a particular image, so --

21      THE COURT:  Okay.  Then why do you believe the

22  two-point enhancement is appropriate under 2G2.2(b)(3)(F)?

23      MS. KATZIN:  Well, because we know that the self-

24  produced images did appear elsewhere, so they had to have

25  come -- you know, tracing it back, they had to have come

 1    from the defendant.  That's what we were focused on in our

 2    distribution analysis, because those are the only specific

 3    images that we can point to having been found elsewhere,

 4    from the defendant's computer elsewhere.

 5         THE COURT:  But you don't know how they were

 6    transported.  You don't know that he ever made those -- or

 7    how they -- you don't know if he ever uploaded those or

 8    distributed those on the computer.  You don't have any

 9    evidence of that.

10         MS. KATZIN:  Correct.  So it is basically a

11    circumstantial argument to say that he had the capability of

12    making compilations; we know he used that software to make

13    some compilations, even though the compilation that was

14    found in Denmark was not on his computer.

15         We know that -- I think one of the most interesting

16    points to support our argument regarding the self-produced

17    images is that the file names that are referenced on that

18    first text slide in the compilation video, where they

19    reference the file names as "new stuff" 001 through 007,

20    match the file names of the clips that were recovered from

21    the sister in Florida.

22         So, basically, Mr. Fottrell's point was that the

23    strongest evidence we have showing how -- where -- trying to

24    follow the path of these videos from the defendant's

25    computer onto the Internet is that -- because the only place

1   where those videos are named "new stuff," then the rest of

2   the tag, is on that media that the defendant's sister had in

3   Florida, which suggests that they were named on that media

4   and then put onto the Internet in some way.

5           So because they were found in the defendant's

6   sister, that's obviously a very close relationship in terms

7   of looking at the defendant's responsibility for --

8           THE COURT:  But you have no evidence how those came

9   into the possession of the defendant's sister.

10          MS. KATZIN:  Correct.  Right.  I mean, this -- it

11  is what it is.  But, you know, it is our position that but

12  for the defendant producing them, saving them to his

13  computer and handling them however he did, you know,

14  following their production, they wouldn't have ended up on

15  the Internet, they wouldn't have ended up in his sister's

16  custody, and they are going to stay on the Internet forever.

17          THE COURT:  This is res ipsa.  I mean, that is

18  almost what you are arguing.  He produced them; they are

19  found in Denmark; therefore, he must have distributed them.

20          MS. KATZIN:  Right.  And also the absence of any

21  conclusive evidence that a hacker came into his computer --

22          THE COURT:  He says it was hacked and then he

23  cleaned -- he tried to clean things up.  I mean, he says it

24  was hacked.  And there is some evidence here that his

25  computer was hacked, as we have heard.

1          MS. KATZIN:  Yeah, but even if we accept the

2    argument that his computer was hacked, there's no evidence

3    that that hacker had the capability of reaching in and

4    taking files.  There is no indication that those files were

5    ever taken from the computer --

6          THE COURT:  And there's no indication that they

7    weren't.

8          MS. KATZIN:  Correct.

9          THE COURT:  It is speculative.

10         MS. KATZIN:  Both ways, yes.

11         THE COURT:  But it is your burden.

12         MS. KATZIN:  Well, that's our argument.  It is

13   basically the circumstantial argument that but for the

14   defendant's actions, the videos would not have ended up on

15   the Internet.

16         THE COURT:  All right.  And your argument is

17   focused on the videos he produced.

18         MS. KATZIN:  Right, because those are the only

19   actual files that we can identify came from the defendant's

20   collection and appeared elsewhere.

21         THE COURT:  All right.  Okay.  Thank you.

22         Let's hear about the other guidelines issues.

23         We'll hear from the government all at one time and

24   then I'll hear from you.

25         MR. BOSTIC:  Oh, okay.

```
 1              MS. HEALEY:  Judge, with respect to the vulnerable
 2    victim enhancement, I understand Mr. Bostic's argument that,
 3    generally speaking, any type of enhancement that already is
 4    taken into consideration under an offense guideline is
 5    generally not grounds to have a special offense
 6    characteristic added.  So the usual view is if age is
 7    accounted for in a guideline, you are not going to ask for
 8    the vulnerable victim enhancement for unusual age.
 9              THE COURT:  And the guidelines say that.
10              MS. HEALEY:  Yes, they do.  And so we acknowledge
11    that.
12              However, as the Court has seen -- as the Court
13    noted before, the Jenkins case out of the Fifth Circuit --
14    that's 712 F.3d 209, which was issued March 20th of this
15    year -- and the Ninth Circuit case of U.S. v. Wright --
16    that's W-R-I-G-H-T, 373 F.3d 935; that was issued in 2004 --
17    those support the use of a vulnerable victim enhancement in
18    certain situations for age.  And we believe it applies in
19    this particular case.
20              I would note that Jenkins, which, of course, is a
21    pretty new case, cited --
22              THE COURT:  Jenkins just follows Wright.
23              MS. HEALEY:  Correct.
24              THE COURT:  What are the age of the children in
25    Jenkins?
```

```
1              MS. HEALEY:  Jenkins talks about babies and
2    toddlers.  However --
3              THE COURT:  The majority of the images in Jenkins
4    were kids seven to ten, I thought.
5              MS. HEALEY:  Actually, what it says -- that may be
6    right.  I think it says on page -- hold on one second.
7    Early on in the decision --
8              THE COURT:  It is hard to parse.  It says right
9    here --
10             MS. HEALEY:  It is.
11             THE COURT:  Well, I have it on a Post-it somewhere.
12             MS. HEALEY:  I think it is page -- yeah, it's at
13   page 211.  It says, "The presentence report stated that 36
14   image files and 110 video files depicting child sexual
15   exploitation were found on Jenkins' computer.  The PSR
16   described the images and videos as follows:
17             "The images and videos were prepubescent children,
18   a majority between the ages of seven and ten and a small
19   number of them were infants/toddlers.  The images and videos
20   reflected the penetration of an adult penis into a child's
21   vagina or anus" -- and then it goes into the damage and
22   talks also about some bondage images.  But it looks like, as
23   the Court has noted, the majority were between seven and
24   ten, clearly prepubescent, and then a small number were
25   infants and toddlers.
```

1          That case, notably, was not even a production

2    case.  That is a trafficking case or otherwise other child

3    pornography offenses.  I believe it was -- the defendant in

4    that case was convicted of receiving child pornography,

5    distributing child pornography, possessing child

6    pornography, and receiving obscene material depicting sexual

7    abuse of a minor, and possessing obscene material depicting

8    the sexual abuse of a child.

9          So in that case I think it is relevant because,

10   when we consider not only the videos in this case, the self-

11   produced videos, which in large part show the young three-

12   year-old victim, Minor A in this case, we also have -- if

13   the Court wants to consider based on *Jenkins* and if the

14   Court has looked at the first sealed exhibit we put into

15   evidence, there are other pictures in the defendant's

16   collection that portray babies in sexually explicit

17   conduct.  So just like *Jenkins* --

18          THE COURT:  Jody, let me see that exhibit.  I

19   haven't seen that.  Let me see that, Jody.

20          Go ahead.

21          MS. HEALEY:  So the government's argument is, you

22   know, based on *Jenkins* and *Wright*, the Court can consider

23   adjusting this offense level for two levels under the

24   vulnerable victim enhancement.

25          The cases do discuss, you know, obviously

 1   vulnerability may depend on a particular child.  The Court

 2   watched some of the videos, of course, that we put into

 3   -- or the excerpts of the videos that we put into evidence

 4   with the three-year-old child.  It is clear that she was a

 5   very young child.  And unlike somebody who was a ten -- or

 6   seven, even -- five, six, seven, eight, nine, ten, 11, 12

 7   and up, that child is unusually vulnerable because of her

 8   young age.

 9           THE COURT:  Well, let's talk about the facts of

10   this case for a minute.  We have two victims, one three and

11   one five.

12           MS. HEALEY:  Correct.

13           THE COURT:  And we know what happened to each of

14   those.

15           MS. HEALEY:  Okay.

16           THE COURT:  And we have seen the videos.  And we

17   have seen the exploitation of the three-year-old that is

18   different by material degree to the exploitation of the

19   five-year-old.  They are both exploited.

20           MS. HEALEY:  Sure.

21           THE COURT:  But the three-year-old -- and the Court

22   has to wonder why is that?  And why is it that the three-

23   year-old was subjected to this?  And that's because the

24   three-year-old didn't have the cognitive ability or the

25   psychological development -- I mean, that child tried to say

1    no.  That child tried to say no.  That child did say no.

2    That child kept pulling her pants back up in these videos.

3    But that child didn't have the age and maturity to be able

4    to stop this, didn't understand what was going on, perhaps,

5    even that the five-year-old had.

6              Because one has to wonder -- you know, I mean,

7    there's a difference there in the conduct.  And that goes

8    right to the heart of this vulnerable victim enhancement.  I

9    mean, it is -- it is what the court was talking about.

10   That's what the Ninth Circuit was talking about in the

11   *Wright* case.  That's what the Fifth Circuit was talking

12   about in *Jenkins*.  And it is sort of -- it is sort of right

13   smacking me in the face in this case because we have

14   different levels of conduct involving children of different

15   ages.  So I offer that observation for what it is worth.

16             MS. HEALEY:  And I think the Court is exactly on

17   point on that particular issue, because, as the Court has

18   now seen and has heard and has seen in the sentencing

19   memoranda, the three-year-old initially tried to -- she was

20   confused.  It's clear she was confused.  You know, "Why is

21   this guy pulling down my pants?"  She's learning about

22   things that she shouldn't know about or be exposed to at

23   such a young age.

24             And by virtue of that young age he was able to

25   groom her and get her eventually -- I mean, the movies even

1    show a pattern where they have a kid who was initially

2    reluctant to do anything, and then it progresses to, okay,

3    she's comfortable with it, and then it even progresses to

4    the point where she seems to accept it and want it.  And --

5              THE COURT:  The Court watched the videos.

6              MS. HEALEY:  Right.  And I think -- so I do think

7    that that particular child was unusually vulnerable.  But an

8    alternative basis that the Court can also uphold the

9    enhancement is by looking at the collection, because -- as

10   the *Jenkins* court had, the *Jenkins* court considered the fact

11   that the defendant's collection there had babies and

12   toddlers, and I think if the Court does look at that sealed

13   notebook -- I think that is Government 2?  I don't remember

14   what number.

15             THE COURT:  Yes.

16             MS. HEALEY:  Government's Exhibit 2, there are

17   pictures that appear to depict, if not a baby, a very, very,

18   very, very young toddler.

19             And we know from the birth date of the three-year-

20   old that the conduct occurred only a couple -- began to

21   occur only a couple of months after Minor A turned the age

22   of three.  So that is the government's position.

23             THE COURT:  Okay.  Let's talk about the --

24             MS. HEALEY:  Double counting?

25             THE COURT:  The interplay of 2G2.2(b)(5) and

```
 1   4B1.5(b)(1), the alleged double counting --
 2             MS. HEALEY:  Okay, Your Honor.
 3             THE COURT:  -- or the argued double counting.
 4             MS. HEALEY:  And we address that.  Actually what I
 5   ended up doing -- I have had this discussion or argument
 6   before Judge Moon before.  And I had briefed it even more
 7   extensively than we briefed in our memo.
 8             What is significant about those particular
 9   enhancements, one comes under, obviously, the offense
10   characteristics or the offense levels of Chapter 2.  Chapter
11   4 is a different bird.  The United States v. Schellenberger
12   case which comes out of the Fourth Circuit, which is an
13   unpublished case, but it's found at 246 Fed. Appendix 830.
14             THE COURT:  I read it.  I have it.  I understand
15   what it says.
16             MS. HEALEY:  Right.  It is directly on point.
17             THE COURT:  Let me ask you this question.
18             MS. HEALEY:  Sure.
19             THE COURT:  This double-counting issue only applies
20   to Count Thirteen.
21             MS. HEALEY:  That's correct.
22             THE COURT:  Right?
23             MS. HEALEY:  That's correct.
24             THE COURT:  It doesn't -- and at the end of the
25   day, all right, at the end of the day, if you take -- if you
```

1   put Count Thirteen aside, just for the sake of argument, and

2   you look at Count One, if you apply the vulnerable victim

3   for Count One, probation calculates the adjusted offense

4   level as 40.  Then you increase the guidelines by -- because

5   there is -- let's see --

6           MS. HEALEY:  I think there are a couple that are

7   calculated --

8           THE COURT:  No, I got it.  I got it.  Because there

9   is -- then you go to paragraph 121.  And because there's so

10  many different units, you have got to add five; so that

11  would take you to 45.  Subtract three for acceptance of

12  responsibility; that's 42.  And then you add the five under

13  Chapter 4; that's 45.  The highest you can go in the

14  guidelines is 43.  The practical implication of this is

15  -- of this double-counting argument is does it really matter

16  at the end of the day?

17          MS. HEALEY:  That's correct.  But it is legally --

18          THE COURT:  I know.  I have to deal with it.  And

19  I'm going to deal with it.  But I'm just sort of wondering.

20          MS. HEALEY:  And I see where the Court is going on

21  this.

22          I would point out there are other cases.  *United*

23  *States v. Bastian,* B-A-S-T-I-A-N, 650 Fed. Supp. 2d 849, at

24  869-70, it was a Northern District of Iowa case which

25  acknowledged the two provisions involved the same pattern of

1  activity but explaining that the sentencing commission

2  intended cumulative application of 2G2.2(b)(5) and

3  4B1.5(b)(1), and that the sections concerned conceptually

4  separate notions in that the 2G2.2 enhancement is a specific

5  offense characteristic for crimes involving child

6  pornography while 4B1.5 was created to address recidivism

7  concerns.  And that cites the commentary to 4B1.5.  That was

8  affirmed at 603 Fed.3d 460 by the Eighth Circuit in 2010.

9          *U.S. v. Wilson*, 2007 Westlaw 3070361, at star two,

10 is an Eastern District of Virginia 2007 unpublished case and

11 said even where a five-level enhancement applies to one

12 particular count under Section 2G2.2(b)(5), an additional

13 five-level enhancement may apply under 4B1.1.

14         There's another case out of New Mexico, *United*

15 *States v. Fred*, 2008 Westlaw 22298527, at star nine, which

16 cites *Schellenberger* case and also states the court's belief

17 is that there is some cumulative nature to what the

18 guidelines do and that Congress intends the guidelines to be

19 cumulative for sex crimes against minor victims.

20         I could go on on other cases if the Court would

21 like.  There was an Eleventh Circuit case, *U.S. v. Carter*,

22 292 Fed. Appendix 16, at page 20, Eleventh Circuit 2008,

23 also unpublished, where the Eleventh Circuit rejected a

24 defendant's argument that application of both sections could

25 be constituted impermissible double counting.  First, the

1  court noted that the sentencing commission intended for

2  guideline sections to apply cumulatively.  Second, the court

3  relied on the specific language of the guidelines to hold

4  that the two sections were not mutually exclusive as

5  4B1.5(b)(1) explicitly states that the enhancement shall be

6  five plus the offense level determined under Chapters 2 and

7  3.  And the Eleventh Circuit found that that language is

8  indicative of the commission's intent.  The court reasoned

9  that the two sections addressed different harms, and,

10  therefore, no double counting occur.

11         So while 2G2.2(b)(5) addressed the fact that the

12  offense itself involved a pattern of sexually exploiting

13  minors, the 4B1.5 enhancement looked at the likelihood that

14  the defendant could become a repeat offender and whether a

15  lengthy incarceration was therefore needed to protect the

16  public.

17         So that is the government's argument on that, Your

18  Honor.

19         And I would note too, in some ways, even though we

20  are already at the maximum of the guidelines, because the

21  grouping was actually only allowing a limited number of

22  offenses to be grouped and then you get some freebies, there

23  are other acts that were being sort of unaccounted for by

24  the fact that we are already at the maximum and you can only

25  group -- I think it is five offenses or six offenses.

1          THE COURT:  That's right.

2          MS. HEALEY:  Thank you, Your Honor.

3          THE COURT:  All right.

4          Mr. Bostic.

5          MR. BOSTIC:  Judge, as to the first matter we are

6    going to deal with, the distribution enhancement, we

7    objected to that.  The government basically used what the

8    Court referred to as a res ipsa approach on this:  It is out

9    there; he must have distributed it.  The evidence actually

10   indicates the exact opposite with respect to those videos.

11         The compilation video, which was actually found in

12   Denmark, was -- from everything that we know, was not on his

13   computer, was never on his computer.

14         THE COURT:  How did it get on the Internet?  He

15   produced it.  How did it get on the Internet?

16         MR. BOSTIC:  Looking at the email --

17         THE COURT:  He produced it.  How did it get on the

18   Internet?

19         MR. BOSTIC:  He produced it and put it on his

20   computer.  He did not put it on the Internet.

21         THE COURT:  He put it on his computer and somehow

22   it shows up in Denmark.  Doesn't that demonstrate

23   distribution?

24         MR. BOSTIC:  No, sir.

25         THE COURT:  I mean, practically speaking, for

 1   goodness sakes.

 2          MR. BOSTIC:  It ended up as a distribution.  But

 3   what we also have is an email where he actually was talking

 4   to a friend of his and describes his computer was hacked.

 5   We have the physical evidence from both of the two computer

 6   forensic specialists.  And both of them testify those videos

 7   were accessed and then CCleaner was run immediately

 8   thereafter, which is what his story has been from the very

 9   beginning.

10          So I think we actually had the email that he

11   actually talked about this; didn't talk anything about what

12   was actually hacked or what was taken, and didn't know at

13   that time.  He simply has on there, "My computer was

14   hacked."

15          So we have -- that's before any investigation,

16   before anything was seen on the Internet, before anything.

17   He simply is talking about it.  That is verbatim statements,

18   not realizing there is going to be any future

19   investigation.

20          So I would submit to the Court that as far as him

21   actively going out and distributing it, that there simply

22   -- other than it being on the Internet, we don't have

23   anything else to show that it was.  It was certainly not on

24   his computer, from both of the experts.  And there was a

25   conversation that he said, "My computer was hacked."  So

1    that is what the -- the evidence that the Court has.

2          There's nothing showing that those images -- that

3    he ever uploaded those images.  So --

4          THE COURT:  Why wouldn't the distribution

5    enhancement apply by virtue of his -- by virtue of the

6    Fourth Circuit cases?  And there's an Eastern District case,

7    *United States versus McVey;* and then Fourth Circuit, *United*

8    *States versus Layton;* Fourth Circuit, *United States versus*

9    *Brunner.*  Merely by the fact that he is using the BitTorrent

10   and the Freenet software and that he is -- by engaging in

11   those peer-to-peer on BitTorrent and then making his --

12   pieces of his computer available, that 10 -- whatever it was

13   on the hard drive available to Freenet, and given the number

14   of child pornography images on his computer, you take that,

15   you combine it with the fact that he took these and produced

16   these videos and they end up in Denmark, isn't both of those

17   together -- doesn't that provide sufficient evidence that

18   the government has met its burden with regard to this

19   two-point enhancement?

20          MR. BOSTIC:  The government --

21          THE COURT:  He made his computer and images on his

22   computer accessible to others on the Internet.  And we know

23   he had 70,000 child porn images on his computer.  And he

24   made it available by using BitTorrent.  He made it available

25   by using Freenet.  And we know the videos he produced end up

1    in Denmark in a compilation form.  Isn't that enough to

2    -- for the government to meet its preponderance burden on

3    the application of this two-point enhancement?

4              MR. BOSTIC:  No, for one reason.

5              THE COURT:  All right.

6              MR. BOSTIC:  The Court is aware and the Court heard

7    testimony on this, the file sharing, which is what I believe

8    almost all of those cases that deal with this particular

9    issue, if you voluntarily leave the file-sharing aspect of

10   your computer on, then people come in and out of your

11   computer and get things.  But there's no evidence on the

12   BitTorrent or with the Freenet --

13             THE COURT:  Free network, absolutely, 10 percent of

14   your computer is accessible to the rest of the world, to the

15   folks who are on that free network.

16             MR. BOSTIC:  But there's no evidence that the

17   videos -- there's no evidence that the videos were

18   downloaded -- videos or pictures downloaded and put in that

19   particular folder.

20             THE COURT:  But it doesn't matter whether it is

21   these videos, because the enhancement applies to any child

22   pornography.  It doesn't have to be these particular

23   videos.  The government is arguing that, but it doesn't have

24   to be.

25             MR. BOSTIC:  Any of the other videos -- there's no

 1  evidence that any of those were put into the Freenet

 2  folder.  What the evidence is, that it was somewhere on his

 3  computer --

 4          THE COURT:  Don't you think it is reasonable to

 5  assume that they were, because he had 70,000 images?

 6          MR. BOSTIC:  Reasonable to assume --

 7          THE COURT:  Or am I speculating?

 8          MR. BOSTIC:  I believe that's speculation.  I think

 9  there's no actual evidence of it.

10          THE COURT:  All right.

11          All right.  Let's talk about the double-counting

12  issue, Mr. Bostic.

13          MR. BOSTIC:  Judge, with respect to the double

14  counting, I have read a variety of cases on this and I know

15  what the law is.  It just --

16          THE COURT:  Do you have any law that is on your

17  side?

18          MR. BOSTIC:  I have not found any.

19          THE COURT:  That's what I thought.  I mean, you

20  know that Section 2 of the guidelines and Chapter 2 of the

21  guidelines and Chapter 4 of the guidelines are there for

22  different -- they address different purposes.  You know

23  that.  That's what the cases say.  That's what the Fourth

24  Circuit says in *Schellenberger*.

25          Have you got any case law that supports your

```
 1   position?

 2          MR. BOSTIC:  I do not.

 3          THE COURT:  Okay.  Now, there's one other

 4   -- there's one other thing that you talked about in your

 5   sentencing memo or maybe in a -- no, it was early on in an

 6   objection.  You objected to paragraph 111.  And we haven't

 7   talked about that yet here today.  And that was the one

 8   which -- you said, "I haven't seen the videos yet and I

 9   don't know about the four-point enhancement that's in

10   paragraph 111."  Are you continuing to press that

11   objection?

12          MR. BOSTIC:  No.

13          THE COURT:  You have now seen the videos; you agree

14   that's an appropriate enhancement?

15          MR. BOSTIC:  I do.

16          THE COURT:  Is there anything else you want to say

17   about the enhancements?

18          MR. BOSTIC:  No, sir.

19          THE COURT:  Okay.  Does the government wish to say

20   anything else?

21          MS. KATZIN:  Regarding the distribution

22   enhancement, we just want to make sure that it is clear that

23   while the defendant was using technologies that would allow

24   others to come in and -- you know, would allow images to be

25   sent out, we can't point to any particular image, including
```

1    the self-produced images, you know, that was shared --

2              THE COURT:  I understand that and I appreciate

3    that.

4              MS. KATZIN:  Okay.

5              THE COURT:  All right.  Anything else with regard

6    to the guideline calculations that you-all want to raise

7    with the Court?

8              MS. HEALEY:  Not with the guidelines, Your Honor.

9              MR. BOSTIC:  No, sir.

10             THE COURT:  Okay.  Could counsel approach, please?

11         (Off-the-record discussion at sidebar.)

12             THE COURT:  Let's go back on the record.

13             Off the record we discussed the fact about whether

14   we should take a lunch break.  That was all that was

15   discussed.  And we are going to take a lunch break until

16   -- a half-an-hour break, until 1:30, because the Court wants

17   a little bit of time to get my thoughts in order with regard

18   to all of these guideline issues.

19             Now, are there any other issues that need to be

20   addressed with regard to the guidelines or the objections to

21   the guidelines?

22             MR. BOSTIC:  Judge, it was just brought to my

23   attention, there was one other objection, paragraph --

24             THE PROBATION OFFICER:  44.

25             MR. BOSTIC:  -- 44.

```
 1              THE COURT:  All right.

 2              MR. BOSTIC:  Judge, I went back and reviewed that

 3    particular -- the video concerning that particular one, and

 4    we would withdraw that objection.

 5              THE COURT:  You withdraw your objection to 44.

 6              MR. BOSTIC:  I think it would qualify.  And I don't

 7    think I have a legitimate argument that it would not.

 8              THE COURT:  All right.  So you withdraw that, as

 9    well as the objection you had to 111.

10              All right.  Now, have we addressed all of the

11    guidelines objections?

12              MR. BOSTIC:  Yes.

13              MS. HEALEY:  I think so, Your Honor.

14              THE COURT:  All right.  Let's recess until 1:30, at

15    which time I will make my guideline findings.  Then I will

16    hear any evidence and argument related to an appropriate

17    sentence under 3553.  Then we will hear -- if there are any

18    victims, the Court would like to address the victims and

19    hear from them.  And then, of course, the Court will hear

20    allocution from the defendant.

21              Ask the marshal to declare a recess.

22         (Recess at 1:00 p.m.)

23         (Call to Order of the Court at 1:40 p.m.)

24              THE COURT:  Okay.  We are back in session.

25              Is there anything else that occurs to either the
```

1    United States or the defendant that you would like to raise

2    at this time before the Court makes its guidelines

3    findings?

4              MR. BOSTIC:  Not at this time.

5              THE COURT:  Okay.  I went back and looked at the

6    addenda to the presentence report during the recess and

7    looked at the objections.  And I do have something I want to

8    raise with you, Mr. Bostic.  I don't know if you have got

9    that in front of you.

10             I think we have dealt with -- and I'm talking about

11   the addenda to the presentence report.  I think we have

12   dealt with here today all of the objections, perhaps with

13   the exception to objection two that you raised.  And I don't

14   know if -- whether you are satisfied with the probation's

15   response to your objection number two.

16             And it was -- objection number two was "Defense

17   counsel objects to a second statement within the offense

18   conduct section describing the same or similar video

19   clips."  And then probation says, "I based this on what was

20   in the written statement of facts."

21             I just want to make sure -- I wanted to know if you

22   have any additional argument or anything else you wanted to

23   say about that particular objection?

24             MR. BOSTIC:  Judge, I guess what -- I was trying to

25   remember exactly when I filed that objection, because I

1  believe it was the same video, as I understood it at the

2  time.

3         THE COURT:  What you said from your letter of

4  February 18th -- would you like to see that?  What you said

5  was at the bottom of page four and going on to page five, it

6  states that "The same or similar video clips were obtained

7  from Mr. Dowell's sister.  It was, in fact, the same

8  compilation video that contained the videos of Mr. Dowell

9  and the two girls.  And I would note an objection to the

10  characterization of 'the same or similar video clips.'"

11         And I think all that probation was saying there was

12  -- and this was with regard to paragraph five, that -- all

13  that probation was saying there was that "I took this

14  language directly from the statement of facts."

15         So do you have anything else you want to say about

16  that?

17         MR. BOSTIC:  No, sir.

18         THE COURT:  Okay.  All right.

19         Let's go through these objections.

20         Objection one filed by the government, to which we

21  have heard extensive argument and the Court has -- we have

22  also had evidence here today, particularly the video

23  evidence, concerns the vulnerable victim enhancement and

24  whether or not that's appropriate.  And that is the

25  enhancement under 3A1.1(b)(1), and whether that is

1    appropriate in this case where the enhancement under

2    2G2.2(b)(2) is given because that enhancement applies --

3    under 2G2.2(b)(2) applies when the material involved a

4    prepubescent minor or a minor who had not attained the age

5    of 12 years.

6         The Court is going to apply the vulnerable victim

7    enhancement in this case.  Recently the Fifth Circuit held

8    in *United States versus Jenkins,* 712 F.3d 209, at 213, Fifth

9    Circuit 2013, that "The vulnerable victim enhancement under

10   3A1.1(b)(1) may be applied when victims are very young

11   despite giving the 2G2.2(b)(2) enhancement given when the

12   material involved a prepubescent minor or a minor who had

13   not attained the age of 12 years."

14        I think this case points up exactly why -- exactly

15   why -- and the specific facts of this case point up exactly

16   why -- the Court is persuaded by the *Jenkins* decision, given

17   the specific facts of this case, to apply that additional

18   vulnerable victim enhancement in this case, as I will

19   explain.

20        In *Jenkins* the Court noted that while the

21   vulnerable victim enhancement explicitly states that the

22   enhancement can never be applied to a count for a

23   vulnerability that is related to age when the specific

24   offense guideline provides for an enhancement on the age of

25   the victim.  The 2G2.2(b)(2) enhancement is a specific

1  offense guideline that provides for an enhancement based on

2  the age of the victim.  The Fifth Circuit, however, noted

3  that the vulnerable victim enhancement may be given in the

4  case where the vulnerability of the victim stems from

5  something other than just the age of the victim.

6  Specifically, the Fifth Circuit held that there was no

7  logical reason why a victim-under-the-age-of-12 enhancement

8  should bar application of the vulnerable victim enhancement

9  when the victim is especially vulnerable, even as compared

10  to most children under 12.  The Fifth Circuit upheld the

11  application of the enhancement in the case where the

12  presentence report indicated the images included children

13  between the ages of seven and eight and included infants and

14  toddlers.

15       And, of course, in *Jenkins*, of course, that was

16  simply a trafficking in child pornography.  It was not a

17  production case, as this one is.

18       In coming to this conclusion, the Fifth Circuit

19  relied primarily on *United States versus Wright*, 373 F.3d

20  935, from 2004, where the Ninth Circuit held that a

21  3A1.1(b)(1) vulnerable victim enhancement was appropriate

22  along with a Section 2G2.2(b)(2) enhancement based on

23  prepubescent younger-than-12-year-old children, where the

24  victims ranged in age in that case from 11 months to four

25  years.

1      The Ninth Circuit explained that the victim's

2   vulnerability is not fully incorporated in the victim-under-

3   12 adjustment because most children under 12 are well beyond

4   the infancy and toddler stages of childhood during which

5   they are the most vulnerable.  The Ninth Circuit further

6   explained that though the characteristics of being an infant

7   or toddler tend to correlate with age, they can exist

8   independently of age, and are not the same thing as merely

9   not having attained the age of 12 years, the criteria for

10   the four-level increase in 2G2.2(b)(2).

11      Particularly the Ninth Circuit focused on three

12   reasons, all of which exist independent of the victim's

13   age.  One, physical characteristics; small physical size

14   increased vulnerability, inability to walk increased pain

15   upon penetration.  Two, cognitive development; differing and

16   not necessarily linked to age.  And, three, unique concerns

17   about the moral and psychological development of the child.

18   I think the reasons two and three particularly bear on this

19   case.

20      The Ninth Circuit held that because the traits and

21   characteristics associated with infancy and the toddler

22   state can exist independently of age and because the factors

23   of extreme youth and small physical size recognize a

24   vulnerability beyond age per se, the application of both

25   enhancements is not impermissible.

1          Now, in this case I watched the video.  And it is

2     clear to me -- from the video clip that we have seen in

3     evidence in this case, it is clear to me of how vulnerable

4     this child is and how -- the minor victim A, and how her

5     cognitive abilities just do not allow her to appreciate what

6     is going on with her, what is being done to her, and the

7     progression of this vile abuse that was inflicted on her.

8          From my own viewing of the videos and looking at

9     what happened over the progression, seeing that she plainly

10    doesn't understand what is going on here, focusing on her

11    cognitive development, I believe this victim is particularly

12    vulnerable.

13          First and foremost, the concern of this Court notes

14    that the psychological effect of this abuse is clear based

15    on the progression of abuse in this case due to the

16    vulnerabilities of minor child A.  At first the Court notes

17    that the child is giggling and laughing and saying, "Stop

18    it," and attempting to put her pants back on, her underpants

19    back on, as the defendant was beginning to groom her and

20    begin his abuse.  And due to her cognitive state, she just

21    thought he was just playing with her.  He was picking her

22    up, upside down, laughing.  She's laughing particularly when

23    she's held upside down while he was doing other things.

24          And it is clear from viewing the progression, as

25    depicted in the evidence, throughout the several months that

1    this happened, the child went from telling the defendant
2    "No" to requesting such conduct, demonstrating the
3    particular vulnerability psychologically in this child.
4              In that regard, the Court notes what I pointed out
5    earlier, the different levels of abuse inflicted on minor
6    victim A and minor victim B.  Both these children are under
7    12 years old.  And 2G2.2(b)(2) treats them the same, treats
8    them the same.  And that points up more than anything for me
9    why 2G2.2(b)(2) doesn't cover the waterfront here.
10             There is a stark difference in the abuse inflicted
11   on minor victim A and minor victim B.  And that points up
12   the very reason why the under-12 enhancement in 2G2.2(b)(2)
13   paints with too broad a brush.  Minor victim A is much less
14   cognitively capable of understanding her abuse.  She's much
15   more psychologically susceptible to accepting and welcoming
16   this conduct than an older child would be.  She is, in fact,
17   a more vulnerable victim.  And I believe the two-point
18   enhancement is not double counting.
19             The Court is persuaded on the specific facts of
20   this case that the *Jenkins* and *Wright* cases got it right,
21   and I'm going to apply it.
22             All right.  That takes care of vulnerable victim.
23             MR. BOSTIC:  Judge, the Court will note my
24   exception.
25             THE COURT:  Absolutely.  Your objection and

1    exception to that is noted.

2            All right.  Objection one by the defendant,

3    probation took care of in the presentence report.  That was

4    -- the presentence report was amended.

5            We have taken care of objection two with regard to

6    the same or similar video clips.  We just dealt with that.

7    That is -- that particular reference comes straight out of

8    the statement of facts that has been agreed to by the

9    defendant, and it is appropriate.

10           Objection number three deals with paragraph 44 of

11   the presentence report.  That was withdrawn by the defendant

12   after further -- his further -- counsel's further review of

13   the video evidence.

14           Objection number four deals with the two-level

15   enhancement in paragraph 110.  And that's the distribution

16   enhancement that we have talked about in this case.

17           I understand the government's argument.  I

18   understand the defendant's argument.  And the Court is

19   persuaded that the government has not met its burden of

20   establishing distribution to apply this enhancement.

21           I think the government concedes that it doesn't

22   have any specific evidence that these particular videos were

23   uploaded by this defendant or that any of the information

24   available on BitTorrent or free network were, in fact, child

25   pornography that were shared.  And because of that, the

```
1    Court is going to give the defendant the benefit of the
2    doubt and find that the government hasn't established
3    distribution to apply the enhancement under -- two-point
4    enhancement under paragraph 110, so I'm not going to apply
5    that under the specific facts of this case.
6              All right.  Objection number five was paragraph
7    111.  And the defendant has withdrawn that, based on our
8    prior conversation, after further review of the videos in
9    this case.
10             All right.  Objection number six from the defendant
11   is the -- objection number six is the double -- the
12   so-called double-counting objection, the five points under
13   2G2.(b)(5) and 4B1.(b)(1).
14             Now, the Fourth Circuit has held that double
15   counting occurs when a provision of the guidelines is
16   applied to increase punishment on the basis of a
17   consideration that has been accounted for by application of
18   another guideline provision or by application of the
19   statute.  That is *United States versus Reed*, 264 Fed.3d 151,
20   158, Fourth Circuit, 2004.  Double counting is generally
21   authorized unless the guidelines expressly prohibit it,
22   *United States versus Crawford*, 18 Fed.3d 1173, 1179, Fourth
23   Circuit, 1994.
24             In this particular case there is no prohibition
25   against this -- applying both of these five-point
```

enhancements.  And, in fact, the Fourth Circuit has approved
this very application.

In *United States versus Schellenberger*, 246 Fed.
Appendix 830, 832, Fourth Circuit, 2007, the Fourth Circuit
specifically said it is not impermissible double counting to
apply both of these enhancements.  It says each guideline
applies because Schellenberger's conduct fell squarely
within its definition.  That's plainly the same in this
case.

Moreover, Section 4B1.5(b)(1) states that the five-
level enhancement is to be added to the offense levels
determined under Chapters Two and Three.  So the guidelines
themselves contemplate the cumulative application of these
enhancements.

Not only do the guidelines themselves contemplate
that the enhancements be applied cumulatively, not only does
the Fourth Circuit say, "Look, double counting is authorized
unless the guidelines prohibit it," it makes sense in this
case to allow both of these enhancements to apply.  And that
is because they deal with separate things.

2G2.(b)(5) is a specific offense characteristic for
crimes involving child pornography.  4B1.5 is there for
different reasons.  It is there for recidivism.  This
guideline applies to offenders whose instant offense of
conviction is a sex offense committed against a minor and

1  who presents a continuing danger to the public.  The courts

2  have consistently found that these two guidelines can be

3  applied together, do not constitute impermissible double

4  counting.

5       The defendant could identify no cases which went

6  the other way.

7       The government cites a number of cases from around

8  the circuit, in addition to *Schellenberger*, which is enough

9  of itself; the *Bastion* case from Ohio; the *Wilson* case -- I

10  think from Texas; the *Friend* case.  There's a plethora of

11  precedents supporting it.

12       I'm going to apply both of those, the Chapter Two

13  five points and the Chapter Four five points as well.

14       All right.  And your exception is noted.

15       MR. BOSTIC:  Thank you, Judge.

16       THE COURT:  All right.  Now let's go to the

17  guidelines calculations.  All right?

18       Anything from the government?

19       MS. HEALEY:  Just a point of clarification.  I know

20  the Court found the vulnerable victim enhancement under the

21  transportation charge, but I'm assuming the Court also found

22  that it is applicable under 2G2.1, and not just 2G2.2?  The

23  production guideline allows for an enhancement if the child

24  is between 12 and 16 and another enhancement if the child is

25  below 12.  And I think Mr. Sheffield had put in vulnerable

1  victim enhancements for the three-year-old in the various

2  counts that were applicable.

3         THE COURT:  It is the Court's intention to apply,

4  for the reasons I just said, the vulnerable victim

5  enhancement to every count here, across the board.  That was

6  my intention.  If I used a (b)(1) or a (b)(2)

7  inappropriately in my oral recitation, I apologize for

8  that.  It is my intention, based on the evidence that I have

9  seen, to apply the victim-related adjustment for a

10 vulnerable victim to every count in this indictment.

11        All right.

12        MS. HEALEY:  Except for the two that have to do

13 with minor --

14        THE COURT:  Except for Eleven and Twelve.

15        MS. HEALEY:  Yes.  Thank you, Your Honor.

16        THE COURT:  So it is One through Ten and Thirteen.

17 All right.

18        Okay.  Now -- thank you for that.

19        Let's go through the -- let's go through the

20 guideline calculations.  All right?  And I am going to

21 differ from -- in my guideline calculations and what the

22 Court is going to find -- and I'll tell you why -- from what

23 probation has calculated.

24        All right.  All right.  The statutory penalties in

25 this case for Counts One through Twelve are a mandatory

```
 1   minimum per count of 15 years, a statutory maximum of 30

 2   years.  Count Thirteen, the transportation count, bears a

 3   mandatory minimum of five years, a statutory maximum of 20.

 4   There's a period of supervised release of five years to life

 5   and a fine of up to $250,000 per count.  There's, of course,

 6   a $100 mandatory special assessment per count.

 7             All right.  And I'm going to do this count by

 8   count, just so that we're all clear.  And I know it will be

 9   a bit tedious, but there are 13 counts and they are a little

10   bit different, so I'm going to go through them.

11             For Count One the base level offense is a 32.  And

12   that's founded on 2G2.1.  You have got the four-level

13   enhancement under 2G2.1(b)(1)(A).  You have a specific

14   offense characteristic of plus two because the defendant was

15   in a supervisory role or in the custody or care.  There's a

16   -- I'm applying the vulnerable victim enhancement --

17             MR. BOSTIC:  Judge, can I address the Court on

18   that?  To -- if the Court would note, just for the record --

19             THE COURT:  You didn't object to it.

20             MR. BOSTIC:  Yes.

21             THE COURT:  You didn't object to it.

22             MR. BOSTIC:  I objected to the vulnerable --

23             THE COURT:  Victim, right.

24             MR. BOSTIC:  -- victim, yes.

25             THE COURT:  But you didn't -- what do you want to
```

1   address me on, Mr. Bostic?  I'm sorry.

2       MR. BOSTIC:  I was just going to say for each of

3   the vulnerable victim enhancements for each count, to note

4   an objection.

5       THE COURT:  Absolutely.  Absolutely.  No.  Your

6   objections as to the Court's -- across the board on

7   vulnerable victim, your objection as to the five plus five

8   is noted.

9       MR. BOSTIC:  Thank you.

10      THE COURT:  All right.  Thank you.  All right.

11      Vulnerable victim, plus two, for an adjusted

12  offense level of 40.  That's for Count One.

13      Count Two is exactly the same.

14      Count Three is exactly the same.

15      Count Four is different.  Count Four starts with

16  the same base offense level, 32.  There is a minor victim

17  under 12, so you add four.  This one adds two more points

18  because this specific count, Count Four, alleges sexual

19  contact.  So you get two more points under 2G2.(b)(2)(A).

20  So that -- and then the other two, the vulnerable victim and

21  under the custody or care.  So the adjusted offense level

22  for Count Four is a 42.

23      For Count Five, it is the same as Count One.

24      For Count Six, it is the same as Count One.

25      For Count Seven, it is the same as Count One.

1          For Count Eight and Count Nine, it is the same as

2   Count Four, because each of those counts alleged touching.

3   And so the sexual contact two points apply.

4          For Count Ten, it is the same as Count One.

5          All right.  For Counts Nine -- excuse me.  For

6   Counts Eleven and Twelve, the same base offense level, 32;

7   plus four for under 12; plus two for custody or care.  There

8   is no vulnerable victim for Counts Eleven or Twelve.

9   Therefore, the base offense level -- or the total -- excuse

10  me.  Excuse me.  The adjusted offense level is 38.

11         All right.  Now, for count -- the last count, Count

12  Thirteen, starts with a base offense level of 22.  You add

13  two for the under 12.  You add two for -- no.  I'm -- I am

14  not accepting the paragraph 110 two points for

15  distribution.  I'm adding four for the paragraph 111.  I'm

16  adding five for paragraph 112, under 2G2.(b)(5).  I'm adding

17  the use of the computer, plus two.  And because it involves

18  600 or more images, under paragraph 114, I'm adding five

19  more.  And, of course, we have the vulnerable victim there,

20  so that is a plus two.  And so that is an adjusted offense

21  level of 42.

22         All right.  That is going to impact, therefore,

23  item number -- it is going to make a change under paragraph

24  119.

25         THE PROBATION OFFICER:  It is, Your Honor.

1           THE COURT:  The adjusted offense level for group 13

2   should be 42; correct?

3           THE PROBATION OFFICER:  Correct.

4           THE COURT:  That still leaves it at a one unit,

5   however?

6           THE PROBATION OFFICER:  Correct.

7           THE COURT:  Okay.  All right.

8           Now, the greater of the adjusted offense levels is

9   42 now.  That is under paragraph 120.

10          Because there are so many groups, that has to take

11  it up to a 47, so you go to plus five.

12          Let me ask the United States about acceptance of

13  responsibility.  The United States didn't go to trial in

14  this case.  Is there sufficient evidence of acceptance of

15  responsibility?

16          MS. HEALEY:  Your Honor, he accepted early enough

17  that we did not have to prepare for trial.  That's fine,

18  Your Honor.

19          THE COURT:  All right.  Are you satisfied with

20  that, Mr. Bostic?

21          MR. BOSTIC:  Yes.

22          THE COURT:  All right.  I'll give Mr. Dowell the

23  full measure of acceptance of responsibility.  That takes

24  the subtotal offense level in paragraph 125 to 44.

25          He gets the five points under 4B1.5(b)(1).  That

1    takes his total offense level up to 49.  That's a little

2    different from the presentence report, which had it at 51.

3    And that's just because of the paragraph 110 and the

4    distribution.  But the highest guideline level is 43.  So we

5    come back to the same point, 43.

6              Now, in computing -- in going from there -- I got

7    it.

8              Okay.  I now want to go to paragraph 151.

9    Actually, the -- yes.  151 says the calculated offense level

10    is 49 -- actually, that would have been an error, wouldn't

11    it, Mr. Sheffield?  It should have said 51 under your --

12    isn't that right?

13              THE PROBATION OFFICER:  It should be.

14              THE COURT:  It doesn't.  It says "49."  So you and

15    I must have been thinking on the same wavelength

16    intuitively.

17              So we are at 49.  So paragraph 151 does not have to

18    be changed.  So we know we are at 43, which is the highest

19    you can get under the guidelines.

20              Then you go to paragraph 152.  And this is what I

21    want to mention at this time.  And this is where I'm going

22    to, with all due respect, disagree with what probation has

23    done with regard to the guideline range.

24              Paragraph 152 says, "If the sentence imposed on the

25    count carrying the highest statutory maximum is less than

1  the total punishment, then the sentence imposed on one or

2  more of the other counts shall run consecutively, but only

3  to the extent necessary to produce a combined sentence equal

4  to the total punishment.  In this case, the statutorily

5  authorized maximum sentences are less than the maximum of

6  the applicable guideline range, life," because the guideline

7  range in this case, even at a -- he has a criminal history

8  category of I, because he has no prior criminal history --

9  the guideline range is life.

10         And what the probation officer does is he simply

11  totals up all of the -- the maximum statutory penalty on

12  each count and adds them all up and gets to 4,560 months.

13  Now, I don't believe that 5G1.2(d) requires the probation

14  officer to take the maximum of every sentence of every count

15  to reach the total punishment.  The total punishment under

16  the guidelines is life.  And based on a base offense level

17  -- based on a total offense level of 43 and a criminal

18  history category of I.

19         And if you read 5G1.2(d), when it says, "But only

20  to the extent necessary to produce a combined sentence equal

21  to the total punishment," well, it is a fact of our

22  existence that 4,560 months is far more than necessary to

23  produce a combined sentence equal to the total punishment.

24  And -- so, therefore, I don't think that the guideline range

25  ought to be 4,560 months, because I think that is far more

 1   than is necessary to produce a combined sentence equal to

 2   the total punishment.

 3            So I don't think you have to run all of the counts

 4   consecutive in order to be able to do that.

 5            MS. HEALEY:  Your Honor?  At some time, at some

 6   point, may we respond to that?

 7            THE COURT:  You may say whatever you want.

 8            MS. HEALEY:  I would beg to differ.  I believe the

 9   cases that have been -- and these cases frequently end up

10   resulting in what we find are guideline sentences that are

11   well above the number of months that you could possibly live

12   your life.  Of course, the Court has to --

13            THE COURT:  What does that mean?  What does that

14   mean?  Your argument would say -- "But only to the extent

15   necessary to produce a combined sentence equal to the total

16   punishment," you would read that right out of the

17   guidelines.

18            MS. HEALEY:  I did not -- I may have done it in the

19   *Cobler* memo -- I don't recall if I wrote more on this

20   issue -- but the government's position is that the

21   guidelines -- the guidelines have to -- since the guidelines

22   advise life, but the statutory maximum doesn't meet life,

23   then the guidelines still have to be the maximum you can

24   get.  And in this case, the maximum --

25            THE COURT:  What is your case law for that?

1          MS. HEALEY:  I don't -- I didn't know this was
2    going to be an issue, I'm sorry, Judge, so I do not have it
3    before us.  It may have been briefed.  I may have put
4    something in -- extra in the *Cobler* memo that I don't have
5    before the Court right now.
6          I would point out, in looking at -- I was provided
7    a chart, for example -- and this doesn't tell you the legal
8    answer, but I actually queried our listserv for certain
9    sentences that were given around the country.  There was an
10   AUSA, I think out of Texas, who had requested from the
11   department any statistical data they had on sentences
12   exceeding -- I think it was 600 months, or 50 years,
13   effectively.
14         And the chart -- and I'm happy to show the Court; I
15   think they come from official data -- you can see -- they
16   calculate numbers in months.  And, for example, there was a
17   case in the Northern District of Alabama where the defendant
18   was sentenced to 11,520 months because of the statutory
19   maximum in that case.  That has been affirmed, as I
20   understand, on appeal.
21         But the chart indicates -- here you have prison
22   time that these guys were sentenced to.  And they are 3,720
23   months, at 11,000, 3900, 840, some have life.  But there are
24   these huge numbers -- or include these huge numbers that
25   would obviously exceed --

```
 1            THE COURT:  So you are telling me you think that
 2    that provision in the guidelines means nothing?  Because it
 3    says "but only to the extent necessary."  And we all know
 4    that 4,000 months is way too much.  And so, therefore, if I
 5    do anything other than give, according to your reasoning,
 6    4,560 months, I have got to vary from the guidelines?  If I
 7    do something other than give 4,560 months, I have got to
 8    vary from the guidelines?
 9            MS. HEALEY:  That's correct.  That is my position,
10    Your Honor.
11            THE COURT:  Well, I want to know what your
12    authority is for it.
13            MS. HEALEY:  I didn't know this was an issue.  This
14    came up in Cobler.  We did brief it.  I did not think -- I
15    know the Court accepted -- in that case it was 1,440 months,
16    I know it is separate facts, but I know that was not made an
17    issue.  I do not have that.  I can get that, if I have time
18    to actually brief that.  But, yes, I do think --
19            THE COURT:  It is 380 years.
20            MS. HEALEY:  Yes, Your Honor.  I'm well aware of
21    that.  But I do think that in these types of situations,
22    where the guideline is life, but the statutory maximum does
23    not allow for a technical life sentence, the Court is
24    supposed to aggregate the maximum sentences and --
25            THE COURT:  Yes, but only to the extent necessary
```

1  to produce a combined sentence equal to the total
2  punishment.  That's what the guidelines says, "but only."
3  Okay?  And are you telling me there's case law that says I
4  can't do that?
5         MS. HEALEY:  I don't have -- I honestly did not
6  perceive that this was going to be an issue.  This was
7  always my understanding --
8         THE COURT:  No, I'm telling you -- do you have case
9  law to support that proposition?
10        MS. HEALEY:  Not right now I do not, Your Honor.
11        THE COURT:  Have you got the *Cobler* brief?
12        MS. HEALEY:  And maybe I did not put it in, but I
13  thought I might have put in more.
14     (Pause.)
15        THE COURT:  Is the probation officer aware of any
16  case law that supports the proposition that I am required to
17  add up every count, the maximum penalty, and result in a
18  4,560-month sentence, and then in order to do something that
19  -- other than that, I would have to vary from the
20  guidelines?
21        THE PROBATION OFFICER:  Your Honor, I'm not aware
22  of any case law.  I can tell the Court that it has been the
23  practice of this district to add the maximum penalties
24  available for the total punishment.
25     (Pause.)

1          THE COURT:  Okay.  All right.  Hold on.  Hold on.

2          Let me just say that at the end of the day -- I

3    mean, I -- no, I have got it right here.

4          At the end of the day the total punishment in this

5    case under the guidelines calls for life.  And we're almost-

6    we're almost debating an academic point, because -- but I

7    want to get it right.

8          All right.  The case that you cited in *Cobler* was

9    *Schellenberger*.

10         MS. HEALEY:  And I -- Your Honor, I'm sorry --

11         THE COURT:  No.  Hold on.  Hold on.

12         MS. HEALEY:  -- I didn't know this would be an

13   issue.

14         THE COURT:  That's okay.  Just let me look at it.

15   I don't want to create a problem.  If the Fourth Circuit

16   says that what I was about to do isn't right, well, then,

17   let's do what is right.

18         MS. HEALEY:  I think it says the same thing as the

19   present case as well.

20      (Off-the-record discussion between the Court and the

21   law clerk.)

22         THE COURT:  All right.  *Schellenberger*, from the

23   Fourth Circuit, says exactly what I said.  It quotes the

24   guidelines, quotes *United States versus White*, 238 F.3d 537,

25   at 543, and says, "In a case of multiple counts of

1  conviction the guidelines instruct that if the total

2  punishment mandated by the guidelines exceeds the highest

3  statutory maximum, the district court must impose

4  consecutive terms of imprisonment to the extent necessary to

5  achieve the total punishment."

6          The *United States versus White* case that is cited

7  in *Schellenberger*, all of which -- both *White* -- well, *White*

8  is -- *White* is pre*Booker* -- doesn't say anything

9  differently.

10          MS. HEALEY:  Your Honor, may I offer a possible

11  explanation for why the cases -- or why the language is "to

12  the extent necessary"?

13          THE COURT:  Certainly.

14          MS. HEALEY:  Because I think in the normal

15  situation where this happens is we don't always end up in an

16  advisory life situation.  So you might end up with -- you

17  might have a multiple drug case -- or a multiple drug

18  conviction case where the guidelines say 240 months or 360

19  months, and we have charged possession or some

20  distributions, petty distributions, and where -- since the

21  distributions might be five years to something, not as high

22  as the production charges that we're talking about here, you

23  want to get those up as close to the guideline range as

24  possible.  So where normally if the guidelines exceed the

25  statutory sentences, then you have got that -- I'm not

1  saying this articulately.

2          I'm trying to explain that in most cases we're not

3  talking about, necessarily, an advisory life situation and

4  we're often talking about lower statutory maximums.  And I

5  get that, but --

6          THE COURT:  It is "to the extent necessary."  And

7  in this -- in this world I guess what I was thinking was why

8  do I have to add all of the sentences for all of the counts

9  to come up with a sentence that is over 300 years when it

10 makes -- when no -- everybody knows that that is way beyond

11 what is necessary to achieve the total punishment, which is

12 life.

13         MS. HEALEY:  But then the Court would be in the

14 position of having to sort of do an actuarial assessment as

15 to how long can the defendant live.  We know that production

16 sentences result in huge sentences that far exceed the

17 possible potential -- or possible or potential life span of

18 these defendants.  And I do -- I don't have anything to give

19 to the Court.  I would love to see --

20         THE COURT:  I don't think *Schellenberger* or *White*

21 say anything different than what the guideline says, nothing

22 different.

23         MS. HEALEY:  And they may not.  It is still the

24 government's position that the combined statutory maximums

25 have to be used in a life situation because there's got to

1  be a number of years.  Life arguably extends beyond any

2  number of years.

3        So I know what the Court is trying to say.  And

4  nobody is trying to say the Court cannot vary from the

5  guidelines --

6        THE COURT:  I'm not trying to -- I'm just trying to

7  figure out -- and I appreciate your argument.  I

8  understand.  But I'm just trying to figure out what -- under

9  5G1.2(d) it says -- if you buy your argument, then you are

10  reading out of the guideline the "but only to the extent

11  necessary to produce a combined sentence equal to the total

12  punishment."  Therefore, I am not going to go along with

13  you.  And I'm going to set a guideline range, something

14  lower than 4,560 months.  I'm going to set a guideline range

15  -- I'm going to do it to the extent necessary to produce a

16  combined sentence equal to the total punishment.

17        And if you want to ask the Fourth Circuit to tell

18  me I did this wrong, then Godspeed, you have got the right

19  to do it.  Okay?  But this is what I'm going to do.

20        I do not believe that the Court -- I do not believe

21  that the Court must add up all of the maximum sentences

22  -- let me just be very clear about what I am doing.  I do

23  not believe that the guidelines themselves -- when 5G1.2(d)

24  says, "but only to the extent necessary to produce a

25  combined sentence equal to the total punishment," I do not

 1  believe that requires the Court to add up the maximum

 2  penalty on each and every count, yielding thousands upon

 3  thousands of months, and thus requiring the Court to vary

 4  from the guidelines in order to make -- to reach a sentence

 5  that is anything other than astronomical.  I just -- I mean,

 6  it would be -- if I gave a guideline sentence in this case

 7  at 4,560 months, or 380 years, that just seems to me to make

 8  no practical sense in this case.

 9          So what I'm going to do in this case -- and I'm

10  learning as I go along -- is I am going to set the guideline

11  range in this case at 960 months.  And I'm doing it -- I'm

12  running -- I'm doing it under counts -- I'm running Counts

13  Eight and Nine consecutive at 30 years, their maximum

14  punishment.  I am running 180 months -- that's 360 months on

15  Count Eight, 360 months on Count Nine, 180 months on Count

16  Eleven, 180 months on -- and 60 months on Count Thirteen.

17  That, I believe, 960 months, or 80 years, is sufficient

18  -- is to the extent necessary to produce a combined sentence

19  equal to the total punishment, given this defendant's age.

20          So I'm setting the guidelines at 960 months.

21  That's 360 plus 360 plus 180 plus 60.  That is 960 months.

22          Okay.  Now, what arguments do the parties have with

23  regard to the 3553(a) factors?

24          MS. HEALEY:  Your Honor, I do have some evidence to

25  put on.  I just want to make it clear, we do think that's

1    procedural error.  Obviously, we know the Court has the

2    right to vary, but we do think the Court has to justify

3    -- if the Court were to determine to vary, that the Court

4    would have to justify a variance from the 4,600 months.  I

5    just want to make that clear, so we have a record.  But with

6    all due respect to the Court, that is the government's

7    position.

8            THE COURT:  Absent some authority -- I have got the

9    case you cited in *Cobler*, *Schellenberger*.  I have got the

10   *White* case that is cited in there.  I've looked at both of

11   them.  They don't say anything different than what the

12   guidelines say, and that is -- and I just don't see that the

13   guidelines -- I don't see that the guidelines require me to

14   find that -- anything that is beyond what is necessary to

15   produce a combined sentence equal to the total punishment.

16   So that's what I'm doing.  I'm imposing guidelines of 960

17   months.

18           All right.

19           MS. HEALEY:  And, Your Honor, I understand.  But,

20   as the Court is well aware, the case law also says, you

21   know, if you have a bigger -- if you are varying, you have

22   to justify whatever level of variance.  A bigger variance

23   deserves a bigger justification, which is why we think,

24   because we don't know what the Court is going to do, the

25   Court would have to justify a variance from the higher

1   level.  And I just wanted to set that for the record.

2            Thank you, Your Honor.  I understand your holding.

3            THE COURT:  That's fine.

4        MS. HEALEY:  Go ahead.  I'm sorry?

5        MR. BOSTIC:  Judge, I guess -- are we done with

6   that particular issue?  Okay.  I was -- with respect to the

7   psychological evaluations, moving on to the next thing, the

8   defense had previously requested and had been granted one

9   evaluation that was done, actually, by the Public Defenders

10  Office, prior to my involvement in this case.  Then I filed

11  a motion requesting that the Court grant a follow-up on that

12  basically, in part due to a change in circumstances of

13  Mr. Dowell's situation up until the time I filed the motion.

14            Based upon the information I have received from

15  Dr. Fracher, it is my view now -- number one, I'm not going

16  to call him as a witness.  He did advise me that he had

17  changed his position somewhat.  And we would request to

18  withdraw both of those two evaluations at this time.

19            THE COURT:  All right.  Any objection from the

20  United States?

21        MS. HEALEY:  No, Your Honor.  I think it is fair to

22  say that the change of opinion would be adverse to the

23  defendant.  And, yes, we think it is appropriate for the

24  Court to disregard those particular reports.  There are

25  admissions, of course, in those report that the defendant

1   made, knowing that they would be made available to the Court

2   and revealed to the Court, but the findings should be

3   disregarded.

4          THE COURT:  I will disregard the reports in their

5   entirety.  And I'll grant the defendant's motion.

6          All right.  What evidence does the United States

7   have, you want to put on, for the 3553(a) factors?

8          MS. HEALEY:  Yes, Your Honor.  The only witness we

9   have for this is Dr. Donna Moore.

10         THE COURT:  All right.

11         MR. BOSTIC:  Judge, at this time I would like to

12  note an objection to Ms. Moore being called, as the defense

13  has withdrawn its psychological evaluations.  I don't

14  believe there's any statutory authority for her to testify.

15         MS. HEALEY:  And, Your Honor, I do think this type

16  of evidence is relevant to 3553(a).  Obviously, the Court

17  -- some of the factors the Court has to consider under

18  3553(a) deals with the offender characteristics as well as

19  the danger posed by a particular defendant to society as a

20  whole and the argument of a strict sentence being

21  deterrence.  We're, obviously, seeking the highest potential

22  sentence that the Court could impose.  And we think her

23  testimony is highly relevant as to the 3553(a) factors that

24  this Court must consider.

25         THE COURT:  All right.  The 3553(a) factors span a

```
1   wide waterfront for the Court to consider.  And I would be
2   happy to hear what evidence the government wants to put on,
3   including the evidence from this witness.  I believe it is
4   relevant.  And let's just put the evidence on.
5             DONNA MOORE, GOVERNMENT'S WITNESS, SWORN
6             THE CLERK:  Thank you.  Please have a seat.
7             MR. BOSTIC:  Judges, if I could just raise one
8   thing before she actually testifies.
9             THE COURT:  Sure.
10            MR. BOSTIC:  Judge, as I'm reading Rule 12.2, it
11  appears that with respect to sentencing purposes --
12            THE COURT:  All right.  Hold on.  Just let me get
13  it in front of me.  12.2.  All right.
14            MR. BOSTIC:  It seems to me that with respect to
15  -- let me see if I can get exact where I was.
16            THE COURT:  12.2 deals with an insanity defense.
17            MR. BOSTIC:  Yes, sir.  I was looking at what other
18  authority under that would we have to deal with the
19  admission of psychological evaluation.
20            THE COURT:  I don't think 12.2 has anything to do
21  with what we're talking about.  And, you know, the
22  government can put on whatever evidence the government wants
23  to put on addressing the 3553(a) factors.  And I'm going to
24  allow it.
25            Go ahead.
```

MOORE - DIRECT

```
1              MR. BOSTIC:  The Court will note my exception.
2              THE COURT:  Certainly.
3                        DIRECT EXAMINATION
4    BY MS. HEALEY:
5    Q.   Good afternoon.
6    A.   Good afternoon.
7    Q.   Would you please tell the Court your name?
8    A.   Donna Moore, M-double O-R-E.
9    Q.   All right.  And how are you employed?
10   A.   I'm a psychologist.
11   Q.   And where are you employed?
12   A.   I'm employed at Moore Psychology Services.  It is a
13   private practice that I have outside of Nashville,
14   Tennessee.
15   Q.   Okay.  How long have you been so employed?
16   A.   I have had that practice since 2006, but I have been
17   working in the field of mental health treatment since 1993.
18   Q.   All right.  Let's talk a little bit about your
19   background.  Can you please summarize your educational
20   background as it relates to your position?
21   A.   I have a bachelor's degree in psychology, a
22   counseling -- a master's degree in counseling, and a Ph.D.
23   in psychology as well.
24   Q.   All right.  And have you been engaged in continuing
25   education in terms of what you do now?
```

MOORE - DIRECT

1   A.   Yes.   Yes.

2   Q.   And has part of that included receiving specialized

3   training in the field that you work?

4   A.   Yes.   Yes.   I have specialized training.   I'm a

5   certified forensic examiner in the state of Tennessee.   I'm

6   a licensed psychologist in the state of Tennessee and the

7   state of Virginia.   And I'm an approved sex offender

8   treatment provider in the state of Tennessee as well.

9           MS. HEALEY:   Your Honor, would you like me to wait?

10          THE COURT:   No.   I'm listening.

11  BY MS. HEALEY:

12  Q.   Okay.   Do you provide any training for anyone else?

13  A.   Yes.   As part of -- in the state of Tennessee, to be an

14  approved provider of sex offender violation and treatment

15  services, persons have to be trained and retrained every

16  year.   And I'm one of the trainers for those new providers.

17  Q.   Okay.   Can you describe your practice, your present

18  practice?

19  A.   My present practice is a private practice, but I also

20  contract with other agencies.   My practice consists of five

21  sex offender treatment groups in my practice.   And then I

22  contract, where I provide evaluations as well as treatment

23  services, for men and women, but mostly men, that have

24  presented with issues of sexual deviance.   And the majority

25  of them have gone through the court system or have pending

MOORE - DIRECT

1    charges or they anticipate getting charges.

2         I also contract one day a week with an agency that I

3    started working with in 1993, called Centerstone.  It's a

4    community mental health agency.  And through that contract

5    we contract with the Middle District of Tennessee to provide

6    services for their clients that are on probation for sex

7    offenses.  So I have two groups under that contract as well.

8    Q.   All right.  And what is the percent of time you work

9    with sex offenders?

10   A.   Most of the time.  Probably, I would guess, one day is

11   also devoted to forensic evaluations of competency and

12   mental condition.  If I don't have a forensic evaluation, I

13   usually plug in some work with -- psychosexual work or work

14   with offenders.  So I would guess easily 90 percent.

15             THE COURT:  90 percent of your work?

16             THE WITNESS:  Yes.  And the majority of my

17   career -- at times it has been 100 percent offender work.

18   BY MS. HEALEY:

19   Q.   And what percentage of sex offenders are you dealing

20   with child sex offenders?

21   A.   Most of them are child sex offenders.  I have also

22   worked at Butner in the prison program there and in the

23   state prison program.  In the state of Tennessee, offenders

24   that have adult victims tend to get prison sentences and

25   they do not come for community mental health treatment.  So

MOORE - DIRECT

1   I tend to see more child offenders, voyeurism, exhibitionism

2   offenders, just because of the nature of the sentences.

3        So I have treated -- I do have a couple of clients with

4   adult offenders, but I have treated -- had more experience

5   treating them in the correctional system.

6   Q.   All right.  Since you have raised the issue of working

7   at Butner previously, could you briefly summarize the prior

8   work experience that you have in this particular area?

9   A.   I started working in 1993 with my master's degree at

10  the community mental health center.  And I was going to go

11  to school at night getting my doctorate.  And once I was

12  getting ready to graduate, I did my predoctoral internship

13  in the sex offender treatment program for the state.  And

14  that's our model for the state system, the program that we

15  teach for providers who want to come provide services.  So

16  that's the model that we use.  So I was an intern there.

17       And then, after I graduated, I went back to the

18  community mental health facility and worked there until

19  2001.  I went to Butner and worked at Butner in the sex

20  offender treatment program there until 2003.  And then --

21  Q.   That's the Federal Bureau of Prisons?

22  A.   Yeah, the Federal Bureau of Prisons, in the sex

23  offender program.  And then I came back to the agency

24  again.  And I'm still contracting there, but in 2006 started

25  my own practice.

MOORE - DIRECT

1    Q.   Okay.  And how often have you conducted psychosexual

2    examinations of defendants?

3    A.   I would guess 20 years, of maybe a hundred referrals a

4    year, easily 1200.

5    Q.   Okay.  And have you ever conducted evaluations at the

6    request of prosecutors like myself?

7    A.   Yes, I have.

8    Q.   All right.  Have you ever performed any work at the

9    request of defense attorneys?

10   A.   Yes.  Yes.

11   Q.   Are you a member of ATSA, A-T-S-A?

12   A.   Yes, the Association for Treatment of Sexual Abusers.

13   I'm a clinical member and have been, I think, since 2004.

14   Q.   And do they have certain -- does ATSA have certain

15   guidelines that they suggest should be used in the course of

16   your practice?

17   A.   Yes.  It is an organization that is a professional

18   organization that deals with people who work with this

19   population.  And they have a best practices model and

20   standards of care as well as ethics that we adhere to.  And

21   in the state of Tennessee, our state model also uses those

22   ethics standards and guidelines.

23   Q.   All right.  Do you follow the ATSA guidelines in the

24   course of your work?

25   A.   Yes.

MOORE - DIRECT

1   Q.   Okay.  Have you ever testified about any of the

2   findings that you have made during your evaluations?

3   A.   In psychosexual evaluations and forensic evaluations,

4   yes.  This is probably either 98 or 99.  I am in between --

5   I have given direct testimony in one case and I am expecting

6   to do my cross next week.  So I think this is either 98 or

7   99 in providing testimony.

8   Q.   Have you been deemed as an expert when you have

9   testified?

10  A.   Yes.  In forensic evaluations or psychosexual and sex

11  offender evaluation and treatment.

12  Q.   And specifically in this case that we're going to be

13  talking about in a minute, that would be with psychosexual

14  evaluations and sex offenders?

15  A.   Yes.  Typically, the forensic, the way I'm using it

16  from Tennessee, is competency and mental condition

17  evaluations.  And the other deals with people presenting

18  with sex offense charges.

19  Q.   Okay.  Have you ever been denied expertise in any of

20  those areas?

21  A.   I have not.

22  Q.   Okay.

23        MS. HEALEY:  Your Honor, may I have Dr. Moore's CV

24  marked as a government's exhibit?

25        THE COURT:  Yes.

MOORE - DIRECT

1          Any objection?

2          MR. BOSTIC:  No objection.

3          MS. HEALEY:  What are we up to, Jody?  Is it 4?

4          THE CLERK:  It is 4.

5          MS. HEALEY:  Okay.

6          Your Honor, if I may move it into evidence as

7     Government's Exhibit 4.

8          THE COURT:  Yes.  It will be accepted without

9     objection.

10          MS. HEALEY:  Thank you.

11     (Government's Exhibit No. 4 was marked for

12     identification and received in evidence.)

13     BY MS. HEALEY:

14     Q.  Dr. Moore --

15          MS. HEALEY:  Actually, Your Honor, may I also move

16     her in as an expert in psychosexual evaluations and sex

17     offender --

18          THE COURT:  Any objection?

19          MR. BOSTIC:  No, sir.

20          THE COURT:  Yes.  She will be permitted to testify

21     as an expert in those areas.  Please proceed.

22          MS. HEALEY:  Thank you.

23     BY MS. HEALEY:

24     Q.  Dr. Moore, did you have an occasion to conduct an

25     evaluation of this particular defendant, John Stuart Dowell?

MOORE - DIRECT

```
 1    A.    Yes.

 2    Q.    How did you come to conduct this particular evaluation?

 3    A.    You requested that I evaluate the prior psychological

 4    evaluation that he had and as well as conduct an evaluation

 5    of Mr. Dowell.

 6    Q.    And I assume you were paid or you are going to be paid

 7    for this particular evaluation?

 8    A.    I am hoping to be paid.  I have not been paid.  But,

 9    yes, I have billed, so, yes, I am.

10    Q.    And you are also going to be paid for your travel

11    expenses as well?

12    A.    Yes.

13    Q.    And do you know about how much you are going to be paid

14    for the evaluation itself and your court testimony?

15    A.    The evaluation and -- closing the practice and the

16    evaluation I think was billed at 3,000 for the days of

17    travel and coming to do the evaluation and writing the

18    report.  And the travel and coming here for this is billed

19    at 2,000.

20    Q.    When you conducted an evaluation of the defendant, did

21    you meet with him in person?

22    A.    Yes.

23    Q.    All right.  And what date was that?

24    A.    I met with him on May 31st of this year, 2013.

25    Q.    And prior to doing that, did you review any particular
```

MOORE - DIRECT

1    materials?

2    A.   Yes.  I did.

3    Q.   Could you summarize what you reviewed.

4    A.   Yes.  And if I may look at my report for -- as I have

5    noted in my psychosexual evaluation dated June 17th, I

6    looked at -- I evaluated him; I gave him a test; I did a

7    risk assessment; and I reviewed his criminal history;

8    investigations from ICE -- I'm just going to kind of

9    summarize, if that's okay -- computer account information;

10   subscriber information; emails from different agencies

11   looking for -- Interpol, ICE, etc.; FBI information;

12   incident report from Frederick County Sheriff's Office;

13   supplementary reports from Frederick County Sheriff's

14   Office; arrest warrants; criminal complaint from the United

15   States District Court; statement of facts in support of

16   complaint/arrest; warrants; San Jose Police Department

17   records; probable cause; grand jury testimony; NCMEC

18   records; computer forensic examination report; the reports

19   of Dr. Fracher; the images from the computer, I reviewed

20   those; and the videotapes that were produced, I reviewed

21   those; and then a motion to continue sentencing; and an

22   order entered in January of this year.  So I reviewed all of

23   those.

24   Q.   And having sat here during this testimony, you are

25   aware, of course, that Dr. Fracher's report will no longer

MOORE - DIRECT

1   be relied upon in this?

2   A.   Correct.  Correct.

3   Q.   But that was part of what you were being paid to do is

4   to evaluate that report as well; is that correct?

5   A.   Correct.

6   Q.   How long did you -- approximately how long did you meet

7   with the defendant?

8   A.   Approximately -- I got there about -- a little bit

9   before nine o'clock.  And I didn't get to see him until

10  9:30.  And I interviewed him until a little bit after 11.

11  And then he took a paper-and-pencil test.  And that took

12  another probably hour and a half.  And I had some follow-up

13  questions and left at that time.  So I left.  Probably from

14  about ten until nine when I got there until almost one

15  o'clock when I left the facility.

16  Q.   So fair to say that the evaluation included basically

17  an interview of the defendant's history and his version as

18  well as administering certain tests?

19  A.   Yes.  Some background information, talked to him about

20  the case, other history.  And I gave him a paper-and-pencil

21  test, the MMPI-2.  The STATIC-99R, which I also used in the

22  evaluation, is a risk assessment that I did outside of

23  meeting with Mr. Dowell.

24  Q.   So the STATIC-99, which we might talk about later, that

25  is sort of a ten-question test that you don't have to meet

MOORE - DIRECT

1   with the defendant to complete?

2   A.   Correct.  Yes.  Correct.  It is done from the records.

3   And it is an actuarial measure that we use to get a baseline

4   of risk, to kind of start to get some ideas about somebody's

5   risk level.

6   Q.   All right.  And just briefly can you describe what the

7   MMPI-2 is?

8   A.   The Minnesota Multiphasic Personality Inventory 2, or

9   second edition, is the most widely used psychological test.

10  And I give that to get an idea -- it has got validity

11  scales, to see how someone's presentation is during the

12  interview; scales that -- we have what they call a lie

13  scale, a defensiveness scale, another scale to detect

14  malingering, which may be more common in a forensic

15  evaluation than would be for maybe a psychosexual

16  evaluation.

17       And then there are clinical scales that look at

18  psychiatric problems, depression, anxiety, mania,

19  psychopathic deviants, and then paranoia.  So there's

20  different clinical scales.  If a person had a psychiatric

21  condition with -- presumably, I'd have a high score in one

22  of those clinical scales.

23  Q.   Okay.  And can you tell the Court what the results of

24  the MMPI showed -- or the MMPI-2 showed?

25  A.   Okay.  If I can look at my report, from the MMPI-2,

MOORE - DIRECT

1  under the testing, the validity scales -- just kind of a

2  summary, the validity scales were a little bit elevated,

3  where someone who might be defensive or denying their

4  behavior.  And so that is -- typically what that does, when

5  someone is scoring high on a validity scale, except for the

6  malingering scale, it will decrease their scores on other

7  scales.

8       Despite that, he had a profile that is loaded high on

9  the scales for psychopathic deviance and paranoia, with

10  paranoia being a little bit higher than psychopathic

11  deviance.  And just some of the traits -- and this is just a

12  profile of somebody that had that two-scale spike would be

13  somebody who might be narcissistic and self-indulgent, as I

14  have written in my report; a person who might make a lot of

15  demands on others, but not -- but feel somewhat resentful if

16  people asked them to do similar things; persons may see them

17  as irritable or argumentative.  And one of the aspects of

18  this profile is that they may deny psychological problems

19  and try to shift the blame or responsibility on to other

20  people.  So they are really not at times -- not good -- to

21  be good candidates for therapy due to that, that lack of

22  responsibility; since they also tend to present vague

23  emotional and physical complaints, just a lot of complaints

24  about -- but nothing very specific that someone might

25  -- such as with a depression or a clinical depression or a

MOORE - DIRECT

1   clinical anxiety present with.

2   Q.   Okay.  As a result of your evaluation, which includes

3   both the tests and the interviews that you conducted, did

4   you form any opinion or any diagnosis of the defendant?

5   A.   I offered the diagnosis of pedophilia, sexually

6   attracted to females, nonexclusive type -- and nonexclusive

7   type means attracted to adults as well as children, primary

8   focus was attracted to females.  I also diagnosed a sexual

9   abuse of a child as perpetrator, again, based upon a review

10  of records I had.  And I did a rule-out, which means more

11  information is needed to refute or confirm a diagnosis for

12  depressive disorder, largely based on some of the

13  information from the other reports and also the statements

14  of Mr. Dowell kind of having these underlying depressive

15  symptoms throughout his life.

16  Q.   Now, I notice you said that the defendant had a

17  diagnosis of pedophilia but nonexclusive.  What do you mean

18  by that and is that common?

19  A.   Sometimes we think about people attracted to children

20  sexually, that they are exclusively attracted to children

21  and they're not also attracted to adults.  The research, I

22  think, speaks to only about 7 percent of people with

23  pedophilia are exclusively attracted to children.  So it is

24  not uncommon to find people with pedophilia to be married,

25  to have or to have had sexual relationships with adults.

MOORE - DIRECT

1     And so based on Mr. Dowell's statements that he had

2    been married and he has had sexual relationships with adult

3    women, I diagnosed him as the nonexclusive type.

4    Q.   Can you explain to the Court what your basis of -- your

5    diagnosis of pedophilia was based on?

6    A.   Well, based upon -- largely -- somewhat based on his

7    statements about his attraction and the materials he was

8    viewing.  Also based upon the collection that -- I viewed a

9    number of images, although not the entire collection of the

10   images.  And the images he produced to me suggested that

11   that met the criteria for pedophilia, which is a sexual

12   attraction, arousal, interest in children; that that arousal

13   and attraction persists for six months or longer and can

14   cause some distress, if nothing but legal distress.  So I

15   felt like he met that diagnostic criteria, again, largely on

16   some of the data that I viewed as well as the statements by

17   Mr. Dowell.

18   Q.   Did the defendant admit that he was sexually aroused by

19   images of child pornography?

20   A.   He said that he had been viewing images and had been

21   aroused by those since the year 2000.

22   Q.   And before I get to anything else, did you prepare a

23   report based on your review and your diagnosis?

24   A.   Yes.

25        MS. HEALEY:  Your Honor, that is already in the

MOORE - DIRECT

1    report.  May I have that officially part of the record as
2    Government Exhibit 5, to remain under seal?
3              THE COURT:  Yes.  It will be admitted.
4              Any objection --
5              MR. BOSTIC:  No objection.
6              THE COURT:  -- other than you have already stated?
7              MR. BOSTIC:  Yes.
8         (Government's Exhibit No. 5 was marked for
9    identification and received in evidence.)
10   BY MS. HEALEY:
11   Q.   Dr. Moore, how would you characterize any claim -- or
12   the defense claim that this was a crime of opportunity?
13   A.   Well, as I said in my report, pedophilia is not
14   opportunistic.  It is a preference for children.  And as
15   sexual beings and creatures, we tend to want to be sexual
16   and to be sexual with the objects of our interests and
17   desires.  And to say that it is opportunistic because
18   children are around and people have multiple opportunities,
19   it just seemed like that is not consistent with the data
20   that there was planning involved.  Again, the camera and a
21   lot of the other elements of this particular offense
22   behavior doesn't seem opportunistic.
23        That would fit more of a one-time event, that was not
24   repeated, that seemed to not -- that seemed to be a little
25   bit more nonsensical.  That didn't really, in my opinion,

MOORE - DIRECT

1    fit in this case.

2    Q.   All right.  Now, going to your report, the defendant at

3    times characterized his problem as a sex addiction or as a

4    pornography addiction, to be used for self-soothing and

5    things like that.  Can you comment on those

6    characterizations of his issues or problems?

7    A.   Yes.  That's fairly typical in persons that I

8    evaluate.  When they come in, they may come in with a

9    multitude of sexual problems, of sexual charges, and say

10   they have a sex addiction.  If they are using images of some

11   sort, they will say they have a pornography addiction.

12       A sexual addiction is not recognized as a legitimate

13   sexual disorder or a psychiatric disorder.  It is not in the

14   DSM-IV.  And I don't believe, based upon my brief perusal of

15   the DSM-5 that has just come out, that it is in there as

16   well.

17       So it is not a recognized clinical disorder.  It tends

18   to be a belief from -- more consumer-driven than data-

19   driven.  And it is typically from 12-Step or other self-

20   help-type groups more than from people who are trained and

21   licensed to provide certain services.

22   Q.   So have you heard other people that you have diagnosed

23   as pedophiles claim that they just had a sex addiction or a

24   pornography addiction?

25   A.   Yes.  Again, it is very common for people that get into

MOORE - DIRECT

1    trouble -- again, it is not uncommon for maybe family

2    members or others to encourage them to go to a SA or

3    Sexaholics Anonymous group.  It's very popular or common in

4    the church to recommend people to go to these types of

5    groups.  And it tends to come more from kind of an ignorance

6    of the problem.

7        I see people with exposure offenses and voyeurism

8    offenses, child pornography offenses, incest offenses, and

9    they all kind of get the same label.  And I think that just

10   doesn't capture the complexity of what we are talking

11   about.

12       I think also, again, my diagnosis of Mr. Dowell is with

13   pedophilia.  And I think that's a better fit from a

14   diagnostic perspective of where a person would look in terms

15   of any kind of treatment recommendations or plan.

16   Q.   All right.  So it sounds like that did not change the

17   diagnosis that he was a pedophile?

18   A.   It did not.  Again, that's not a recognized diagnosis.

19   So, no, it did not for me.

20   Q.   All right.  What about the defendant's suggestion to

21   you that he didn't do anything to Minor A that she didn't

22   want him to do?  I noticed that in your report.  Is that

23   something he said to you at some point?

24   A.   Yes.  Yes.  He made some statements about that, about

25   -- yes, kind of implying about her being more into it and

1   things that she wanted to do.  And, again, that's not

2   uncommon for people that have sexual misconduct against

3   children, as well as adults, to be able to -- you know, part

4   of the offending behavior or offending cycle includes a

5   number of cognitive distortions.  And that is part of how

6   they are able to commit these offenses.  They tell

7   themselves that it is something else, "I'm not really

8   hurting somebody.  I'm doing it because they want it too.

9   They like it too."  And that's something we would address

10  clinically.

11      So, yes, certainly those things are present, more so in

12  an evaluation setting with someone that has not had any

13  intervention.  And Mr. Dowell had not had the opportunity to

14  have any treatment at the time I saw him.

15  Q.   And what is a cognitive distortion?  Is that --

16  A.   A distortion of -- you know, again, if you look through

17  a window that had water and it was distorted so you could

18  see it, but it wouldn't -- it would look differently until

19  you cleared it up.  So it is really kind of -- sometimes in

20  the language of treatment people call it stinking thinking

21  or a distortion.  And it is really just a form of denial.

22  It is just denial from minimization, denial from shifting

23  responsibility.  And it is just one of the components that

24  we work on fairly heavily in the treatment is to kind of

25  redirect some of those thinking patterns.

MOORE - DIRECT

1  Q.   All right.  Now, did you challenge him on his claim

2  that he didn't do anything that Minor A didn't want him to

3  do?

4  A.   I challenged just a few things in the evaluation, but,

5  again, it was really more of gathering data.  I think for an

6  evaluation perspective, I see a number of -- more

7  evaluations, psychosexual evaluations, I do are when people

8  are coming to treatment.  So if I were setting the pace and

9  the tone for therapy, I might say some things at that time

10 to say perhaps that is or not.

11     I think I did challenge more about -- early on when he

12 said -- referenced he was not interested in graphic images.

13 I do recall that was fairly early in the interview.  And I

14 said that based on what I had viewed, that didn't seem to

15 fit with what I viewed.  So really just in that term -- that

16 forum may be a little bit of a challenge, but not too much.

17 Q.   What about the defendant's claim that he wasn't

18 interested in the actual sex acts but rather just wanted to

19 collect more images of sex abuse of a minor?

20 A.   Again, that's -- that, to me, didn't fit with what I

21 viewed.  And that explanation is not uncommon.  Again, part

22 of persons who engage in behavior that is very upsetting to

23 them as well have to -- seem very interested in maintaining

24 an ego, an ego that is not consistent with a person who does

25 bad things and hurts other people.  So there's a lot of

1  investment personally in trying to maintain that image, not

2  just for others outside of them, but for themselves as

3  well.  So to say, "I didn't do it for sexual reasons" or "I

4  didn't hurt anybody," that's, again, part of the distorted

5  thinking process that is part of the offending cycle.

6  Q.  All right.  Now, your report indicates that the

7  defendant stated on various occasions he had a history of

8  depression?

9  A.  Yes.

10  Q.  Does -- is depression something that causes somebody to

11  become either a pedophile or to molest children?

12  A.  No, it is not.  But he -- and he spoke of it in

13  somewhat vague terms, said when he was younger he had more

14  physical symptoms; and when he was older, as an adult, it

15  tended to be more resulted from relationships causing him

16  problems.  That's fairly typical in this population of

17  people with sexual misconduct that they have a very -- they

18  have problems with emotional regulation and they have a hard

19  time feeling any discomfort.

20      So instead of being able -- like we all have bad days

21  and we all feel sad and we all have things that happen.

22  Instead of being able to address that, there's this

23  expectation they shouldn't have to, they shouldn't feel bad.

24      So, again, that's not uncommon to kind of have these

25  vague symptoms.  But he had never been hospitalized in a

MOORE - DIRECT

```
 1   psychiatric facility.  And even any prior therapy he had
 2   seemed somewhat vague in terms of not at a psychiatric
 3   hospital.  He talked about doing meditations and some other
 4   kind of mind-body work that didn't seem as traditionally
 5   mental health based as it did kind of more counseling and
 6   self-help-type therapy.
 7   Q.   Okay.  Overall, how does this defendant compare to
 8   other men who you have diagnosed as pedophiles?
 9   A.   I felt that it was fairly -- his behavior was fairly
10   consistent.  Those types of statements that he made had some
11   distortions, which, again, when somebody has not had
12   treatment, that's fairly common.  He presented with a lack
13   of history of criminal misconduct before; that's, again, not
14   uncommon.
15       So I felt like he was not atypical from somebody else
16   that I would be asked to evaluate with this type of offense
17   behavior.
18   Q.   Okay.
19       Did you make any determination as to whether this
20   particular defendant was a risk to reoffend?
21   A.   I felt like he was at risk.  And I think that's more of
22   a qualitative statement rather than a quantitative one.  I
23   think it is really hard to predict what someone may do in
24   the future.  He may never do anything else again or he may
25   do something else again.
```

MOORE - DIRECT

1    We do have an actuarial measure which is the standard
2    that we use in sex offender diagnosis and treatment called
3    the STATIC-99R. And that R means for revised. And that's
4    just a ten-item measure that looks at factors that have been
5    predictive of sexual reoffense among people who have been
6    charged or convicted of a sexual offense or sexual
7    misconduct. So someone could be charged with something that
8    gets pled down to a simple assault, but it is sexual in
9    nature, and it still would be used for that charge as well.
10    And it is a simple tool, but it only really gives us an
11    idea and a baseline of somebody's risk. And it tends -- and
12    it's predicted mainly on factors that we know from a
13    criminal record, heavily weighted on prior charges. So a
14    person that has molested a family member that is older, that
15    has no criminal history, would score a zero. And that
16    doesn't mean no risk. That means that they are in the low
17    risk category compared to other offenders.
18    And typically most of the people I see are going to be
19    low risk on that measure. So it is really rare for someone
20    to score higher. They tend to score higher because they
21    have other criminal behavior or charges, thefts, other
22    misconduct that may not be sexual that elevates that score
23    or they might be younger men, because younger persons get
24    more points. They also get points for not having a long-
25    term relationship. So a younger man is going to almost

MOORE - DIRECT

1   always be in a low-moderate risk category just because of

2   his age.

3       So it gives us a baseline of risk.  And we know that

4   this only tells us about half of the variants of things that

5   are -- for offending.  So this just kind of gives me an

6   idea.  Not unlike if you went to a physician and they told

7   you you were at risk for heart disease based on your family

8   mystery or something you couldn't change, your age, like

9   other static factors in the sexual measure.

10      But we would also have dynamic factors that we know we

11  can change.  And those would be the treatment targets.  So

12  just like if a doctor said don't smoke and you can eat and

13  you can keep your risk level at the lowest baseline, that's

14  what we do in sex offender evaluation too.  We start with a

15  STATIC-99 score, which Mr. Dowell was low, and I looked at

16  other factors.

17      But it is not uncommon at the evaluation stage, which

18  is really a snapshot, because all I know is what he tells

19  me, which may be influenced not by him deliberately trying

20  to deceive me, but because of his own -- the distortions

21  that support that diagnosis he has and his offending cycle.

22  So he may not have an accurate self-awareness to tell me

23  things that I need to know.

24      So what I find over time in treatment with people is

25  that I find out much more information.  So their risk tends

MOORE - DIRECT

1  to get higher once they get into treatment and we find out

2  more information, particularly after they have a sexual

3  history polygraph once they start in treatment.

4      So it is not uncommon for people to have a low score.

5  It is not uncommon for people to look like they don't have

6  much risk or it is not a big deal, when, in fact, there may

7  be some other things that we just cannot count in this

8  measure.

9  Q.   So, in other words, I think what you are saying is the

10  STATIC-99 in large part is based on prior court events or

11  criminal contacts?

12  A.   Charges.   Charges.   And some kind of sanction.

13      So someone who might be, again, a teacher, and they

14  don't have any legal action but they might be involved in

15  sexual misconduct with their students, administratively

16  might be moved to different places, so they would score as a

17  zero on this too, because it looks at prior convictions,

18  prior violent convictions, prior sexual convictions.

19      A person absent a criminal history -- and, again, most

20  people with child pornography offenses have no criminal

21  history at all.   Sometimes we'll see guys with other sexual

22  offense behavior that come in that may have some other

23  criminal history, but rarely, rarely does that happen.   So,

24  again, most of the people are going to be low on this

25  instrument.

MOORE - DIRECT

1   Q.  And just for clarification, are you aware of how often

2   or whether there's a problem with reporting of child sex

3   offenses by the victims or by offenders?

4   A.  Yes.  It is fairly common knowledge in the community

5   treating and evaluating sex offenders and victims that these

6   cases are underreported.  And so this looks at actual

7   charged offenses that we can use.

8        So I have seen a number of men that get zero.  And the

9   R, or the adjustment, the revised, has added -- where people

10  are older, they actually get negative scores.  And so

11  Mr. Dowell actually has a negative one on this measure.

12       So what we know is based upon charged offenses.

13  However, the diagnosis of pedophilia is something one

14  doesn't age out of.  So that's more of a clinical

15  assessment --

16            THE COURT:  What do you mean that's a diagnosis

17  that one doesn't age out of?

18            THE WITNESS:  It is a lifelong persistent

19  condition.  So one doesn't just get old and they don't have

20  it anymore.  It is a chronic condition.  And so from a

21  treatment perspective, that's what I like to teach my

22  clients:  This is something you have to be aware of, so you

23  can't think you are safe because you haven't used

24  pornography in ten years and start using pornography.

25            So it doesn't go away.  So while someone's score

MOORE - DIRECT

1   might be low because they have had no formal charges -- and
2   typically we think of people at higher risk for any kind of
3   misconduct, criminal, violent, sexual, are under the age of
4   25, where people are more impulsive, are more immature.  And
5   as people get older, they tend to age out and not have as
6   many criminal charges.  That's not true with people with
7   pedophilia that may not even present until someone is
8   middle-aged or later.  So it doesn't go away, if that makes
9   sense.
10  BY MS. HEALEY:
11  Q.  You are aware, of course, that there has been numerous
12  recidivism studies that look at -- or that try to predict
13  the number of people that will recidivate in these types of
14  crimes?
15  A.  Yes.  And you look at general recidivism.  So what I
16  see in my practice is a number of people, again, that may
17  have criminal charges, that also, interestingly, have a lot
18  of denial, that may fail their first polygraph, tend to
19  violate and get another charge for some kind of nonsexual
20  violation.  They are using drugs.  They fail a drug test.
21  They have possession of pornography.  They have violated
22  something else.
23      So recidivism studies vary depending on what they are
24  looking at as criteria.  Did someone recidivate with a
25  violent offense?  Did someone recidivate with a sexual

MOORE - DIRECT

1   offense?

2       And some of the times of measure are fairly short.  I

3   have had people in my practice that have gone -- I have had

4   somebody go 14 years in between offenses.  So it's not

5   uncommon for people to have up to ten years in between, and

6   seemingly everything is fine and then they reoffend.

7       So some of those studies look at recidivism data from

8   four to six years, which is really -- as they say -- the

9   authors, I think, of some of those studies say over time --

10  those numbers tend to increase over time.

11  Q.  And with the studies that tend to say lower risk to

12  recidivate, is it fair to say that a lot of those studies

13  are based primarily either on self-report or official court

14  records which, as you said, might not reflect the true scope

15  of the problem?

16  A.  Yes.  Yes.  It doesn't capture everybody that could be

17  included in those charges, yes.

18  Q.  All right.  And are you aware that there are other

19  recidivism studies where when they add in physiological

20  assessments such as polygraphs or the penile plethysmographs

21  that the recidivism rates are actually higher?

22  A.  Well, I'm aware that they sometimes will find higher

23  rates of abuse or contact offenses among people using the

24  polygraph or self-report.  That's what I found in my own

25  practice.  And in my practice with the Middle District of

MOORE - DIRECT

1    Tennessee, we have a fairly small program, and a number of
2    those men have come in and they have -- they look like
3    pornography-only offenses or having no contact offenses, and
4    after treating them and having polygraphs, I found that 75
5    percent of our population there have contact offenses; and
6    we knew of a very small percentage before that.
7        So self-report confirmed by polygraph once they are in
8    treatment -- because one of -- if they are not in denial of
9    their instant offense, their first polygraph and treatment
10   is a sexual history, to get a full picture of their
11   offending -- other sexual disorders, other sexual behaviors
12   that may be part of the treatment plan that we would want to
13   target.
14   Q.   All right.  Now, the STATIC-99 is based on static
15   factors; correct?
16   A.   Unchangeable, yes.  So the problem is if one gets a
17   high score, it takes a long time -- it takes about 15 years
18   in the community offense-free before getting a start to make
19   adjustments.  But if somebody has been convicted of a number
20   of offenses, those convictions will always be there, so they
21   will get a high score.
22   Q.   All right.  But are there always dynamic risk factors
23   that are not accounted for in the STATIC-99?
24   A.   Yes.  So what they have tried to look at are things
25   that are more predictive among this population of what is

MOORE - DIRECT

1   likely to relate to future sexual offenses.  And they tend
2   to be grouped in general categories of sexual deviance
3   factors, so attraction to children, attraction to other
4   sexually deviant material, having self-regulation problems
5   in terms of masturbating a lot, going to strip clubs; using
6   the Internet for engaging in sexual behavior.  So sexual
7   self-regulation, that a person really is using a lot of
8   different avenues to explore and to engage in sexual
9   behavior.
10       General self-regulation problems, again, as we talked
11  about earlier about depression or other kind of mood states,
12  sometimes sex offenders or people with sex-offending
13  problems don't do a good job at managing anger and other
14  emotions, so they have a hard time with just having coping
15  skills to address those.
16       Anger and hostility have been found also to be dynamic
17  factors that we would address in treatment as well as
18  intimacy deficits in terms of addressing relationship
19  problems.  So those are some of the dynamic factors that we
20  would look at.
21  Q.  What did you base your determination that the defendant
22  poses a recidivism risk?
23  A.  Well, again, the primary is the instant offense
24  behavior, the diagnosis of pedophilia, his reliance on not
25  only the instant offense of the creating the images and

1   producing the images and in the course of that abusing the

2   two victims, but also having that collection.  So, again,

3   just almost immersed in this pedophilic subculture of

4   looking at these images, using these images, making these

5   images.  And so I felt --

6           THE COURT:  Does it impact on your analysis here

7   that, as I understand the facts, this defendant viewed child

8   pornography images for about ten years before he engaged in

9   a contact with the two minor victims.  Now, does that impact

10  your analysis one way or the other?  A -- and one of the

11  things that the defendant argues is that, look, he didn't do

12  anything after the fact; he just had this one encounter; and

13  he has gone to counseling and all of that.

14          And so you have this history where for ten years

15  he's looking at the pictures and for a period of months he

16  engaged in contact -- making these videos and engaged in the

17  contact, and then after that he is no longer -- there's no

18  evidence of a contact offense.  With that history, does that

19  change or impact your view on this?

20          THE WITNESS:  I think I would -- I would be more

21  confident that nothing happened with a polygraph and

22  treatment, because, again, it is not uncommon for someone to

23  come in and say, "I have never done this," and what we found

24  in that 75 percent that had contact offenses, most of them

25  had more than ten victims; they had double-digit victims.

MOORE - DIRECT

```
 1   And no one ever knew that until we had an opportunity to
 2   look at other places as well.  So that would be one.
 3           If that's true, that would also suggest, again, an
 4   immersion in that culture, and more support for that.  So it
 5   seems like that became more of a focus rather than trying to
 6   engage adult women in relationships.
 7           So just a very -- again, I feel very confident in
 8   the diagnosis of pedophilia.  I don't know that that would
 9   lower the risk, because I haven't seen the arguments
10   clinically or empirically that masturbating and fantasizing
11   about child images is a safe -- quote/unquote, safe
12   alternative.  Because I think if we think about something we
13   want and we think about it and fantasize about it, and we
14   pair that behaviorally, a thought with an action, a sexual
15   gratification, that's very powerful.  So we have to unpair
16   that.
17           So he has had a lot of practice, if that was
18   something he liked and was gratified by.  And I can't say
19   that that was all that was gratifying.  So it didn't change
20   in terms of -- so I can't really put a quantitative number
21   on what his risk level is, but to say I feel like he is at
22   risk and that pedophilia, that is, those interests, are the
23   highest predictor we have of interest in children, in
24   sexually acting out with children.
25   BY MS. HEALEY:
```

MOORE - DIRECT

1  Q.  Now -- and then the Court referenced the counseling he
2  said he went to.  He indicated he went to that counseling
3  before he did the contact offending; correct?
4  A.  He said he went to SLA, Sex and Love Addicts Anonymous,
5  or SAA groups for about four months.  And he said his
6  sponsor fired him.  And those are self-help groups.  And
7  those have not really been found to be as effective in
8  treating sexual disorders.
9  Q.  All right.  That's not something to treat someone who
10  is looking at child pornography or --
11  A.  Someone who has a sexual disorder -- and in my opinion
12  pedophilia is a sexual disorder -- and that would not be
13  adequate.  And, in fact, in the people that I provide
14  treatment to in our state, in Tennessee, that is not
15  acceptable treatment.  And for people to be in that kind of
16  treatment, it really undermines the other treatment because
17  this message is saying, "You are an addict, and you can't
18  help it," while the treatment of the disorder is, "You are
19  responsible.  Here are some things that you did that
20  increase that, those images and urges and desires.  Here is
21  some ways that you can change that."
22     So they are really kind of conflicting in the approach
23  for both of those treatments.  And, again, one of them is
24  really not a treatment; it is self-help by other people who
25  have had similar problems and are really not skilled or

MOORE - DIRECT

1    qualified to provide that level for somebody that needs that

2    level.

3        Now, maybe if somebody is looking at adult images and

4    they don't have any kind of serious or diagnosable

5    condition, that might be -- a self-help group might be more

6    appropriate.  But anyone with any kind of chronic condition

7    would need what is the standard of care for that condition.

8        If one had diabetes, the standard of care would not be

9    go to a support group.  It would be you can go to a support

10   group in addition.  But you would have to look at what the

11   standard of care is.  And the standard of care for sexual

12   disorders tends to be something to address the disorder

13   behavior.

14   Q.  And I think you said he mentioned to you that he had

15   been booted out of the program by his sponsor?

16   A.  That his sponsor had fired him, yes.

17   Q.  Okay.  All right.  Now, you heard this morning

18   Mr. Fottrell testify about some of the nature of the images

19   that were found on his computer?

20   A.  Yes.

21   Q.  All right.  And in that testimony I think you heard him

22   describe some scatological images that were found in that

23   computer.  Is scat considered another -- or an interest in

24   scat considered a paraphilia?

25   A.  Well, it is -- in the clinical world it is coprophilia,

MOORE - DIRECT

1    or the interest in feces, and urophilia, so some people may
2    also or instead of been interested in urination.  And I had
3    seen in the collection of Mr. Dowell there were at least one
4    image I recall seeing of a child, a very young child,
5    urinating.  And I had asked him about his interests.  And he
6    said he had interests in urination and defecation, but would
7    never engage in that behavior.
8        So, again, it is fairly rare, relative to other
9    paraphilia behaviors among other clients that I have seen.
10   But it is certainly one of a paraphilia -- paraphilic
11   behaviors that we would want to look at from a treatment
12   perspective as relevant to the overall treatment plan for
13   sexual problems.
14   Q.  All right.  And was there any effect on your opinion
15   about Mr. Dowell given that you now know that there was a
16   video of Mr. Dowell himself engaging in copraphilia or
17   scatological images?
18   A.  Well, he said he would never do it.  So I think it
19   just, again, speaks to maybe a lack of awareness through his
20   disordered behavior or an attempt to misdirect.  And I can't
21   say which one.  But he said he wouldn't be interested in
22   doing that but he was interested in that.
23   Q.  All right.
24       Is there any concern that somebody who has multiple
25   paraphilias might be more of a risk than somebody with a

1   single paraphilia?
2   A.   Well, typically, again, I think we have to look at the
3   overall picture.  I think the length of time, I think
4   someone can be very immersed with one paraphilia and it be
5   strong enough to load fairly high.  But multiple paraphilia
6   I think is not --
7              THE COURT:  What is paraphilia?
8              THE WITNESS:  It is a sexual disorder.
9              THE COURT:  Just sort of generalized?
10             THE WITNESS:  Yes.  It could be voyeurism,
11  exhibitionism, or any of those.  So it is not uncommon for
12  offenders to have multiple --
13             THE COURT:  Multiple kinds of disorders.
14             THE WITNESS:  Yes.
15             THE COURT:  Okay.  All right.
16             THE WITNESS:  And their pornography collections
17  also reflect other interests.  They may have hidden
18  cameras.  Cameras are very small, so I have a number of
19  people that like to get those cameras.  So, again, the
20  urophilia, the copraphilia, people may have that in their
21  collection and have --
22             THE COURT:  What is copraphilia?
23             THE WITNESS:  Interest in defecation.  So either
24  the person is defecating or wants the other person to
25  defecate on them.  And they have an interest in doing things

MOORE - DIRECT

```
 1   with that material -- that organic matter, I guess.
 2            THE COURT:  Sorry I asked.  Go ahead.
 3            THE WITNESS:  Yes.  So I think, not unlike someone
 4   with substance abuse issues -- if a person had a number of
 5   different substance they were using, the treatment of their
 6   overall substance-abusing problem would be more difficult
 7   because there would be a lot of areas in which they could
 8   continue to engage.  And so that is not unlike someone with
 9   multiple sexual disorders.  It is just -- again, we want to
10   look at that to address from a treatment perspective.
11   BY MS. HEALEY:
12   Q.  All right.  Is pedophilia --
13            MR. BOSTIC:  Your Honor, could we approach?
14            THE COURT:  Please.
15       (Off-the-record discussion at sidebar.)
16            THE COURT:  Ask the marshal to declare a recess.
17            While we are in recess, since you have been on the
18   stand testifying, I'd ask that you not discuss your
19   testimony with anyone else.  You can leave the box though.
20   You can leave all of your stuff right there.
21            Let's take a -- let's see.  Say about ten minutes.
22       (Recess at 3:20 p.m.)
23       (Call to Order of the Court at 3:35 p.m.)
24            THE COURT:  Please proceed.
25            You are still under oath.
```

1          MS. HEALEY:  Judge, I only have one more question.

2          THE COURT:  Okay.

3   BY MS. HEALEY:

4   Q.  You just informed the Court what paraphilia is.  Is

5   pedophilia a paraphilia?

6   A.  Yes.  Pedophilia is one of the paraphilias.

7          MS. HEALEY:  That's it.

8          THE COURT:  Thank you, Ms. Healey.

9          Mr. Bostic, do you have any questions?

10         MR. BOSTIC:  Yes, sir.  I have a few, Judge.

11                      CROSS-EXAMINATION

12   BY MR. BOSTIC:

13   Q.  Dr. Moore, I wanted to ask you just a couple of quick

14   questions.  And going back to -- as much as I really don't

15   want to get into this subject, on the scat and -- what was

16   the other?  Copraphilia?

17   A.  Copraphilia is -- I think legal people call it scat and

18   a clinical person calls it copraphilia.

19   Q.  It is all the same thing?

20   A.  Yeah, we're talking about the same thing.

21   Q.  Okay.  Mr. Dowell did admit to have some interest at

22   some point in that?

23   A.  Yes.  Yes.

24   Q.  And -- but I think you had actually talked about seeing

25   a picture and I think a discrepancy as to whether or not you

MOORE - CROSS

```
 1   may have thought he was lying to you?
 2   A.   I'm sorry?
 3   Q.   Was there a discrepancy to where you thought he was
 4   lying to you about something?
 5   A.   He said that he -- let me see where I have got that.
 6   He said he had -- and this is from my report.  He had an
 7   interest in urination and defecation that he said was
 8   arousing.  And he said the idea was appealing, although
 9   viewing images -- through viewing images, but the practice
10   was less appealing.  And he denied any experimentation.  And
11   I'm referring to the testimony from this morning that he had
12   made a video.
13   Q.   Okay.  But that was not -- the video that had him did
14   not have he and anybody else; correct?
15   A.   Correct, just him.  And I just said there was a
16   discrepancy in what he said and that information I heard
17   today.
18   Q.   Okay.  Now -- now, in your report, one of the things
19   that you put in where you had the diagnosis of pedophilia,
20   you also did put in that it was a permanent condition, but
21   it was a condition that is manageable?
22   A.   It -- yeah.  It is a lifelong condition, but one that
23   can be managed.  And that is what treatment addresses.  So
24   treatment does not reject persons that have the pedophilia
25   diagnosis, because it can be managed.  It is believed to be
```

MOORE - CROSS

1    incurable.
2    Q.    And over the time period when -- strike that.
3          How long did you actually talk to him?
4    A.    A little over, let's see, about an hour and 45 minutes
5    talking to him.  And then the rest of the time he was taking
6    the test.  And then we had some follow-up for maybe another
7    five minutes.
8    Q.    And during that time period, what was the conversation
9    that you-all were having?  You were primarily pulling
10   information -- or getting information from him?
11   A.    I have a -- I go down and I have a list of questions
12   that -- I basically have this report and I go through all of
13   these -- filling in all of these questions.  So I ask all of
14   these questions about background history, about his sexual
15   history, and ask him to kind of explain his version of the
16   behavior in question.  So, yes, it is a fairly structured
17   interview, but I may ask questions based on what he tells
18   me, yes.
19   Q.    And one of the things that you talked about is the
20   diagnosis that you have given him of pedophilia and a lot of
21   people that fit the same general criteria.  Let me see if I
22   can get the words that you used.  "In providing information,
23   they give somewhat of a distorted view of how they view
24   things"?
25   A.    Correct.

MOORE - CROSS

1  Q.  As compared with you, who would be looking at it and

2  you would not have that distorted effect, I guess?

3  A.  That other people might have another perspective,

4  correct.

5  Q.  And that often leads to people thinking -- or people

6  that kind of fit this category into thinking what they were

7  doing to the child was not -- they were not really hurting

8  the child and things of that nature, so that would be

9  typical for people that are in that category?

10  A.  Correct.

11  Q.  Now, you understand he will be in prison for a pretty

12  good time period; is that correct?

13  A.  I understand that.

14  Q.  And during -- while he is in prison he will be

15  receiving treatment for this, in all likelihood; would that

16  be correct?

17  A.  I don't -- I don't have any basis to which to speak

18  about that.  I know that in programs in prisons I have been

19  affiliated with, someone had to get closer to their end date

20  to be eligible for certain programs.  So I'm not -- I'm not

21  affiliated with any prison programs to be able to speak

22  about that currently.

23  Q.  The judge can make recommendations to send him to a

24  particular prison that has sexual deviant behavior

25  counseling or treatment?

MOORE - CROSS

1   A.   I would imagine, yes, he could; yes.

2   Q.   Okay.  And there -- were you aware that there were a

3   lot of different ways that the Court -- in fact, a lot of

4   things the Court has to order as part of somebody that has

5   child pornography convictions as far as where they can live,

6   where they can go to, ability to have contact with

7   children?  There's a lot of different things that the Court

8   will order as part of that order if the person was ever to

9   be released?

10  A.   Yes.

11  Q.   Is that correct?

12  A.   Yes.

13  Q.   And would those type of things help as far as lower

14  that risk when you set him as a risk of deviant behavior or

15  a further risk of either contact offenses or --

16  A.   No, it would not.  It would not lower one's risk.  What

17  it does, it provides external barriers while somebody is

18  learning to manage their risk.  So while someone comes to

19  treatment, they come to treatment with their problems.  And

20  part of treatment is to teach them how to manage

21  internally.  So what we start with is a fairly intensive

22  external management.

23       So it makes sense that persons, when they first get in

24  trouble, they may go to prison, they may get probation, they

25  may get community correction, they may get a mixture of

MOORE - CROSS

1   several of those, and they have a lot of external components

2   in place.  Because they demonstrated their decision-making

3   has not been good, that their access to certain materials or

4   persons has been problematic, so we kind of take away that

5   decision-making through external barriers.  And then as they

6   get healthier, we remove some of those external, because

7   eventually they will be -- theoretically eventually they

8   will be on their own and totally relying on the internal.

9        So that doesn't lower one's risk.  It just is a

10  restriction that helps a person while they are learning to

11  lower their risk.

12  Q.   Okay.  So if -- if he was on house arrest, for

13  instance, wouldn't that lower the risk substantially?

14  A.   No.  No, it wouldn't lower the risk.  His risk is

15  internal.

16  Q.   So the risk is the same whether he's in prison or out

17  of prison?

18  A.   Correct.

19  Q.   Okay.  And I believe one of the things you did talk

20  about a little bit and I think were asked by the judge, do

21  you have any evidence whatsoever of any contact crimes prior

22  to November -- late November of 2010?

23  A.   No, sir.

24  Q.   And have no evidence of any contact crimes after

25  January of 2011?

MOORE - CROSS

```
 1   A.   No.
 2   Q.   Now, one of the things you also had in your report is
 3   you talked very much about a lack of empathy for others, a
 4   tendency to be very narcissistic, very self-centered, that
 5   sort of thing?
 6   A.   I'm not sure what you are referring to.  You mean the
 7   testing section?
 8   Q.   Yes.
 9   A.   That's the testing profile, from his scores.
10   Q.   And his scores would tend to indicate somebody like
11   that, had very little empathy with anyone else?
12   A.   It tended to be narcissistic, which, again, is not
13   uncommon in this population.  So I didn't diagnose him with
14   a narcissistic or other personality disorder.  But this
15   profile from his MMPI, that's what his elevations suggested.
16   Q.   Okay.  I think one of the other things that you were
17   looking at is he was -- did not seem to be receptive towards
18   counseling or that was an indication of somebody with his
19   type of scores?
20   A.   That's what the MMPI profile suggests, that a person
21   who -- that shifts responsibility for their behavior and
22   wants to deny psychological problems is not a good candidate
23   for therapy.  And that's the MMPI profile.
24   Q.   But you did understand from speaking to him that he has
25   had various counselors for years; is that correct?  As a
```

MOORE - CROSS

1    result of going back to his father dying when he was in
2    college and depression and then marital counseling and had a
3    variety of different therapists over the years?
4    A.    I understood he had been in some -- he had had some
5    therapy before.
6    Q.    And that would -- his willingness to actually undergo
7    therapy on his own would be an indication that he would be
8    somebody that might be amenable to treatment or at least
9    seek out treatment?
10   A.    That could -- yes, that could be one explanation.
11   Q.    And certainly one of those is he attended Sex and Love
12   Anonymous -- or Sex and Love Addicts Anonymous; that would
13   also be an indication that he would be somebody that would
14   be amenable to treatment?
15   A.    He said he was willing to get into treatment, yes.
16          MR. BOSTIC:  Judge, if I could have one moment?
17          THE COURT:  Yes, sir, Mr. Bostic.
18       (Pause.)
19   BY MR. BOSTIC:
20   Q.    Dr. Moore, have you seen any of the letters that were
21   filed with the presentence report concerning friends of his
22   or anything of that nature?
23   A.    No, I have not.
24   Q.    In those letters, a lot of those, it explains the work
25   that he did with them.  And I believe he actually did

MOORE - CROSS

1   describe to you that he had helped other people in several

2   different types of therapy or several different types of --

3   I think dance is one of the things he was doing, things of

4   that nature?

5   A.   Yes.  Yes.  I recall him saying he was very active in

6   the dance community, yes.

7   Q.   And did you have anything -- any reason to disbelieve

8   the fact that he was, in fact, helping other people in dance

9   and also I think -- I forget what the name is.  It is a

10  particular type of psychotherapy, Hakomi?

11  A.   Yes.  I have no reason to disbelieve Mr. Dowell.  I

12  felt he was telling --

13  Q.   So those are indications he would be also helping

14  others or be involved with treatment and certainly

15  interested in treatment and counseling and even helping

16  others with treatment and counseling?

17  A.   It seemed like he sought out treatment throughout his

18  life.

19  Q.   Okay.

20       MR. BOSTIC:  I have no further questions, Judge.

21       MS. HEALEY:  Your Honor --

22       THE COURT:  Any redirect?

23       MS. HEALEY:  Just briefly.

24

25

MOORE - REDIRECT

```
 1                    REDIRECT EXAMINATION
 2   BY MS. HEALEY:
 3   Q.   Dr. Moore, you were asked a question about whether you
 4   had received any evidence of any other contact offenses
 5   other than the ones that brought him to court today, you
 6   were just asked by Mr. Bostic.
 7   A.   Yes.
 8   Q.   It is not your job to collect evidence; correct?
 9   A.   Correct.
10   Q.   All right.  And the defendant's statements to you are
11   purely self-report other than the investigatory materials
12   that you received to review?
13   A.   Yes.
14   Q.   All right.  Did you perform a polygraph or a PPG to
15   determine the accuracy of any denial of any other contact?
16   A.   No, I did not.
17             MS. HEALEY:  Thank you.  I have no further
18   questions.
19             THE COURT:  Thank you.  You may stand down.
20             May this witness be excused?
21             MS. HEALEY:  Yes, Your Honor.
22             THE COURT:  Okay.  Does the government have any
23   other evidence the government wants to put on?
24             MS. HEALEY:  Your Honor, the only other evidence
25   would be a couple of excerpts from victim impact statements,
```

1   including one from "Vicky" who requests that her victim
2   impact statement be read at sentencing proceedings and also
3   we have the father of the victims who would like to make a
4   victim allocution.  Perhaps we could do that first?  It is
5   up to the Court what the Court wishes to do on that.  Would
6   that be okay, so he may leave, if he can?
7              THE COURT:  Yes.  Yes.  Whatever you want to do.
8              MS. HEALEY:  All right.
9              Would you like to come forward?
10             And he knows not to put his name on the record.
11  And I think the Court intends to address him as well at some
12  point, I believe.
13             VICTIMS' FATHER:  Bear with me.
14             THE COURT:  Well, the Court appreciates you being
15  here.  I know this is difficult.  And it has to be hard for
16  you, so I want you to take your time.  And this is a
17  difficult circumstance; it has to be for you.  And, you
18  know, we are sorry that you are here and having to do this.
19  And -- but I appreciate your willingness to come forward and
20  tell me what you have to say.  And thank you for being here.
21             VICTIMS' FATHER:  My purpose for being here is to
22  give my children a voice through me and how it has been over
23  the last 21 months.  And it has been incredibly difficult
24  and painful; many sleepless nights and a lot of guilt,
25  blaming myself that if I had been a better husband and not

1   had gotten a divorce that this happened; a lot of empty

2   bottles of whiskey when I was alone; a loss of motivation;

3   just an incredible amount of pain.  Apart from losing a

4   child, I cannot think of anything more unbearable to go

5   through.  And through that, it has been trying on my ex-wife

6   and her husband and our children.

7            There has been a silver lining that it has drawn my

8   ex-wife and I and her husband very close.  And we are very

9   much a family; if not an unorthodox family, a family,

10  nonetheless.

11           And through the anger and the grieving, there has

12  been temptation to go into hatred and bitterness and rage

13  and everything.  And my purpose in coming here today is to

14  get this out to John and just for the Court and also to know

15  that I have worked through this.  And by the grace of God I

16  am able to come to a stand of forgiveness and to look at

17  you, John, and say, "I forgive you."  And I am praying for

18  you.  And no matter how hard this next 25 years will be with

19  whatever damage that has been done to my children, I wish

20  you no ill will.  And I will continue to pray for you and

21  your life henceforth.  And -- but it has not been easy.

22           And I think that is all I had to say.  But thank

23  you for letting me address that.  And that is --

24           THE COURT:  Sir, let me say that I thank you for

25  that.  And it takes a person of incredible character to come

1  forward and do what you have done.  So I don't think you

2  should hold yourself accountable for what has happened.

3  Your words are remarkable.  Your ability to forgive is

4  admirable.

5          We all -- everybody here hopes and prays for the

6  best for your girls --

7          VICTIMS' FATHER:  Thank you.

8          THE COURT:  -- everybody.  And I hope they are

9  doing well.  I hope they will continue to do well.

10          And I want to commend you on, A, coming up here in

11  a very, very difficult circumstance.  I just can't imagine

12  how hard this is for you.  And for you to demonstrate the

13  level of compassion and understanding and humanity that you

14  have done speaks very highly of you, very highly of you.

15  And I just -- I want you to know I appreciate it.

16          VICTIMS' FATHER:  Thank you.

17          THE COURT:  I appreciate it.  And we all hope and

18  pray the best for those two little girls in your family.

19          VICTIMS' FATHER:  Thank you.  Appreciate it.

20          THE COURT:  Ms. Healey.

21          MS. HEALEY:  Yes, Your Honor.  The only other

22  evidence, Your Honor, are a few excerpts from some victim

23  impact statements.  I'm aware that the Court has, obviously,

24  read them.  So I will keep them brief.  I have picked out

25  excerpts from, I think, three.

1    The first one is from the -- what is known as the

2    "Jessica" series.  And it states as follows:  "The sexual

3    exploitation of a child is a crime that can be compared to

4    the severity of that of murder.  While the victims are still

5    left breathing in most cases, but sadly not all, their

6    futures have been permanently scarred, not due to their own

7    fault, but due to the wrong of someone else.

8        "My daughter was sexually abused by her own

9    father.  Her pictures were transmitted over the Internet.

10   It has been explained to me that trading child pornographic

11   pictures for a pedophile is like a common child trading

12   baseball cards.  In order to get more 'cards' or better

13   'cards' you need to trade or share.  Because of this

14   practice, pictures of my beautiful, innocent, and loving

15   daughter have been circulated all over the world for these

16   sick people to view for their disgusting pleasure.

17       "Once pictures are transmitted via the Internet,

18   they cannot be retrieved.  These photographs are in

19   cyberspace forever and will constantly be viewed by sick

20   perverted minds.

21       "My daughter has aspirations, like all young girls,

22   of being a model or a movie star.  Because of her

23   exploitation, I do not foster her dreams as I normally would

24   in a normal situation.  I fear her becoming famous, and

25   someone digging up the 'dirt' about her unfortunate past.

1     "To see my daughter today, you would never know
2   what transpired in her early childhood.  Her father has been
3   and will be permanently out of her life.  He is currently
4   incarcerated for a term of 18 years for his abuse.  The
5   repercussions of his actions are too numerous and depressing
6   to list.  But through the support and love of family and
7   friends and counseling, we have overcome this tragedy and
8   have thankfully moved on in our lives.

9         "Unfortunately, this horror will never go away
10  entirely.  I am constantly receiving notifications from all
11  over the United States that my daughter's photos have popped
12  up on another pedophile's portfolio.  I can choose to stop
13  receiving the notifications, but I don't.  If my words can
14  help keep a pedophile off the streets to protect our young
15  innocent children, then that is what I need to do.

16        "When it comes to deciding how long the offender
17  should be punished for, we need to remember that the victims
18  in the case have also been punished, but their punishment is
19  a lifelong scar rather than just a few years like the
20  offender.  We should try and make it more and more difficult
21  for this type of crime to occur, and the punishments for the
22  pedophiles should be more severe in hopes of making them
23  think twice before doing the act they do.  A slap on the
24  hand is not proper punishment for the loss of innocence and
25  dreams of a child.

1           "In the words of my daughter when I asked her years

2    ago what the police should do to the bad guys, 'Punch them

3    really hard, mommy.'"

4           And I say these things, Judge, because I know we

5    have focused, of course, in large part on the contact

6    offenses that led to the production in this particular case,

7    but, as the Court has heard, this guy had a very large

8    substantial collection of child pornography and other

9    sexualized images of children.  Children should never be

10   posed sexually.

11          And we know from seeing these victim impact

12   statements that the effects are profound, enduring; they

13   last a lifetime.  And we hear it time and time again that it

14   is not just the initial abuse, but also the knowledge that

15   their life can truly never go on by knowing what happened.

16          So the other two I have are one paragraph from the

17   "Jan_Feb" series -- or -- or a couple of small paragraphs.

18   "Throughout this nightmare" -- this is from, I think, the

19   mother.  "Throughout this nightmare I have longed to put my

20   arms around my child and comfort her.  But her experience

21   left her distrustful of any touch.  A hug, a kiss, an arm

22   around the shoulder all met with disdain and shouts of 'No

23   smooshies.'  For months, the only creature she would hug was

24   the stuffed toy she carried to bed with her.

25          "The little girl who once played at dress-up and

1    who called for me to come and see how beautiful she was now
2    hates being called pretty.  She has learned that being
3    pretty attracts the type of attention that she dreads.
4    After extensive therapy she is beginning to recover now.
5    She no longer smears food on her face or pulls tangled hair
6    over her eyes to hide behind as she used to.  It is less
7    often that she rubs her hands raw, washing them over and
8    over again, trying to feel clean.  She even comes to mom for
9    hugs now and then.
10            "But the fear is not entirely gone.  The
11   strategically placed broken toys on the floor, 'to hurt the
12   feet of the bad man if they try to sneak into our house,'
13   have been replaced with martial arts lessons, which she
14   practices with a grim determination 'to learn how to protect
15   myself.'  And then there is the shadow that still comes over
16   her face if a stranger gives her an unexpected compliment.
17   The pictures are still out there."
18            And this is a very long statement.  I will not read
19   more; I know the Court has.  It is a very compelling
20   statement.
21            And the final one is from "Vicky."  "Vicky" is one
22   of the most widely traded child pornography series.  In
23   fact, it is pretty frequent that the primary investigator in
24   that case is called upon to testify around the country.  He
25   testified in one of my trials that I had.

1    And she states as follows.  This is an Updated

2  Victim Impact Statement from December of 2011.  "I live

3  every day with the horrible knowledge that many people

4  somewhere are watching the most terrifying moments of my

5  life and taking grotesque pleasure in them.  I am a victim

6  of the worse kind of exploitation:  child porn.  Unlike

7  other forms of exploitation, this one is never ending.

8  Everyday, people are trading and sharing videos of me as a

9  little girl being raped in the most sadistic ways.  They

10  don't know me, but they have seen every part of me.  They

11  are being entertained by my shame and pain.

12    "My world came crashing down the day I learned that

13  pictures of me being sexually abused had been circulated on

14  the Internet.  Since then, little has changed except my

15  understanding that the distribution of these pictures grows

16  bigger and bigger by the day and there's nothing I can do

17  about it.  The enormity of this has added to my grief and

18  pain and given me a paranoia.  I wonder if the people I know

19  have seen these images.  I wonder if the men I pass in the

20  grocery store have seen them.  I feel totally out of

21  control.  They are trading around my trauma like treats at a

22  party and it feels like I am being raped all over again by

23  every one of them.  It sickens me to the core, terrifies me,

24  and makes me want to cry.  So many nights I have cried

25  myself to sleep thinking of a stranger somewhere staring at

their computer with images of a naked me on the screen.  I have nightmares about it often.  I can never feel safe so long as my images are out there; every time they are downloaded I am exploited again, my privacy is breached, and I feel in danger again.  I fear that any of them may try to find me and do something to me.

"I have a right to know who has my pictures and who is trading them.  While it hurts to know, not knowing makes me feel more in danger.  To be criticized for wanting to know what is going on with the humiliating pictures of me, to exercise the few rights I have under the law, only makes the hurt that much worse.  How can such people not understand or care?

"I am justified in my paranoia.  Some of these perverts have contacted me.  I have received emails suggesting making porn with these strangers; one has stalked me.  Another created a slideshow of me on YouTube.

"As I go on with my life the effects of these crimes still hurt me and I hope the Court and everyone involved will understand this and how serious it is.  While the abuse from my biological father was awful, as time goes on that is farther and farther away from me.  He is in jail and can never hurt me.  That is over.  The men that download my pictures are all around me for all I know and it will keep going on forever.  I have no control over it at all.

1  This is frightening, beyond belief.

2        "I still have nightmares that come from knowing

3  that pictures of me are spread around the Internet by people

4  with perverted interests in my pain.  I have panic attacks

5  and flashbacks.  I can't sleep a lot of nights, no matter

6  how early I go to bed or how early I wake up in the

7  morning.  Even if I've barely slept for days and am

8  exhausted, sleep doesn't come easy.  I take afternoon naps

9  just to function, but something about the night time puts my

10  mind at alert and after all these years and going to

11  different counselors, I still haven't learned the trick to

12  let my mind rest.  When I do sleep, my dreams are vivid and

13  I remember them for weeks.  A common theme is finding myself

14  naked in front of a crowd of people or in an enclosed space

15  and I can't escape or run away fast enough.

16        "Most days I can put away the thoughts of the

17  previous night and function okay, but some days I get

18  'stuck' and zone out.  When this happens, I sit in the same

19  spot motionless for a long time.  My mind will come back at

20  some point later in the day, maybe 30 minutes later or maybe

21  six hours later.  I can't remember what I did during that

22  time but I look around my apartment for clues.  This happens

23  a few days out of the month, more frequently if I'm under a

24  lot of stress.

25        "I have left my home in this 'zoned-out' state of

1  mind a few times.  Friends and family who've seen me in this
2  stage describe me as "loopy" and tell me that they can talk
3  me out of it by pointing out my odd behavior and talking me
4  through some deep breaths.  They have told me my personality
5  changes when this happens.  I can't remember things I have
6  said in that state, and then they repeat them back to me" --
7  "when they repeat them back to me it is really surprising.
8          "I have struggled off and on with this, which I
9  now" -- "I know now" -- "I now know is called
10  disassociating.  This last year I felt under such stress, I
11  started zoning out, or disassociating, a few times a week
12  and having the personality issues so bad that my friends
13  were really concerned about me.  They keep telling me I
14  wasn't acting normal, especially at night.  I had missed a
15  lot of the first two weeks at school so I have the added
16  stress of trying to catch up.  It felt like I couldn't
17  control it.  I never knew when I was going to zone out and I
18  kept missing classes and appointments.  It seems crazy, but
19  it took me a long time to recognize what was going on and to
20  get myself to start working on my coping skills again.
21          "School has been a struggle.  I have had to quit
22  two different times.  I cannot attend a regular college away
23  from home due to my paranoia.  Over the last year I have
24  disassociating and missing classes.  This puts me behind and
25  hurts my grades.  I am doing my best to salvage my grades

1   and do all of the extra credit I can do to compensate.  My

2   struggles with sleep due to the fear of unknown people

3   watching my images and coming after me compounds all of the

4   other problems.  It frustrates me because I hate the feeling

5   of being out of control, yet these effects can get triggered

6   when I least expect it.

7       "My paranoia about pornography and panic attacks

8   has so far made a serious relationship beyond my

9   capabilities.  The paranoia of knowing people are viewing

10  videos of me messes with my mind and adds a back burner type

11  of stress to my life constantly that is brought to the front

12  of my mind by unexpected situations and still throws me for

13  a loop, the episodes of disassociation and personality

14  change and stress management.  Many of my PTSD symptoms have

15  gotten better.  One thing that has gotten worse is that the

16  stress affects my health and makes me sick.  I sometimes

17  stress out to the point of not being able to keep food down

18  for days.  It also seems to wear down my immune system

19  because I seem to be getting sick more often.  In my efforts

20  to counteract this I try to work on doing regular exercise,

21  eating healthy, and take vitamins every day.

22      "I want you to know that dealing with the effects

23  of the stress of random men looking at pictures of my sexual

24  abuse as a child is like a full time job that wears me down

25  and colors every aspect of my life.  Please think of me and

1    what I am going through."

2            And that's her most recent one.  There are, of

3    course, other ones, Your Honor.  She is not the only one who

4    has actually been stalked.  We know of another very popular

5    series where CS, DOJ, and others have been dealing with

6    trying to give some protection to another victim as well.

7            These -- from what I understand about "Vicky," they

8    discovered -- there was a discovery by the victim that the

9    images were out there well after the investigation of the

10    abuse, and so it was an ongoing thing.

11            And as the Court may know -- I'm not sure whether I

12    put this -- we put this in our memo or not -- we requested

13    back in mid June, I think June 19th, a report from the

14    National Center for Missing and Exploited Children, just to

15    see whether the videos of the -- of Minor A had made it into

16    other collections.  And, to our sadness, they had made it

17    into numerous collections.

18            I have shared this with Darren.  And if the Court

19    wishes to see it, the Court can see it.  But otherwise I

20    understand that these have already been found in numerous

21    collections.  And I believe even Mr. Fottrell had actually

22    checked with NCMEC and I think there's even a larger number

23    since June 19th when we last checked.  The Internet is

24    forever.

25            You know, I don't know -- one of the things I have

DOWELL - DIRECT

1   tried to figure out, is it better to tell a kid who may grow

2   up and not know?  Does she have a right to know at the age

3   of 18 what happens?  What happens then?  What happens if she

4   finds out?  Her face -- as the Court saw in those videos,

5   all -- you know, clearly, her face is front and center

6   stage, as is the five-year-old as well, although we don't

7   have any evidence the five-year-old images are online.

8          So that's the evidence we have.  We, obviously,

9   have argument.

10         Thank you, Your Honor.

11         THE COURT:  Thank you, Ms. Healey.

12         All right.  Mr. Bostic, do you wish to put on any

13  evidence?

14         MR. BOSTIC:  Yes, sir.  Judge, if I could call Bill

15  Dowell.

16         Mr. Dowell.

17            BILL DOWELL, DEFENSE WITNESS, SWORN

18         THE CLERK:  Please have a seat on the witness

19  stand.

20         THE COURT:  Good afternoon.

21         THE WITNESS:  Good afternoon.

22

23                    DIRECT EXAMINATION

24  BY MR. BOSTIC:

25  Q.  State your name for the Court.

DOWELL - DIRECT

1    A.    Bill Dowell.

2    Q.    Mr. Dowell, what is your relationship to John Dowell?

3    A.    John is my brother.

4    Q.    And how many brothers and sisters do you have,

5    including John?

6    A.    Well, there's four brothers total, including John, and

7    one sister.

8    Q.    And where is John in the line as far as --

9    A.    He's by far the youngest.

10   Q.    Okay.  How much younger is he than the next youngest

11   child?

12   A.    I think he's about nine to ten years younger than my

13   sister, who is the youngest of the rest of the group.

14   Q.    Now, were you aware of what John's relationship was

15   with his parents when he was growing up?

16   A.    Of course.  Yes.

17   Q.    Yes.  Could you describe that briefly for the Court?

18   A.    Well, of course, the home was pretty empty.  We had all

19   left.  The rest of us siblings had left.  My dad was an

20   alcoholic and they had a difficult marriage.  John spent a

21   lot of time alone.  They lived on a farm.  I don't know what

22   age John was when that started, but he was young.  And so he

23   was -- he was fairly isolated.  And there was a fair amount

24   of trauma in the household.

25   Q.    Now, at some point John left high school and went to

DOWELL - DIRECT

```
 1   college?
 2   A.   Yes.
 3   Q.   And where did he go to college at?
 4   A.   Down at VPI.
 5   Q.   And at some point you ended up going down to pick him
 6   up; is that correct?
 7   A.   Yes.
 8   Q.   If you would describe to the Court the circumstances,
 9   what was going on in the family and why you went down to
10   pick him up?
11   A.   Yeah.  Well, my dad was dying of cancer.  And he was in
12   the house there.  My mom was a nurse.  So we were nursing
13   dad.  And John just wasn't coping in school, deeply
14   depressed.  So I went down and found him -- found him, you
15   know -- he was incapacitated with depression.  His apartment
16   was littered in trash and stuff.  And so I packed him up and
17   brought him home.
18   Q.   And are you aware of mental issues that he has had over
19   the years?
20   A.   I think a lot of depression is the main thing that I
21   know of, and loneliness, and some struggles with
22   relationships with women.
23   Q.   And there was a time period -- let me kind of jump
24   forward here.  There was a time period in 2009 where he
25   actually came back to Virginia; is that correct?
```

DOWELL - DIRECT

```
 1   A.   Yes.
 2   Q.   And there was a -- I think a young man that had
 3   obtained -- had obtained -- had been diagnosed with cancer?
 4   A.   Yes.  My nephew -- my oldest brother's oldest son had
 5   brain cancer.
 6   Q.   And did John come back to Virginia?
 7   A.   Yes.  John came back.  He was asked to come back -- or
 8   maybe he volunteered; I don't remember -- to help care for
 9   Jason.  He was in the home.  And we were all trying to care
10   for him.  And John came back to be of some help in that.
11   Q.   And was John -- kind of, basically, his responsibility,
12   when he had moved back in, in 2009, was to care for Jason?
13   A.   That was his main function when he was there during
14   that time period, yes.
15   Q.   Okay.  And did you see John with Jason a lot?
16   A.   Yes.  Yes.
17   Q.   And what type of things on a daily basis would he do to
18   help him?
19   A.   Oh, I don't know.  He would help -- moving him was a
20   big problem.  He helped move him and bathe him and at times
21   I think probably feed him.  I don't remember that
22   specifically.  But Jason needed -- he was still mobile
23   somewhat, so he needed a lot of attention.  He couldn't talk
24   in the latter months.  So our job was to try to interpret
25   what he wanted or didn't want.  John was a big help in that.
```

DOWELL - DIRECT

1   Q.   At some point did Jason die?

2   A.   Yes.

3   Q.   Now, do you know where John went after that?

4   A.   Well, he went back to California.

5   Q.   Now, at some point he actually became homeless while he

6   was in California?

7   A.   He what now?

8   Q.   At some point did he become homeless when he was in

9   California?

10  A.   Yes.

11  Q.   And how did you become aware of that?

12  A.   Well, I think John told me about it, I'm sure.  Yeah.

13  Q.   And if you would describe, what was your impressions of

14  him during that time period, prior to November when he came

15  back in 2010?

16  A.   Well, I mean, we were all deeply worried about him.  He

17  was living in a park.  John has got a lot of skills.  He's a

18  very skilled carpenter.  He's a skilled computer person.  He

19  has got a lot of marketable skills.  And yet he was living

20  in a park and claimed he was happy doing that.  But -- so

21  we were -- all of us, the whole family, was concerned about

22  him.

23  Q.   Did you have concerns for how his mental health was

24  doing during that time period?

25  A.   Yes, I certainly did.  Yeah.

DOWELL - DIRECT

1   Q.   Now, he ended up moving back to Virginia around
2   Thanksgiving 2010?
3   A.   Yes, I think that's right.
4   Q.   And would you describe what his mental state was during
5   that period of time, from your perspective?
6   A.   Yeah.  I don't know, he was very uncommunicative and
7   more distant and seemed depressed and anxious.  He was -- he
8   was like I had never seen him before.  I tried to get him to
9   come over and spend time at my house and help me with some
10  carpentry projects and so on, but I just couldn't get him
11  motivated.  He was just disconnected.
12  Q.   Did he seem a lot different than he had been in the
13  past --
14  A.   Yes.  Much, much different, yeah.
15  Q.   Did you happen to notice if he was much more withdrawn
16  or things of that nature?
17  A.   Yes.  He was much more withdrawn.  I couldn't
18  -- normally he would spend quite a bit of time with me when
19  he was in Virginia, and he just didn't want to.  And he
20  didn't participate in the activities with my family at all.
21          MR. BOSTIC:  I don't have any further questions,
22  Judge.
23          MS. HEALEY:  We have no questions, Your Honor.
24          THE COURT:  Mr. Dowell, thank you.
25          Is Patti your wife?

DOWELL - DIRECT

```
1          THE WITNESS:  Yes.
2          THE COURT:  I read her letter.  And tell her I
3   appreciate that as well.  Thank you.
4          Thank you.  I know this is difficult for you.
5   Thank you for coming up here and providing that testimony.
6   Appreciate it.
7          THE WITNESS:  Yes.
8          THE COURT:  Thank you.
9          MR. BOSTIC:  Can I have one second?
10         THE COURT:  Yes.
11     (Pause.)
12     (Off-the-record discussion between the defendant and
13   defense counsel.)
14         MR. BOSTIC:  Your Honor, I would like to call John
15   Dowell.
16         THE COURT:  All right.  Come on up and be sworn,
17   sir.
18         THE CLERK:  Please raise your right hand.
19              JOHN DOWELL, DEFENDANT, SWORN
20         THE CLERK:  Thank you.  Please have a seat.
21         THE COURT: Good afternoon.
22         THE WITNESS:  Good afternoon.
23                  DIRECT EXAMINATION
24   BY MR. BOSTIC:
25   Q.  If you would, state your name for the Court.
```

DOWELL - DIRECT

1   A.    John Dowell.

2   Q.    Now, Mr. Dowell, you have entered a plea of guilty to

3   all of the counts in the indictment, One through Twelve on

4   production and then the one count of transportation; is that

5   correct?

6   A.    Yes, I have.

7   Q.    And you have admitted that you committed those

8   offenses; is that correct?

9   A.    Yes.

10  Q.    Now --

11  A.    (Defendant crying.)

12        Sorry.

13          THE COURT:   Jody, tissue.

14  BY MR. BOSTIC:

15  Q.    Tell me when you are ready.

16  A.    I'm ready.

17  Q.    Now, Mr. Dowell, I kind of want to go back and explain

18  to the Court the time frame -- what was going on in your

19  life prior to the time -- say, prior to 1998.  If you would

20  describe to the Court, there was a lot of different things

21  that you were doing during that time period, if you would

22  describe those things to the Court.

23  A.    I guess you mean like rock climbing and --

24  Q.    Yes.

25  A.    I was a carpenter at the time.  And I guess you are

DOWELL - DIRECT

1    probably referring to -- in 1996, that was when my wife

2    divorced me and I entered therapy for the first time.  And

3    that led me to getting involved with contact improvisation,

4    which is a dance form, kind of a martial dance form.

5    Q.    Kind of a what dance form?

6    A.    Martial, as in martial arts.  It is one way to describe

7    it.

8    Q.    And is that -- that actually is with adults; correct?

9    A.    Is what?

10   Q.    With adults?

11   A.    Yes.  Yes.

12   Q.    And who -- what were the age group of the people that

13   were in these contact improv dance classes?

14   A.    Everything.  Anywhere from college kids up to -- I have

15   seen 80-year-old people in the space.

16   Q.    Is it couple dancing or --

17   A.    It is -- it has roots in aikido martial arts and in

18   -- sometimes it looks like swing dancing.  It is a partner

19   dance.  It is about relating to other people in movement.

20   Q.    Now, it -- all during that time period you were doing a

21   variety of different type of things with other people; is

22   that right?

23   A.    I -- I did have a lot of isolation during that period

24   after my divorce, but I was looking for community for sure.

25   Q.    Okay.  You actually did --

DOWELL - DIRECT

1   A.   So I had climbing partners that I went climbing with

2   regularly.  And I went to the contact improvisation classes

3   and jams, like a jazz jam is what that means.

4   Q.   And with those, would you be dancing with women?

5   A.   Yes -- you know, with women and with men, actually.

6   Q.   Now, let's just go ahead and jump right into the

7   point.  When did you actually start looking at and becoming

8   attracted to younger females?

9   A.   Well, I started looking at naturist pictures I think

10  around '99 -- '98 and '99, somewhere in that period.

11  Q.   Now, was there ever a point when you were 18 years old

12  or around that time frame where you had actually bought a

13  child pornographic magazine in Washington, DC?

14  A.   I guess I described to Dr. Fracher, I bought a magazine

15  -- one magazine when I was 18 from a shop in Georgetown that

16  might have had underage females in it; I actually don't

17  know.

18  Q.   Okay.  But it was what you described --

19  A.   It wasn't very young girls, but they were younger than

20  what you usually see.

21  Q.   Okay.  And in that, say, '98-to-2000 range, that's when

22  you actually started looking at younger women, was that on

23  the Internet at that time or how did you --

24  A.   That was on the Internet.

25  Q.   And describe the type of things that you were looking

DOWELL - DIRECT

1    at at that point.

2    A.    Well, at first it was the naturist videos -- or

3    pictures and series like MclT.  It was all very kind of

4    artistic.  And I guess at the time I interpreted it as being

5    fairly innocent.  I see now that that was a very wrong

6    interpretation.  But at the time I guess I rationalized it

7    and thought it was not that big of a deal.

8    Q.    Now, that progressed much more into much more different

9    types of child pornography, did it not?

10   A.    Yes, it did.  It was very -- it was very addictive.

11   Q.    And Dr. Moore described people that have a pedophilia

12   addiction or a pedophilia diagnosis, I guess, as looking

13   through a different lens or having a completely different

14   distorted view of things.  After sitting in jail for quite

15   some time now, has that kind of started to clear some?

16   A.    It cleared somewhat just by not being exposed to the

17   images.  And it cleared a little bit by talking to other men

18   and seeing the various kinds of pedophiles.  And then just

19   very recently I have been confronted with a lot of

20   information that has cleared my head up quite a bit more.

21   Q.    You actually reviewed the victim impact statements,

22   even though they were redacted; is that right?

23   A.    Yes, I did.  I wish I had read them a long time ago.  I

24   -- I -- I think it might have at least pushed me to seek out

25   professional help.

DOWELL - DIRECT

1    I was looking for help for years, but it is just so

2    hard.  It was just so much condemnation and shame, that it

3    is just very hard to get help.

4    Q.  And you did seek treatment for other types of things;

5    is that right?

6    A.  I did.

7    Q.  What type of mental issues did you perceive that you

8    had back when you were looking at counseling and then what

9    brought you to the point of seeking out SLAA in 2010?

10   A.  Well, I had -- I had suffered from depression of

11   various levels for as long as I can remember.  Even as a

12   child, I remember just being kind of very -- on kind of one

13   level, my emotional state.  Where the other kids were kind

14   of up and down, I just remember being kind of overly still

15   or something.

16       And then there was the episode after my father died

17   when -- I had actually helped care for him for the last

18   three months that he was alive.  And that just -- that was

19   too intense for me at the time and put me into a really

20   desperate place.

21       But, really, it wasn't until after my marriage that I

22   sought therapy.  I had tried other things like -- I went to

23   Youth With A Mission right after my father died as an

24   attempt to change myself, get free of the depression.  But

25   then, when my wife left me, she pretty much stated that the

DOWELL - DIRECT

1    reason she was leaving me was because of my depression.  I

2    didn't think that was a very good reason to leave, but I

3    thought it was a pretty good reason to change.

4    Q.   Now, if you --

5    A.   And then -- let me just get to the last part of your

6    question which was why I started -- why I went to SLLA.  So

7    when I was living in Santa Cruz, for the first time in my

8    life I had community on a level that I had never had before,

9    people supporting one another on a level that I had never

10   had before.

11        And I found myself, after a very hard struggle, able to

12   quit smoking cigarettes.  And I was in a men's group at the

13   time.  And I just started -- I was just working very hard to

14   get my inner ideals to fit my outer life, which they didn't

15   up to that point, because I had these secret addictions.  So

16   I started looking very hard for support at that point to

17   quit looking at child pornography.  And that's what

18   eventually led me to SLLA.

19   Q.   Now, in 2009 you actually ended up coming back and

20   spending a lot of time with Jason?

21   A.   That's true.  Yes.

22   Q.   And if you would describe to the Court just very

23   briefly what condition was he in, what type of things did

24   you do to help him?

25   A.   Well, it was pretty much as my brother said.  When I

DOWELL - DIRECT

1    first got there, he actually could talk a little bit.  But

2    within just two or three days he lost the ability to speak.

3    And so I took care of him.  I went over there and -- myself

4    and his wife were his primary caregivers.  And we changed

5    his clothes, his diapers, his -- moved him around, fed him,

6    everything.  I did some amount of physical therapy on him,

7    just kind of moving his limbs around, because he couldn't

8    move quite completely.

9    Q.   So were you the primary person trying to take care of

10   him at that point or --

11   A.   Well, his wife was.  And I was helping.  I was -- I was

12   the person helping most besides his wife.

13   Q.   Now, let me take you back to the time -- there was a

14   point where you were very heavily involved in a variety of

15   different activities, including dancing, counseling, I think

16   hiking, cave diving.  If you could describe to the Court the

17   type of things that were going on in your life at that

18   point?

19   A.   Well, that's pretty much my -- from the time I was 18

20   until I was arrested, that's -- when I was -- when I went to

21   school in Blacksburg, I got very involved in the caving

22   community.  I spent -- we actually logged our hours, and I

23   spent like 3,000 hours underground.  So I was very involved

24   in that.  And then when I moved to the west coast, I was

25   very involved in rock climbing.  I actually put up new

DOWELL - DIRECT

1   routes and it is in guide books.  It was pretty much

2   carpentry and rock climbing there for a long time.

3       And then more recently I have gotten very -- I got very

4   much into serving.  But contact improvisation since 1996

5   until the present was kind of the center of my life.  I was

6   heavily involved in the dance communities.  I taught dance

7   class, ran dance jams, organized events.  It was kind of a

8   very transformative experience for me.

9   Q.   And there was a number of people that actually you

10  assisted with that; is that correct?

11  A.   Excuse me?

12  Q.   There was a number of people that you assisted with

13  that?

14  A.   Oh, sure.

15  Q.   Correct?

16  A.   Yeah.  Well, I had my -- I had some buddies, like Matt

17  Faw, who -- we just liked to rock climb and dance together.

18  And then there was people who were more students, like

19  Andrea Namaste.  She was a student of mine for several years

20  and later -- she is still my best friend, really.

21  Q.   And both of them have written letters on your behalf;

22  is that correct?

23  A.   They have, yes.

24  Q.   And you have had the opportunity to read those letters?

25  A.   Yes, I have.

DOWELL - DIRECT

1    Q.   And everything they say about your assisting them,

2    helping them with counseling, helping them -- being involved

3    with them in outdoor activities and dancing, is all of that

4    stuff that you would state as well?

5    A.   Yes, sir.

6    Q.   I believe you also had a good friend Erica Pagels?

7    A.   Uh-huh.  She was in my Hakomi psychotherapy training

8    with me.  I wouldn't actually say that she's a very -- a

9    super-close friend, but she was in the training with me.

10   And we were in a nonviolent communication group together as

11   well.

12   Q.   Needless to say, it looks like throughout a good time

13   period of your life you actually have sought out counseling

14   or assisted in counseling; would that be accurate?

15   A.   Well, it has been my goal for the past ten or 15 years

16   to be a therapist.  And I have worked with a lot of clients

17   as well.  I was a therapist in training, primarily.  And it

18   is -- yeah, it has been a -- it is my favorite thing to do.

19   Q.   And throughout all of it you had this addiction lying

20   under -- or this --

21   A.   I did.

22   Q.   -- disorder underneath --

23   A.   I had this secret addiction.  I was very aware that --

24   in the last couple of years I began -- as I was really

25   trying to work on my practice, I became very aware that that

DOWELL - DIRECT

1    addiction was isolating me and making it very hard for me to

2    promote myself.  It is like it is a lull around me.  And I

3    can't really fully commune with other people as long as it

4    exists.

5    Q.   You realize that the Court is going to sentence you to

6    a very lengthy term in prison no matter what; is that

7    correct?

8    A.   Yes, sir.

9    Q.   As part of that prison sentence there's a high

10    likelihood that you also will receive treatment, therapy,

11    specifically for child pornography, or pedophilia?

12    A.   Yes, sir.

13    Q.   Would you be willing to get as involved with that as

14    possible and to utilize that and see if you can get as much

15    treatment as possible?

16    A.   I would very much like to be free of -- or not be

17    controlled by that.

18    Q.   If at some point --

19          THE COURT:  You are 47 years old, aren't you?

20          THE WITNESS:  Yes, sir.  Yes, Your Honor.

21    BY MR. BOSTIC:

22    Q.   If at some point you actually are released from prison,

23    there's going to be a wide variety of things that you would

24    actually have to do, including where you could live, who you

25    could associate with, probably very intensive counseling.

DOWELL - CROSS

1  Would you agree to do everything possible not to have any
2  type of recidivism or any type of reoffending?
3  A.   I will do anything possible not to ever offend in any
4  way or be involved in child pornography in any way again,
5  whatever I have to do.
6  Q.   Tell the Court now how you feel about what you have
7  done.
8  A.   It really can't be expressed in words now that I have
9  seen how -- how just completely out of my mind I was and how
10  awful just the repercussions have been for my family and for
11  the girls and their parents.  I'll just do my best to spend
12  the rest of my life making reparations for those two months
13  and the previous ten years.  That's all I can do.
14  Q.   John, is there anything else that you want to tell the
15  Court?
16  A.   I think that about sums it up.  I will -- I will spend
17  the rest of my life doing my best to make reparations for
18  what I have done.
19          MR. BOSTIC:  I have no further questions, Judge.
20          THE COURT:  Any cross?
21          MS. HEALEY:  Yes, Your Honor.  Just briefly.
22
23                    CROSS-EXAMINATION
24  BY MS. HEALEY:
25  Q.   You just said you would do anything to not be involved

DOWELL - CROSS

1    in child pornography offenses again; right?  But you weren't

2    just involved in child pornography; right?

3    A.   Yes, I was.

4    Q.   No.  You did other things, like serially molesting a

5    three-year-old; right?

6    A.   Yes, I did.

7    Q.   You took her up to your room; correct?

8    A.   That is correct.

9    Q.   Right.  You were allowed to stay in that household;

10   correct?

11   A.   That is correct.

12   Q.   And you took that girl up to the room where you were

13   living; correct?

14   A.   Right.

15   Q.   And you took her over and over and over again; correct?

16   A.   That's right.

17   Q.   And you kept trying to get her to engage in different

18   sex acts with you; correct?

19   A.   Different sex acts?  Could you be more specific,

20   please?

21   Q.   All right.  Well, you started out -- you have seen the

22   videos.  You made the videos; right?  And you started out by

23   pulling down her pants; correct?

24   A.   Yes, I did.

25   Q.   And she didn't want you to do that, did she?

DOWELL - CROSS

A.   No, I don't believe so.  Not -- not -- not now that I
have recently seen the videos, she did not.

Q.   When she was saying "Pull my pants up.  Why are you
doing that," you didn't realize she didn't want you to do
that?

A.   At the time I was very much in rationalization and I
did not see or hear what she was saying.  I didn't interpret
it the way that I interpret it now, that's for sure.

Q.   So when was it that you first realized that she really
didn't want it?  While you have been sitting in jail,
knowing you are facing a sentence?

A.   No, actually.  It wasn't until very recently, as I've
been confronted -- actually, I had a big revelation today
just watching that video, just listening to her, because I
had this one story in my head that I was telling myself, to
keep myself -- to try to tell myself I'm not a horrible
monster, so I had this story.  And it was a false story.  It
was very false and wrong.

Q.   Well, you are clearly -- you have seen those videos
again.  You are clearly focused on making sure you get done
what you want to get done to her; correct?

A.   I believe that's correct, yes.

Q.   And then -- and that included not only touching her,
not only showing off her genital area, but also you
performing oral sex on her and licking her anal area; is

DOWELL - CROSS

1  that correct?

2  A.   That is true.

3  Q.   And you even tried to get her to do the same things to

4  you that you were doing to her; right?

5  A.   Yes, I did.

6  Q.   That's not soft core child pornography, is it?

7  A.   No, ma'am.

8  Q.   And so when you called what you are doing an addiction

9  -- well, first of all, you heard Dr. Moore testify.  This

10  isn't an addiction, is it?

11  A.   I believe it was my pornography addiction that I had

12  from the time I was ten that led me into this behavior.  But

13  I do not at this point agree that it is just an addiction.

14  It is way beyond that.

15  Q.   Well, it is not the -- you know, if you are saying you

16  had a pornography addiction, that addiction doesn't include

17  going after a three-year-old, does it?

18  A.   No, it does not.

19  Q.   And you tried to also get images of the five-year-old;

20  correct?

21  A.   Yes.  Yes, that's correct.

22  Q.   In fact, that second video shows you physically and

23  intentionally pulling down her pants; right?

24  A.   Yes.

25  Q.   But as you told Dr. Moore, she just wasn't into it; is

DOWELL - CROSS

```
 1   that right?
 2   A.   That is true.
 3   Q.   Does that mean you think the three-year-old was into
 4   what you were doing originally?
 5   A.   Actually what I think now is -- I agree with the judge
 6   that she was -- she was vulnerable and not cognitively able
 7   to even know what was happening to her.
 8   Q.   Well, she's three years old; right?
 9   A.   Yes.
10   Q.   Three-year-olds don't know everything that is going on;
11   right?
12   A.   Yes.
13   Q.   Are three-years-old even supposed to know about sex?
14   A.   No, they do not know about sex.
15   Q.   The other thing I heard you testifying about, you had
16   testified about the images -- being exposed to the images,
17   as if these images -- you just happened upon these images.
18   That's what you just testified to; right?
19   A.   Yes.
20   Q.   But that's not the case; correct?
21   A.   Well, no, actually, that was the case.
22   Q.   Oh, so when you were going on Tor and Freenet and
23   BitTorrent --
24   A.   Well, that was only in the past three years.  I thought
25   you were just asking me about 1998.
```

1   Q.   You just happened upon child pornography?

2   A.   Yes.  You'll find that the entry-level images are mixed

3   with normal pornography.

4   Q.   But you made the choice to go search for more child

5   pornography, not only on Google searches, but on, as you

6   heard from -- Mr. Fottrell testified to, sites that most

7   people don't even know exist; isn't that correct?

8   A.   That is correct.

9   Q.   And Tor is one of those types of -- Tor and some of the

10  other software are the types of things that mask your

11  identity by changing your IP address; correct?

12  A.   That is correct.

13  Q.   You didn't want to get caught; right?

14  A.   No, I did not.

15  Q.   Right.  So if you didn't want to get caught, that

16  doesn't seem to me like you wanted to go get therapy for

17  your problem?

18  A.   The two are not contraindicative, if that's a word.

19  Q.   Now, I do want to ask you one thing.  Mr. Bostic

20  brought up something that you told Dr. Fracher way back

21  when.  You met with Dr. Fracher twice; correct?

22  A.   Yes, I did.

23  Q.   You have seen -- you have reviewed his report?

24  A.   Yes, I did.

25  Q.   All right.  And you know that the second report is very

DOWELL - CROSS

1    similar to the first report; correct?

2    A.   Yes.

3    Q.   All right.

4    A.   I didn't see it, though.

5    Q.   Well, Mr. Bostic just asked you about an incident or

6    something that you were exposed to when you were 18 years

7    old.  And your testimony just now was that it had some

8    pictures, not all of it children, maybe older children, but

9    nothing really extreme was what I understood you to say; is

10   that accurate?

11   A.   There was a magazine that I bought in Georgetown, in a

12   legal pornography shop.  And I do remember the girls in it

13   being -- seeming very young, teenagers, perhaps.

14   Q.   Well, you did not correct what you had stated for

15   Dr. Fracher to write in the second report, which states,

16   "When Mr. Dowell was approximately 18 years old, he

17   purchased a magazine in Washington depicting prepubescent

18   girls in the nude."

19   A.   That's not true.  I didn't say that.

20   Q.   You did not say that?

21   A.   No, I did not.

22   Q.   Did you see the first report before you met with him

23   the second time?

24   A.   I saw it when it was first produced, yes.

25   Q.   All right.  So you didn't think to correct that to

DOWELL - CROSS

1    Dr. Fracher?

2    A.   I don't even -- I'm sorry.  I don't even know what you

3    are asking.

4    Q.   All right.  And what about the statement that

5    Dr. Fracher had made that you indicated that you were

6    strongly aroused by the pictures in the magazine, a

7    preference that would continue in your life, was that not

8    accurate either?

9    A.   It probably was accurate, yes.

10   Q.   All right.  So back when you were 18 you already had

11   started becoming aroused to images -- naked images of girls?

12   A.   Yes.

13   Q.   So it wasn't just in 2000 that you started getting

14   aroused to the idea of sexualized images of children?

15   A.   Well, the girls in that magazine -- I mean, I don't

16   know.  I was -- I don't know how to answer that.  There

17   wasn't anything between 1984, when that happened, and 1998,

18   which is a long time span.  The only thing I ever looked at

19   was like Playboy.

20   Q.   But you started to look at -- you have acknowledged to

21   both Dr. Moore and Dr. Fracher that you increasingly looked

22   at more hard-core images over the years; correct?

23   A.   That is true.

24   Q.   And that you found these highly arousing; correct?

25   A.   That is true.

DOWELL - CROSS

```
 1    Q.  And you acknowledge also that the great majority of
 2    your collection of images is child-oriented; correct?
 3    A.  Yes.
 4    Q.  And even the images that don't necessarily qualify as
 5    child pornography are sexualized images of children;
 6    correct?
 7    A.  Yes.
 8    Q.  So even the, quote, modeling or what you might have
 9    referred to as legal artistic poses are pictures designed to
10    elicit a sexual response in you; correct?
11    A.  I'm sorry?  What was the last part of that?
12    Q.  They are pictures that would be sexually exciting to
13    you?
14    A.  Yes.
15    Q.  Okay.
16         MS. HEALEY:  I have no further questions, Your
17    Honor.
18         MR. BOSTIC:  No follow-up, Judge.
19         THE COURT:  Thank you, Mr. Dowell.  You may stand
20    down.
21         Okay.  Any other evidence from you, Mr. Bostic?
22         MR. BOSTIC:  Defense rests.
23         THE COURT:  All right.  Now, let's hear any
24    argument from the United States.
25         MS. HEALEY:  Your Honor, I know in these types of
```

 1  cases it is hard to stay brief, and I'm sorry that we have

 2  had a long day in court, but obviously the stakes are high

 3  in this particular case and the Court has a tough decision

 4  to make.  The Court can sentence the defendant to anything

 5  between 15 and the adjusted guidelines range the Court has

 6  of, I think, 960 months.

 7          In this case --

 8          THE COURT:  No, the Court can -- if the Court wants

 9  to, the Court can vary upwards, if the Court wants to.

10          MS. HEALEY:  Okay.  To a total number of roughly

11  4,600 months --

12          THE COURT:  No.  The Court can sentence him to

13  life.

14          MS. HEALEY:  I'm not sure that's correct

15  technically because it is a first offense.

16          THE COURT:  Technically.  It would have to be on

17  each and every offense.

18          MS. HEALEY:  Right.  Or it would have to be the

19  number of months, correct, Your Honor.

20          And, of course, as the Court is aware, the

21  government feels very strongly --

22          THE COURT:  But if I wanted to run each and every

23  count consecutive, it would result in 380 years, or 4,560;

24  right?

25          MS. HEALEY:  Which is tantamount to a life

1   sentence.  I totally get that.

2        THE COURT:  And there's a lot less that is

3   tantamount to a life sentence because there hasn't been a

4   person that has lived 380 years yet.

5        MS. HEALEY:  Not yet, that's true.  You never know

6   about modern technology.  I don't know.

7        THE COURT:  I ain't living that long.

8        MS. HEALEY:  In this case, Your Honor, we do

9   believe a guideline sentence is well appropriate.  The Court

10  has heard a lot of evidence in this particular case.  The

11  Court has seen the videos.  We apologize for subjecting the

12  Court to that, but we do think it is important for the Court

13  to get a full understanding and realization of the nature of

14  the offense and the nature of the offender in this

15  particular case.

16       THE COURT:  Well, you know, I think, frankly, given

17  the vulnerable victim enhancement, I think the Court had to

18  see it.  And so be it.

19       MS. HEALEY:  So this is -- you know, what the Court

20  is faced with today is a 47-year-old man who, by his own

21  testimony just now, indicated he started becoming sexually

22  aroused to pictures of minors when he was 18 years old.  So

23  it has not been just this last ten years, but, rather, it

24  has been nearly 30 years that he has had an interest in

25  seeing minors in a sexual way.  And I think that is

1   significant.  This is a long pattern.

2          And as you have heard from Dr. Moore, this person

3   is unquestionably a pedophile.  And that is significant both

4   in terms of our concern for him under society's rules and to

5   make sure that, under 3553, we do something to make sure we

6   protect him from those interests, because we know that this

7   person has progressed from looking at images to acting in a

8   horrendous way against very young victims.  And the five-

9   year-old was very young as well.  The three-year-old, of

10  course, is even younger and, as the Court has acknowledged,

11  was a vulnerable victim.

12     (Off-the-record discussion between the Court and the

13  clerk.)

14          MS. HEALEY:  But even, of course, before -- I know

15  Mr. Bostic is going to make a point that this defendant has

16  no other crimes.  He has no other criminal history.  Most of

17  the defendants that we get in child pornography cases or

18  child production cases or things like that have no criminal

19  history.  So he is not unlike practically any of the

20  defendants that I have prosecuted.  We have some who have

21  offense histories, but a lot of them simply just don't get

22  caught.  Child pornography and child exploitation is one of

23  the most, if not the most, under-reported crime there is.

24  And, therefore, we don't have a good sense of what these

25  guys do.

1          Dr. Moore testified that in her own experience that

2    75 percent of her -- or 70-some-odd percent of her patients,

3    once presented with a polygraph, actually disclosed contact

4    offenses.  And I think she stated that the average number of

5    victims often was over ten.  And that has been borne out by

6    other studies that we know have been presented at sentencing

7    hearings as well.  There are studies -- some studies would

8    say it is a very low risk to reoffend; others, when you

9    combine them with polygraph or some type of physiological

10   test, show a much higher likelihood of recidivism, which is

11   important under 3553.

12         But even besides the evidence that we have now that

13   he is a contact offender, he's not just a child pornography

14   offender, what we know from Mr. Fottrell is that this

15   defendant is a very sophisticated computer user, very

16   sophisticated.  He used software that I might not even know

17   how to find, that is -- that he could exploit to make sure

18   he could get what he wanted, which was gradually more

19   explicit images of children.

20         And, you know, I think they were -- I don't know if

21   someone referred to it, but there are special Internet sites

22   and he stored images in multiple ways.  He collected images

23   in multiple ways.  Did he distribute them?  I don't know.  I

24   know the Court thought with 70,000 images maybe at some

25   point he had to have distributed images.  But whether or not

1  he did, the fact is each and every image that he downloaded

2  is a permanent representation of sexual exploitation of a

3  minor, even though, quote, modeling legal child pornography

4  images I would submit most of those would constitute an

5  exploitation of a minor.  And these children are harmed

6  every single time their pictures are viewed.

7          And we know also the defendant has admitted that

8  these particular images -- these images were highly sexually

9  arousing to him.  His collection, which was primarily girls

10 and included a lot of young children, you know, had many

11 images that were the same age as his contact victims.

12 That's significant.

13         And, you know, to state that somebody like him

14 might not be a recidivism risk is kind of interesting.  When

15 you get a guy that, if you assume arguendo, that he never

16 did anything before he did anything to these kids, he

17 chooses at the age of 44 to begin molesting kids.  That's

18 significant.  I don't think that goes towards saying that

19 he's not a risk, since he chose at middle age to go and

20 reach out and touch these children.

21         And I'm going to try to cut to the chase.  I know

22 the Court has heard about the other types of images that he

23 had.  He had scat; he had other things that were paraphilia

24 which, of course, sort of go into this whole deviant

25 thinking.

1           But, as the Court is aware, the fact that he preyed

2    upon two very young victims is sort of front and center in

3    this particular case.

4           I know Mr. Bostic in his sentencing memo noted that

5    the initial videos showed no contact offenses.  And he is

6    correct.  Some of the images didn't show any contact

7    offenses.  They show the defendant somehow positioning the

8    girls so that they can have their vagina or vaginal area

9    exposed to the camera.  We get that.  The guidelines take

10   that into account.  He didn't get certain points for that.

11          However, I would submit to you, Your Honor, the

12   reason that some of those initial videos did not show some

13   sexual contact was because he was going through a methodical

14   process of grooming at least the younger victim.  He's

15   grooming her.  The Court has seen that.  The Court made that

16   determination in its ruling that the child was vulnerable.

17   The child -- really, truly you can see the progression --

18   starts out as being reluctant, then is okay with it, and

19   then a willing participant.  That should never happen to a

20   three-year-old.

21          Regarding the second victim too, just to clarify

22   any mistake in any of the memoranda, of course, one of those

23   videos does show very clearly his intent to get naked

24   genitals on that camera.  Who knows why the second victim

25   didn't get pictured more?  Maybe because she was old enough

1  to think about reporting what was wrong?  She's a little bit

2  older than the three-year-old.  She wasn't found to be

3  unusually vulnerable.

4          Regarding the therapy, much has been made about

5  whether therapy is a good thing, whether therapy could help

6  this guy.  The fact that he has gone to therapy --

7  Mr. Bostic just brought out from examining the defendant

8  that this defendant has sought therapy many times.  But what

9  we do know is, despite these multiple attempts at therapy,

10 including whatever Sex and Love Addicts Anonymous is, we

11 know that after that therapy, at the age of 44, he began

12 abusing these children.  So I don't know that the therapy

13 that he has tried to receive is anything that we can say

14 would mitigate.

15         Regarding the idea that going to try to

16 rehabilitate yourself should be a mitigator for his

17 sentence, Mr. Bostic cites the *Stern* case.  And I reread the

18 *Stern* case.  And I would submit that that is very

19 distinguishable.  *Stern* very clearly distinguished offenders

20 who were producers and distributors.  That was a case where

21 the defendant, Mr. Stern, was convicted of possession only.

22 And the court was very careful to say, "This is not a

23 producer; this is not a distributor."  So from the get-go it

24 distinguishes that particular case.

25         The other thing that *Stern* -- the *Stern* court found

 1   significant was the age of the defendant, in that case the

 2   youth of the defendant.  It was a very young defendant.  And

 3   in that case the court had noted that the defendant at the

 4   age of 14 started looking at other 14-year-olds and just

 5   continued looking at children as he progressed to

 6   adulthood.  So I would suggest to the Court that that case

 7   is irrelevant for this.

 8           With respect to any claim that this defendant was

 9   close to this youngest victim and cared for this youngest

10   victim, the videos don't depict someone who is close to the

11   victim.  You look at those videos, and it is clear to the

12   government he was very single-minded.  He wanted to get done

13   what he wanted to get done.  I didn't see a tender loving

14   relationship.  Even his play, his, quote, play, was focused

15   on getting the job done, getting her pants down, doing

16   anything else.  I would submit to the Court that those

17   videos do not show a close relationship.  I think even in

18   one of the videos there is some dialogue where "We had

19   better go downstairs," because they are making a lot of

20   noise and he just wants to get it done.  So that's something

21   I thought was interesting too.

22           I don't need to address, of course, vulnerable

23   victim at this point, because the Court has stated that.

24   But one thing I did want to add about vulnerable victim, not

25   only was the victim vulnerable in this case, but the

```
 1   defendant also betrayed the trust of the parents of that
 2   victim -- those victims.  These parents trusted the
 3   defendant to take care of these very young children.  And he
 4   betrayed their trust.
 5          And what we know, and as the father just testified,
 6   the terrible thing about that is not only betraying their
 7   trust, but the parents are likely to go through a period of
 8   wondering what they could have done differently.  So it is
 9   not just the abuse to the child; these parents are
10   victimized.  They will live with the questioning of
11   themselves for the rest of their lives.  "Why did we leave
12   them with this guy?  Why didn't we see any indicators?  What
13   did we do wrong?" when they didn't do anything wrong.
14          Regarding the distribution, we know -- and, you
15   know, the government accepts the Court's ruling on
16   distribution, because we don't know conclusively how this
17   material ended up on the Internet.  But I would state that
18   whether or not the defendant is legally accountable for
19   distribution, the simple fact is that his risky behavior and
20   his conscious choice to, one, film the acts of sexual abuse;
21   and, two, make a permanent depiction of them; and, three,
22   transfer them to his computers; and, four, be on all of
23   these different types of technology that is used by all of
24   these other people makes him responsible for that stuff
25   being on the -- if not legally, makes him responsible for
```

1    the fact that that -- that the three-year-old's images will

2    be out there for other men like the defendant to masturbate

3    to perhaps for the rest of their lives.  Who knows for how

4    long?  We do know that these images stay out there forever

5    and ever.

6            So it is his acts that are responsible for the fact

7    that those images are out there forever.  He chose that.  He

8    chose to engage in risky behavior.  He chose to be in

9    Internet community.  He was using technology with like-

10   minded individuals who would have been very interested in

11   seeing his collection.

12           And the interesting thing is -- even though -- if

13   you look at that exhibit that was in the defense memo where

14   he freaked out because he thought he had been hacked,

15   interesting, he freaks out that he gets hacked.  He uses

16   CCleaner to get rid of all this stuff, to make sure nobody

17   else can get his stuff.  But, notably, he doesn't get rid of

18   his collections at that time.  Obviously, that didn't make

19   him start thinking, "You know, maybe I have got to stop my

20   ways.  Maybe I have got to stop looking at child

21   pornography," because you know he has got 70,000 images of

22   child pornography and erotica.  So I think that is important

23   as well.

24           As a brief address to the attack on the guidelines,

25   this is something that has been a common attack in child

1  pornography sentences.  I would note that Mr. Bostic cited a
2  lot of things that we frequently see in these particular
3  cases.  However, the cases cited by the defense in this
4  particular case attack 2G2.2 primarily, not 2G2.1, the
5  production guideline.
6        And I would note that there are Fourth Circuit
7  cases that have held that we need to be mindful of
8  Congress' judgment that these cases deserve serious
9  attention anyway.  Even without the production cases or the
10  production acts, we need to be mindful about the signal we
11  send in regular child pornography trafficking cases.  And
12  this case, obviously, has a lot of other child pornography
13  in that.
14        One thing I would like to hand up to the Court, if
15  I can find it -- I know Mr. Bostic -- we didn't -- we chose
16  not to file a responsive memo, but I know Mr. Bostic had, I
17  think, cited a bunch of cases that had -- where courts had
18  departed from the sentencing guidelines.  And I have a copy
19  for Darren and then I just would like to give a copy to the
20  Court.  These are the child pornography trafficking cases.
21        This is a list -- just a list of cites, string
22  cites, where courts around the country have found and upheld
23  guideline sections -- sentences, I'm sorry.  And I think
24  they go by circuit.  So you could even get down to the
25  Fourth Circuit as well.  They go serially by circuit.  And

1    they have cases all of the way up until 2013.

2            I just give that for the Court's information that

3    it is not every court that is deciding that a guideline

4    sentence in a regular child pornography trafficking case is

5    inappropriate.  Of course, here we are not primarily dealing

6    with 2G2.2, but we have the aggravating 2G2.1 because of the

7    hands-on stuff.

8            Again, the victim impact is huge, you know, because

9    we know that girl's images are going to be out there

10   forever.  Her face is clearly visible.  The Court saw that.

11   Hopefully she'll never know about it and hopefully somebody

12   won't recognize her when she's older.  Who knows?  But

13   that's something that she may have to deal with forever.

14   And that's, of course, a terrible thing.

15           And, of course, there's the thousands of other

16   victims in this case.  So, you know, what is -- we have to

17   get down to what is a reasonable sentence?  Again, the

18   guidelines advise -- the advisory guideline range is life.

19   We think that is with good reason.

20           We know the Court, of course, must start with the

21   guidelines, as we have been talking about.  So we first go

22   to the offense and offender characteristics.  And we know it

23   is repeated sexual acts against minors who trusted him,

24   especially against that three-year-old and then exploitation

25   of a second personal victim.  But, again -- but since she

1   wasn't into it, we don't have that many videos of that older

2   minor.

3           So then we have, of course, the rest of his offense

4   characteristics show the thousands of other images he

5   acquired for which he found sexual pleasure and to which he

6   masturbated.

7           And we know, yes, he doesn't have a criminal

8   history.  But, frankly, Judge, knowing that he at least

9   started looking at child pornography around 2000, even if

10  you discount the 18-year-old interest in a magazine that he

11  bought on the street of DC, we know he has been looking at

12  child pornography for many, many years and he never got

13  caught.  And part of the reason he probably never got caught

14  is because he used all of those sophisticated technologies

15  we heard about from Mr. Fottrell.  So he may have a clean

16  criminal record in terms of not getting caught, but he has

17  committed crimes for many, many years.  So I think that's

18  important as well.

19          No other contact offenses.  We have no evidence

20  that he did anything other than what we know of in this

21  case.  That's all we know of.  So -- who knows, though.

22          And I know there was some point made, I think in

23  one of the psychological reports, that the defendant wasn't

24  really interested in the sex acts with the child, just

25  wanted the images or wanted to create images, that was the

1    thing that was sexually arousing.  That is sort of hard for

2    the government to understand when -- given the staggering

3    number of child pornography images that are already on the

4    Internet and videos that are already on the Internet, you

5    need to find new images to make?  I would suggest that just

6    sounds implausible that he wasn't into the sexual act,

7    especially when he's trying to get the little girl to touch

8    him and do the same things to him that he did to her.

9         Dr. Moore, of course, convincingly explained why

10   he's a pedophile.  And the information she relied on is

11   corroborated by the forensic evidence of his collection.

12   And her testimony really demonstrated there's good reason to

13   be concerned that he is a risk to sexually reoffend.

14        As we know, 3553(a) includes deterrence.  We need

15   to -- it includes an aspect of deterrence both of him and

16   for others.  And, therefore, I would suggest there's no

17   reasons to deviate from the guidelines in this case.  This

18   is an aggravated case when you consider the age of the

19   victim and the multiple times that he did this.

20        Another aspect of sentence:  Retribution and,

21   quote, just deserts is still a valid goal of sentencing.

22   There's nothing wrong with saying that you need to get the

23   just deserts here.

24        With respect to any claim that this would

25   constitute an unwarranted disparity to put him in jail for

the rest of his life, I have shown and have shared with

Mr. Sheffield a chart of those cases that I referred to

earlier, which, of course, I don't have in front of me this

second.  But if the Court wants to see it, it can, but -- is

that it?  No, that is not it.  All right.  I might have

taken it up there.

     But I think it is clear that there are numerous

cases of production, some or many of which don't even get to

the aggravated position in this case, that have upheld

sentences or have imposed sentences that are tantamount to a

life sentence.  Some sentences have imposed thousands and

thousands of years; others have imposed hundreds of years.

So I don't think there would be an unwarranted -- any

unwarranted disparity for the Court to follow the guidelines

in this case and to send him to jail for the rest of his

life.

     And with respect to any argument that, you know,

this guy is going to be on certain conditions for the rest

of his life, supervised release, he is going to have to

register as a sex offender, he's going to have all of these

collateral consequences that will be imposed upon him, and

therefore the Court doesn't have to sentence him for as long

a period of time, I would like to cite something from the

*Irey* case that comes out of the -- I think it is the

Eleventh Circuit.  So in *U.S. v. Irey*, I-R-E-Y, 612 F.3d

 1  1160 -- it is an Eleventh Circuit, 2010 case -- it addressed

 2  a claim that, you know, supervised release may be a

 3  substitute for some jail time.

 4          And what the Court says on page 1210 is as

 5  follows:  "While it is true that someone on supervised

 6  release is not entirely free, it is equally true that he's

 7  not confined in a prison either.  As the Supreme Court has

 8  held, supervised release, in contrast to probation, is not a

 9  punishment in lieu of incarceration," stating the Supreme

10  Court case, "and a term of supervised release does not

11  replace a portion of the sentence of imprisonment, but,

12  rather, is an order of supervision in addition to any term

13  of imprisonment imposed by the court.  If being on

14  supervised release were the punitive equivalent of being in

15  prison, if it serves the just deserts function as well,

16  there would be no need to put most criminals in prison.  We

17  could put them on supervised release instead.  If the

18  punitive impact of the two were the same, convicted

19  criminals would not ask for a longer term of supervised

20  release in hopes of getting a shorter term of imprisonment.

21  Yet they do."

22          So I think that is notable.  And also that case

23  also addresses the issue that somebody at an older age might

24  not commit certain crimes and ends up actually citing crimes

25  that had been committed by older males primarily.

1              So -- I think I am winding up.

2              But the other thing I think I need to say to the

3      Court is any suggestion that recidivism declines as a person

4      ages, again, is sort of taken away in this particular case

5      by the fact that he began his contact offenses at least by

6      the age of 44.  There may not be any test available to

7      determine the recidivism risk of a particular individual,

8      but given the admitted escalation of conduct in this case,

9      there's reason for us to be concerned that this defendant

10     will potentially pose a risk in the future.  So I think

11     that's a valid goal.

12             And I think for the fact that -- for all of the

13     facts that we have stated, that a reasonable sentence -- the

14     only reasonable sentence in this case is one that would fall

15     within the guidelines.

16             I do have -- if the Court wants to see, I do have

17     some -- a printout of some caseload statistics that an

18     attorney in Texas had -- an AUSA in Texas had requested.  I

19     think it is between FY 2008 and FY 2013 where he requested

20     just to see production sentences that resulted in terms of

21     50 years or more.  If the Court wishes to see it, it can see

22     it.  I know Mr. Sheffield has seen it.  But I don't need to

23     provide it to the Court unless the Court needs to see

24     examples of other sentences.

25             You can look at it too, if you want to see it.

```
1          And other than that, Your Honor, just to remind the
2   Court in this particular case, as we stated in chambers, we
3   are asking for a deferral of any restitution judgment for a
4   period of 90 days, to determine whether the contact victims
5   or the parents in this particular case may incur costs.  I
6   believe there are some cases that -- where they have
7   actually set up a trust for a kid in case something happens
8   to them and they need treatment.  So that's one thing.
9          We are seeking forfeiture.  I believe the
10  preliminary order of forfeiture was finally filed today.  We
11  are asking for forfeiture of all of the computer items that
12  were set forth in the indictment.  And, obviously, we're
13  asking in this case for a life sentence, what is tantamount
14  to a life sentence.
15         Thank you, Your Honor.
16         THE COURT:  If you want to hand me that list of
17  -- whatever you want to give me that you gave Mr. Bostic,
18  I'll be happy to consider it.  If you don't want to, that's
19  fine too.
20         MR. BOSTIC:  I can't make hide nor hair of it,
21  Judge.
22         THE COURT:  I probably won't either, if you
23  can't --
24         MR. BOSTIC:  I am just trying to figure it out.  I
25  can't figure out what the --
```

1          (Off-the-record discussion between counsel.)

2               MR. BOSTIC:  So that only goes to 50 years or

3    more?

4               MS. HEALEY:  Yeah, we just asked for 50.  So I'm

5    trying to eliminate -- he had -- his search parameters were

6    50 years' sentencing or more.

7               THE COURT:  Thank you.

8               MS. HEALEY:  Thank you.

9               THE COURT:  Mr. Bostic.

10               MR. BOSTIC:  Judge, the Court is really dealing

11    with two things, and that's it.  Everything Ms. Healey has

12    stood up here amounts to basically her statement of "This is

13    a horrible guy.  Put him away for life."  You can synthesize

14    everything she said to that one statement.

15               We're looking at -- whenever I look at the

16    guidelines, I look at basically two different things -- or

17    when I look at the 3553 what I really see are two different

18    things.  What is the retribution really going to be, which

19    encompasses all of the seriousness of offense, promote

20    respect for law, provide for just punishment, adequate

21    deterrence, protect the public.  That is the retribution

22    aspect of what the Court is going to do.

23               Mr. Dowell knows, I know, everybody in this

24    courtroom knows, based upon what the guidelines are, an

25    extremely long sentence is forthcoming.  We know that.  And

1  the question really is, is life and whatever sentence the

2  Court -- if the Court gave 380 -- well, 380 years or if the

3  Court gave what the current guideline range is, is that

4  sufficient but not greater than necessary to accomplish the

5  goals of 3553?  And we do have other goals that are there,

6  which are the rehabilitation aspect and what I would call

7  the "Is this person savable at some level?"

8          The Court is going to impose, if he is -- at some

9  point makes supervised release, a wide variety of conditions

10  that are going to put an enormous amount of strings on any

11  movement that he has, on the people he can contact, on the

12  use or lack of use of a computer, up to and including -- I

13  know in state court recently we did one where the only use a

14  person could have of a computer was at the probation

15  officer's -- in the presence of the probation officer, at

16  his office, with their computer.  And those were things like

17  if he was doing banking or had an email that he was getting

18  job interviews.  So it was an incredible amount of things

19  that were already put on that defendant.  He was also put on

20  electronic monitoring.  And we are essentially going to be

21  in that type of a situation.

22          We do have an individual that has sought out

23  treatment, therapy, in the past.  The Court has read the

24  letters.  And what Ms. Healey has described as this horrible

25  monster, he did do some -- without question, some horrible

1   things.  He took advantage of some situations.

2          There's no question we're dealing with mental

3   illness, we're dealing with a high probability of

4   pedophilia.  As you heard Mr. Dowell, it has taken him a

5   long time to get his brain to the point where he is now

6   recognizing just how severe his crimes were, the amount of

7   advantage he took over a very young female.

8          But what I would suggest to the Court is we do have

9   somebody that has some redeemable qualities.  And I would

10  submit to the Court that a sentence of life in prison is

11  greater than is necessary to accomplish all of the factors

12  set forth in 3553.  So we would ask the Court to consider

13  something that would at least give him the opportunity to

14  get out, to live a life outside of prison.

15         As the Court has heard, there has been absolutely

16  no evidence -- and one of the reasons we believe this was a

17  crime that does have as a certain element of it the fact of

18  where he was, he was with a child that he could take

19  advantage of.  There's no evidence whatsoever he was ever in

20  that type of situation before.  So we do think that there

21  was a certain element of the way this actually occurred

22  where he took advantage of a situation and it was more of a

23  situational-type thing rather than him constantly going out

24  and -- I guess what I would call more the predatory type of

25  situation.

1    This was more of what I would call a crime of

2  opportunity considering where things occurred and how it

3  occurred.  No evidence anything occurred before Thanksgiving

4  2010 or after January of 2011.

5    So that is simply what we would ask the Court to

6  consider.

7    THE COURT:  Thank you, Mr. Bostic.

8    All right.  Are there any other victims who wish to

9  be heard before the Court imposes sentence?

10    MS. HEALEY:  No, Your Honor.

11    THE COURT:  All right.  Mr. Dowell, your lawyer put

12  you on the witness stand and asked you some questions.  And

13  I know, obviously, you, even after that, have heard a lot of

14  things that have been said here.  You have spent all day

15  hearing things about you.  Is there anything else that you

16  want to tell me -- to tell the Court by way of allocution

17  that -- before the Court imposes sentence in this case?

18    THE DEFENDANT:  Your Honor, I'm not very good at

19  monologues, which is why I got up on the stand.

20    All I know is -- Nancy did say one thing that

21  wasn't true.  Everything else I pretty much agree with.  I'm

22  pretty much a scumbag, based on what I did.  But I did love

23  that little girl.  And I betrayed myself by betraying her.

24  And I'm going to pay for it for the rest of my life.  And

25  she's going to pay for it and the family is going to pay for

1    it.  I'm very, very sorry.  And I hope to have some way to

2    do something about that.  To help other people with my

3    condition is my primary goal at this point for the rest of

4    my life.

5          Thank you, Your Honor.

6          THE COURT:  Well, thank you for that, Mr. Dowell.

7    I think that -- that recognition, I think, is important.

8    And the interest in helping other folks -- I know some of

9    the letters I read from family members asked that you be

10   housed at Butner.  And, of course, it is up to the Bureau of

11   Prisons to do that.  But perhaps there's some opportunity

12   for you to help other folks to get to the point where you

13   have gotten to in terms of your own recognition of -- your

14   acceptance of responsibility for what has happened.

15          Now, is there anything else that anybody else wants

16   to say, from the government or the defendant, before the

17   Court imposes sentence in this case?

18          MR. BOSTIC:  No, sir.

19          MS. HEALEY:  No, Your Honor.

20          THE COURT:  All right.

21          This may be a minute, so you can sit down.

22          I want to first make clear that I have had a chance

23   to look at the law some more, my guidelines finding.  The

24   presentence report calls for 4,560 months based on 5G1.2,

25   which is nothing more than simple arithmetic.  It is adding

1  up the statutory maximum for all 13 counts in this

2  indictment to which he has pled guilty.  4,560 months is 380

3  years.

4         But 5G1.2 does not require that I make such a

5  guideline finding.  5G1.2 doesn't say just add up all of the

6  maximum.  5G1.2 requires the Court to run sentences

7  consecutive, quote, only to the extent necessary to produce

8  a combined sentence equal to the total punishment, end

9  quote.

10        With a total offense level of 43 and a criminal

11 history category of I, that yields a guideline range -- a

12 total punishment range in this case called for under the

13 guidelines of life.  That's clear.  It is a total punishment

14 of life called for by the guidelines.

15        I don't think what I have done by picking 960

16 versus what probation did by picking 4,560 versus what the

17 United States wants, 4,560, is any different, given the

18 defendant's age at 47 years.

19        With that in mind, the total punishment of life, in

20 applying 5G1.2, I had to determine what sentences -- what

21 counts needed to be run consecutively to achieve the total

22 punishment level.  So I take the maximum sentence for two of

23 the first 12 counts.  I picked Eight and Nine.  There's a

24 reason for that, as I'll explain.  But you take two of the

25 first 12 counts, plus the maximum sentence for Count

 1    Thirteen, for a total of 960 months.  That's 80 years.

 2           That's -- the Court finds that the defendant is 47

 3    years old and that, applying 5G1.2, the Court needs -- using

 4    the word in 5G1.2 "necessary" -- needs to run consecutive

 5    two of the 30-year maximum terms and then Count Thirteen,

 6    the 20-year maximum term.  That is what I believe, given his

 7    age, under 5G1.2(d), is the extent necessary to produce a

 8    combined sentence equal to the total punishment of life.

 9           I believe that this guideline finding is consistent

10    not only with the plain language of the guideline but the

11    Fourth Circuit case law.  The United States cited one case

12    in another prosecution that I had, *U.S. versus*

13    *Schellenberger*.  And *Schellenberger* approves the stacking of

14    maximum offenses but does not require the stacking of each

15    and every count, as the government advocates.

16    *Schellenberger* cites *United States versus White*, 238 F.3d

17    537, Fourth Circuit, 2001, which I believe is the leading

18    case in the Fourth Circuit on this topic.

19           *White* likewise does not say that the Court must

20    stack all of the maximum sentences for all 13 counts and

21    -- to conclude that the guideline range is 4,560 months.

22    *White,* in fact, expressly says that the guidelines call for

23    the Court to stack only, quote, until the guideline

24    punishment is achieved, end quote.

25           Specifically, in *White* the Fourth Circuit, in the

1    penultimate paragraph of *White,* address this issue.  The
2    last sentence of that paragraph says, "And in light of its
3    determination that White's total punishment under the
4    guidelines should be 360 months' imprisonment, the district
5    court would have been obligated to reach that total sentence
6    by imposing a term of imprisonment of 240 months or less on
7    each count of conviction and ordering those terms to be
8    served consecutively to achieve the total punishment
9    mandated by the guidelines."  To be sure, *White* doesn't deal
10   with what we're dealing with here:  a case of total
11   punishment calling for life.

12          I simply find that given defendant's age, running
13   three counts consecutive, two of the first 12 and Count
14   Thirteen, results in the same point:  a life -- a life
15   guidelines term.

16          The defendant will be -- under this guideline range
17   the defendant will be 127 years when this term runs out, be
18   127 years old.  Given his age, there's no practical reason,
19   no reason under the guidelines or the case law, to calculate
20   the guidelines to run any additional sentences consecutive
21   beyond the 960 months.

22          Therefore, I accept the presentence report, as
23   amended, with the changes to paragraphs 110, which takes out
24   the -- takes out the two points for the distribution, makes
25   that change in paragraph 119, and in paragraph 152 I find

1    the guidelines to be 960 months.

2         All right.  Now, thank you all for the manner in

3    which you have conducted yourselves today.  This is a

4    difficult case for everyone, for everyone.  And I appreciate

5    the professionalism, courtesy shown by counsel in this case.

6         The United States argues for a life term.  The

7    United States argues that the defendant, for the purpose of

8    creating videos, molested Minor Victim A and took videos of

9    Minor Victim B naked.  The government argues there's a large

10   amount of child pornography on his computer and has -- and

11   has put into evidence multiple images of infants and

12   toddlers engaged in sexually explicit conduct.  The

13   government says there's 78,532 images and 893 videos.

14        The government argues that the defendant sought out

15   this material.  And the defendant *(sic)* seeks a life term.

16   The government argued lots and lots of other things, but

17   that is what it comes down to.

18        You know, the difference between this case and many

19   of the child pornography cases we see is the contact, the

20   contact, the contact, the touching, the touching, and more,

21   the touching.

22        The defendant argues that he began viewing and

23   downloading child pornography in 2001 and he was arrested in

24   October of 2011 and but for this short period between

25   November and January of -- November of 2010 and January of

1  2011 he was not involved -- there's no evidence that he was

2  involved in any contact offenses.  He has no criminal

3  history.

4       There's no evidence he was involved with any minors

5  except for the two young girls in this period.  The

6  defendant argues that this is situational rather than

7  predatory.  The defendant argues it is a crime of

8  opportunity.

9       The defendant argues that, on brief, he never

10 intended to distribute the videos of these two children he

11 made; he didn't make the compilation video.  The defendant

12 argues, look, after January of 2011 he didn't engage in any

13 further contact crimes.  He has -- he has in his life

14 suffered from depression.  I heard from his brother about

15 those issues.  I heard from Mr. Dowell himself.  I heard

16 from Mr. Dowell his efforts to reach treatment with Sex and

17 Love Addicts Anonymous and that, citing the Stern case, he

18 should get some credit for going to get rehab, going to get

19 some treatment precharge.  Defendant asks me to focus not so

20 much on the retribution aspects of punishment under 3553(a)

21 but don't forget the rehabilitation aspects of 3553(a).

22       I have read the sentencing memorandums.  I have

23 listened to everything that you-all have carefully and

24 professionally presented here today.  I read -- I listened

25 to Mr. Dowell, listened to his brother, read the letter from

 1   Patti Dowell, read other letters from other family members

 2   that are in the record.

 3          Three friends from California wrote letters on your

 4   behalf; I read those.  They talked about your involvement

 5   and helping with their lives in terms of some of this dance

 6   work that you talked about.

 7          So I have done all I can to try to get as clear a

 8   picture as I can and to do what is right and to apply the

 9   law.  And I intend to do that.

10          The starting place is, of course, the guidelines.

11   And I determine the guidelines are 960 months, or 80 years.

12   Under -- that's the starting point.  Under 18 United States

13   Code Section 3553(a) I have got to consider the nature and

14   circumstances of the offense and the history and

15   characteristics of the defendant.

16          Well, as regards the nature and circumstances of

17   the offense, the offense -- I have to disagree with

18   Mr. Bostic.  This isn't just a crime of opportunity.  As

19   regards that three-year-old child, this crime is predatory.

20   This crime is premeditated.  This crime is calculated.  This

21   crime was designed to get that child to a point where she,

22   in her young, young, young, and undeveloped cognitive state,

23   became interested in this behavior.  It is cold.  It is

24   calculated.  It is heinous.  So that's the nature and

25   circumstances of the offense.

1          And it was done for the purposes of making videos

2    so that they could be later on abused.  And as we have

3    heard, they ended up in Denmark and they have ended up in

4    other places around this country and I'm sure around the

5    world.  So perhaps there are -- so the conduct is extremely,

6    extremely serious.

7          As to the defendant himself, to be sure, he has

8    suffered from some depression and he has had some ups and

9    downs in his life.  But he has, since 2001, been engaged

10   -- until he was arrested, was engaged in this behavior.  He

11   was engaged in it by viewing it for ten years and then by

12   acting out on it, to the detriment of those children.

13         The evidence we heard from the doctor here this

14   afternoon -- the psychologist here this afternoon is that

15   his interest in pedophilia is not going to diminish with

16   age.  So what to do?

17         Under 3553(a) I have got to impose a sentence that

18   reflects the seriousness of the offense.  Well, that factor,

19   given the extremely predatory, heinous, despicable nature of

20   this crime, requires a life term.

21         The second factor is to provide just punishment.

22   Just punishment under 3553(a) requires a life term.

23         To afford adequate deterrence, not just to

24   Mr. Dowell, but to others who would -- who would dare to

25   touch a child in this manner and make a video of it to be

1    displayed to others, demands a life term.

2           To protect the public from further crimes of the

3    defendant -- this defendant spent ten years involved in

4    child pornography, touched these children, molested this one

5    girl, videoed it, and kept right on viewing it until he was

6    arrested.  To protect the public from Mr. Dowell, the

7    sentence demands a life term.  A life term is sufficient.

8    It is also necessary, in my view.

9           I do not believe this sentence results in any

10   unwarranted sentencing disparities.  Engaging in this

11   conduct on a repeated basis, with multiple victims, is not

12   only warranted, but it is -- a life sentence in this case is

13   required to do justice.

14          Therefore, I'm going to impose the following

15   sentence in this case.  I'm going to impose a sentence of

16   360 months on Count Eight.  I picked Count Eight because

17   Count Eight involves oral genital and oral anal conduct with

18   Victim A for the purpose of producing videos.  I saw it on

19   the screen this morning.  It was described in Count Eight.

20   And Count Eight is Count Eight because the counts are

21   chronological and it took that long to build up, to set up,

22   and to engage in this predatory conduct with regard to this

23   baby.  So I'm giving the maximum statutory term on Count

24   Eight, 360 months, 30 years.

25          On Count Nine I'm giving the same sentence, the

1  maximum statutory term, 360 months, 30 years, to run

2  consecutive.  I picked Count Nine because Count Nine, again,

3  is among the most offensive conduct that he is -- to which

4  he pled guilty.  It is the oral genital and oral anal

5  contact.  And it is the count in which we saw in the video

6  he was persuading the young three-year-old to touch his

7  member.

8           Again, 360 months on Count Eight, 360 months on

9  Count Nine, consecutive.

10          On Counts One through Seven and Count Ten I'm also

11  imposing 360 months.  I'm going to run those concurrent to

12  Counts Eight and Nine.

13          On Count Eleven, which deals with Minor Victim B,

14  I'm going to impose -- and there was -- you know, there was

15  -- there was videos of her -- efforts to take videos of her

16  with her pants off.  There was no -- there's no evidence of

17  touching of that minor victim, thank goodness.  But there

18  was videos that we saw of her.  I'm imposing the mandatory

19  minimum sentence on Count Eleven of 180 months, to run

20  consecutive to Counts Eight and Nine.

21          On Count Twelve I'm going to run -- I'm going to

22  impose the same sentence, 180 months -- that's the count

23  concerning -- you know, Counts one through Ten concern Minor

24  Victim A.  Counts Eleven and Twelve concern Minor Victim B.

25  So Count Twelve I'm going to impose the same sentence, 180

months, and I'm going to run it concurrent to the other

Counts.

On Count Thirteen, the transportation count, I'm

going to impose the mandatory minimum 60 months.  And I'm

going to run that consecutive to Counts Eight, Nine, and

Eleven.

This yields a total sentence equivalent to the

guideline range that I have found of 960 months.  That is a

sentence of 80 years.  The defendant is 47 years old.  This

sentence -- he will be 127 years old when this sentence

ends.

Let me be clear.  Let me be clear.  This conduct,

harming these children, touching these children, molesting

these children, requires this life sentence.  He did it on

multiple days.  He did it over multiple months.  He did it

in a predatory manner.  He did it to produce these videos.

Justice requires a life sentence.

In real and practical terms this sentence of 80

years, or 960 months, is the maximum aggregate sentence the

law allows me to impose.  It is not greater than necessary.

This sentence is necessary to protect the public and to make

sure this defendant never has the opportunity to do this

again.  So I am imposing that sentence.

The Court recommends to the Bureau of Prisons that

the defendant receive appropriate mental health treatment

1   while in prison.

2          If appropriate, the Court recommends, consistent

3   with some of the letters that I received, that the defendant

4   be housed at Butner --

5          MR. BOSTIC:  Judge, could I --

6          THE COURT:  -- in the sex offender treatment.

7          MR. BOSTIC:  That -- it is my understanding that is

8   no longer in Butner.  I believe the intensive may be in

9   Massachusetts.

10          THE COURT:  Well, I will leave it to the Bureau of

11   Prisons.  I will simply recommend that he receive

12   appropriate mental health treatment and sex offender

13   treatment while imprisoned.  All right?  I'll leave it to

14   the BOP as to where to put him, but I will recommend that.

15          On release from imprisonment -- which, frankly, I

16   do not intend or envision, but I'm required to go through

17   this -- he shall be on supervised release for a term of

18   life.  That's terms of life, supervised release, on all

19   counts, all counts to run concurrent.

20          He has to report to probation within 72 hours and

21   follow the mandatory conditions of supervision:  no crimes,

22   can't possess a controlled substance, can't possess a

23   firearm, must cooperate in the collection of DNA, must

24   comply with the standard conditions of supervision.

25          I'm going to require him to pay the $1300 mandatory

1    special assessment.

2            I'm going to defer restitution for 90 days.

3            I'm going to require testing and treatment for

4    substance abuse.

5            He can't live in a home where there's any firearms,

6    subject to warrantless search and seizure to ensure

7    compliance with these conditions.

8            I'm going to impose the special conditions for sex

9    offenders that are set forth in Part D of the presentence

10   report.  And those are found -- those are found on pages 21,

11   22, 23, and 24 of the presentence report.  I'm not going to

12   read over them.  We all know what they are.

13           The Court finds the defendant does not have the

14   ability to pay a fine.  I'm going to waive a fine.

15           Having assessed the defendant's ability to pay with

16   regard to the $1300, during the term of imprisonment,

17   payment in equal monthly installments of $25 or 50 percent

18   of the defendant's income, whichever is greater, to commence

19   60 days after the date of this judgment; and payment in

20   equal monthly installments of a hundred dollars during the

21   term of supervised release, to commence 60 days after

22   release from imprisonment.

23           It is ordered that the defendant shall forfeit

24   -- and I have entered the order of forfeiture in this case

25   -- the property listed on the preliminary order of

```
 1   forfeiture in this case.

 2          I hereby advise the defendant of the right to

 3   appeal this sentence.  Notice of appeal must be filed within

 4   14 days of the entry of judgment or within 14 days of a

 5   notice of appeal by the government.  If requested, the clerk

 6   will prepare and file a notice of appeal on behalf of the

 7   defendant.  I also advise the defendant of the right of a

 8   person who is unable to pay the cost of an appeal to apply

 9   for leave to appeal without prepayment of such cost.

10          All right.  Is there anything further that the

11   United States has to say?

12          MS. HEALEY:  Judge, only two quick things.  Just in

13   case counsel would want to know, he's correct, Devens is the

14   primary high-impact treatment program.  There is a medium

15   impact, from what I understand, at Petersburg, Virginia.

16   Just to let the Court know.

17          THE COURT:  I know there's one -- there is a sex

18   treatment program at Butner, because I toured it in

19   November.

20          MS. HEALEY:  I thought they were phasing that one

21   out --

22          THE COURT:  Well, they may have since then, but I

23   was there in November.

24          MS. HEALEY:  Okay.

25          And then the only other thing, Judge, I know while
```

```
1    it is academic, due to the case law that has been coming out
2    on sex offender conditions, if, hypothetically, the
3    defendant were ever to be released onto supervised release,
4    I think the Court has to just make a specific finding that
5    they are reasonably related to the goals of supervised
6    release and the goals of sentencing, those particular
7    conditions.  I think they include registering as a sex
8    offender.  I just want to make sure, because that's another
9    one.
10         So I am sorry to say that, Judge, but I know the
11   case law makes it clear it is procedural error if the Court
12   does not make clear that they are reasonably related to the
13   goals of sentencing --
14         THE COURT:  Well, thank you for that.  The Court
15   believes they are all -- I looked at all of these
16   conditions.  And given the touching involved in this case
17   and the molestation involved in this case, I do believe that
18   all of these conditions, including condition one, requiring
19   registration; condition two, requiring no direct or indirect
20   contact with the victim's family; condition three, he can't
21   mess with child pornography; condition four, you have got to
22   live at a place probation approves of and not move from
23   there; condition five, that he shall be evaluated by a
24   mental health professional who is experienced in the
25   treatment of sex offenders; condition six, requiring
```

```
 1   testing; condition seven, shall submit to search of
 2   property, residence to -- upon reasonable suspicion of
 3   violations of the conditions of this release; condition
 4   eight, cannot use electronic devices unless approved by
 5   probation; condition nine, cannot have any interactions with
 6   a minor except in the presence of a parent, on the condition
 7   that the defendant notifies the parent and with prior
 8   approval from the probation officer; number ten, can't use a
 9   camera or video device; number 11, shall notify employers
10   and family members, with others with whom he has regular
11   conduct, that he is under the supervision of probation;
12   number 12, that he cannot volunteer where minors are
13   present; number 13, that he shall participate in the
14   computer and Internet monitoring program; number 14, that he
15   cannot be in the company of children under 18 without prior
16   permission of probation; number 15, he can't have conduct
17   other than incidental conduct in a public forum, such as
18   ordering in a restaurant or grocery shopping, with any minor
19   that is under the age of 18 without permission of probation;
20   number 16, he cannot possess any material depicting sexually
21   explicit conduct with minors or adults; number 17, he can't
22   possess sexually oriented material that may interfere with
23   an ongoing treatment regimen; 18, he can't possess any
24   bindings, restraints, handcuffs, or other sadomasochistic
25   paraphernalia; number 19, that he cannot use social media
```

```
1   for interacting without prior approval of probation; number
2   20, that he shall submit to unannounced examination by
3   probation of any electronic material, including computers;
4   number 21, that he shall permit the probation officer to
5   conduct periodic unannounced examinations of computer
6   equipment; 22, that he can only have contact with minor
7   children who are relatives of the defendant only in the
8   presence of another adult previously approved by
9   probation -- I find that all of those conditions, given the
10  conduct in this case, are reasonably related and reasonably
11  necessary to protect the public and are appropriate in this
12  case.
13           Mr. Bostic, anything from you, sir?
14           MR. BOSTIC:  No, sir.
15           THE COURT:  Okay.
16           Mr. Sheffield, can you think of anything else that
17  you believe is appropriate that I need to do at this time?
18           THE PROBATION OFFICER:  Not at this time, Judge.
19  Thank you.
20           THE COURT:  All right.  If there's nothing further
21  -- is there anything finally, Ms. Healey, that you want to
22  add?
23           MS. HEALEY:  No, Your Honor, finally not.  Thank
24  you.
25           THE COURT:  All right.  Thank you all for your
```

1   patience.  It has been a long day.

2          These are always difficult, difficult cases.  I

3   appreciate the manner in which the counsel conducted

4   themselves.

5          Mr. Dowell, let me say that despite this sentence

6   that I have imposed in your case, which I believe is

7   necessary to protect the public and for the other reasons

8   I've indicated, I do, sir, wish you the best and truly hope

9   that you can find meaning and comfort in your life.

10         Ask the marshal to declare a recess.

11     (Thereupon, these proceedings were adjourned at

12   5:45 p.m.)

13

14                    EXAMINATION INDEX

15   JAMES FOTTRELL, GOVERNMENT'S WITNESS
          DIRECT BY MS. KATZIN                 11
16        CROSS BY MR. BOSTIC                  55
          REDIRECT BY MS. KATZIN               68
17        RECROSS BY MR. BOSTIC                69

18   ALAN GARRETSON, DEFENSE WITNESS
          DIRECT BY MR. BOSTIC                 72
19        CROSS BY MS. KATZIN                  85

20   DONNA MOORE, GOVERNMENT'S WITNESS
          DIRECT BY MS. HEALEY                 142
21        CROSS BY MR. BOSTIC                  178
          REDIRECT BY MS. HEALEY               187
22
     BILL DOWELL, DEFENSE WITNESS
23        DIRECT BY MR. BOSTIC                 201

24   JOHN DOWELL, DEFENDANT
          DIRECT BY MR. BOSTIC                 207
25        CROSS BY MS. HEALEY                  218

```
 1                        EXHIBIT INDEX

 2                                            MAR  /  ADM
        Government's
 3        1                                    14     14

 4        2                                    46     46

 5        3                                    48     48

 6        4                                   148    148

 7        5                                   156    156

 8
        Defense
 9        1                                    73     73

10        2                                    81     81

11        3                                    81     81

12

13

14
            I certify that the foregoing is a correct transcript
15
        from the record of proceedings in the above-entitled matter.
16

17          ____/s/ Carol Jacobs____        September 5, 2013
            Official Court Reporter              Date
18

19

20

21

22

23

24

25
```

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

AO 245B    (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Western District of Virginia

JUL 25 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>JOHN STUART DOWELL | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  DVAW511CR000045-001<br><br>Case Number:<br><br>USM Number:  16359-111<br><br>Russell Darren Bostic<br>Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count(s)    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 of a Superseding Indictment

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty,

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2251(a) &<br>18 U.S.C. § 2251(e) | Production of Child Pornography | 11/30/2010 | 1 |
| 18 U.S.C. § 2251(a) &<br>18 U.S.C. § 2251(e) | Production of Child Pornography | 12/9/2010 | 2 |
| 18 U.S.C. § 2251(a) &<br>18 U.S.C. § 2251(e) | Production of Child Pornography | 12/20/2010 | 3 |

The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s)    Count 1 of the Indictment    ☒ is    ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 18, 2013
Date of Imposition of Judgment

/s/ Michael F. Urbanski
Signature of Judge

Michael F. Urbanski, United States District Judge
Name and Title of Judge

07-23-2013
Date

324

AO 245B    (Rev 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
Sheet 1A

| | |
|---|---|
| DEFENDANT:    JOHN STUART DOWELL | Judgment-Page ___2___ of ___8___ |
| CASE NUMBER:  DVAW511CR000045-001 | |

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/3/2011 | 4 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/7/2011 | 5 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/10/2011 | 6 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/10/2011 | 7 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/14/2011 | 8 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/25/2011 | 9 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/27/2011 | 10 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 12/27/2010 | 11 |
| 18 U.S.C. § 2251(a) & 18 U.S.C. § 2251(e) | Production of Child Pornography | 1/12/2011 | 12 |
| 18 U.S.C. §§ 2252(a)(1) & 2252(b)(1) | Transportation of Child Pornography | October 2011 | 13 |

325

AO 245B    (Rev. 9/11 - VAW Additions 6/05) Judgment in Criminal Case
Sheet 2 - Imprisonment

| | Judgment - Page | 3 | of | 8 |

DEFENDANT:    JOHN STUART DOWELL
CASE NUMBER:  DVAW511CR000045-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

960 months. The term consists of 360 months on each of counts 8 and 9; 180 months on count 11; and 60 months on count 13, all to be served consecutive to one another and to all other counts. Additionally, 360 months on each of counts 1, 2, 3, 4, 5, 6, 7, 10 and 180 months on count 12, all to be served concurrently.

☒ The court makes the following recommendations to the Bureau of Prisons:

The court recommends to the Bureau of Prisons that the defendant receive appropriate mental health treatment while imprisoned.
The court recommends to the Bureau of Prisons that the defendant receive appropriate sex offender treatment while imprisoned.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.  on _____

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before_____ on _____

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

326

AO 245B    (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page | 4 | of | 8 |

DEFENDANT:    JOHN STUART DOWELL
CASE NUMBER: DVAW511CR000045-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Life on each of Counts 1 - 13, all such terms to run concurrently.

     The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☒  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☒  The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☒  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an  informer or  a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
Sheet 3C - Supervised Release

| | | |
|---|---|---|
| DEFENDANT: JOHN STUART DOWELL | Judgment—Page <u>5</u> of <u>8</u> | |
| CASE NUMBER: DVAW511CR000045-001 | | |

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall pay any special assessment and restitution that are imposed by this judgment.

The defendant shall participate in a program of testing and treatment for substance abuse, as approved by the probation officer, until such time as the defendant has satisfied all requirements of the program.

The defendant shall reside in a residence free of firearms, ammunition, destructive devices, and dangerous weapons.

The defendant shall submit to warrantless search and seizure of person and property as directed by the probation officer, to determine whether the defendant is in possession of firearms, illegal controlled substances and pornography.

It is further ordered that the defendant must comply with the special conditions for sex offenders, as follows:
The defendant shall register with all local and state sex offender registration agencies in any jurisdiction where the defendant resides, is employed, carries a vocation, is a student, or is otherwise required to register by SORNA.
The defendant shall have no direct or indirect contact at any time, for any reason, with any victim identified in the presentence report or any victim's family.
The defendant shall not possess, view, or otherwise use any materials depicting or describing "child pornography" as defined in 18 U.S.C. § 2256, nor shall the defendant knowingly enter, or knowingly remain in, any location where such materials can be accessed, obtained, or viewed, including pictures, photographs, books, writings, drawings, videos, or video games.
The defendant's residence and employment shall be approved by the probation officer. Any proposed change in residence or employment must be provided to the probation officer at least 10 days prior to the change and must be approved before the change may take place.
The defendant shall submit to an evaluation by a qualified mental health professional, approved by the probation officer, who is experienced in the treatment of sexual offenders. The defendant shall take all medications reasonably related to his or her condition, complete all treatment recommendations, and abide by all rules, requirements, and conditions imposed by the treatment provider until discharged from treatment by the provider.
The defendant shall submit to risk assessments and psychological and physiological testing, which may include but is not limited to polygraph or plethysmograph examinations or other specific tests to monitor the defendant's compliance.
The defendant shall submit to a search of his person, property, residence, vehicle, papers, computer, electronic communication devices, or data storage devices or media at any time by the probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of release. The defendant should warn any other residents or occupants that their premises or vehicles in which the defendant may be located could be subject to search pursuant to this condition.
The defendant shall not use, purchase, possess, procure, or otherwise obtain any computer or electronic device or cellular telephone that can be linked to any computer networks, bulletin boards, the Internet, or other exchange formats involving computers unless approved by the probation officer for such purposes as the defendant's lawful gainful employment, use by an immediate family member living in the defendant's same household, or other legitimate activities. In addition, the defendant shall not access or use any computer that utilizes any "cleaning" or "wiping" software programs.
The defendant shall not associate or have verbal, written, telephonic, electronic communications or knowingly socialize through the Internet with any minor, except: 1) in the presence of the parent or legal guardian of said minor; 2) on the condition that the defendant notifies the parent or legal guardian of the defendant's sex offender condition(s); and 3) with prior approval from the probation officer. This provision does not encompass minors working as waiters, cashiers, ticket vendors, and similar service positions with whom the defendant must deal in order to obtain ordinary and usual commercial services.
The defendant shall not purchase, possess, or use any camera or video recording devices without approval of the probation officer.
The defendant shall notify employers, family members, and others with whom the defendant has regular contact of the defendant's sex offender conditions and that the defendant is under the supervision of the probation officer.
The defendant shall not be employed in any position or participate as a volunteer in any activity that involves contact with minors without prior approval of the probation officer. The defendant may not engage in an activity that involves being in a position of trust or authority over any minor.
The defendant shall participate in the Computer and Internet Monitoring Program and abide by all conditions therein as directed by the probation officer. Participation in this program is contingent upon all program criteria being met.
The defendant shall not be in the company of or have contact with children under the age of 18, including the defendant's own children, without prior permission of the probation officer. Contact includes but is not limited to letters, communication devices, audio or visual devices, and communication through a third party. The defendant shall immediately report any such contact to the probation officer.
The defendant shall not have any contact, other than incidental contact in a public forum such as ordering in a restaurant or grocery shopping, with any minor that is under the age of 18 without prior permission of the probation officer. Any approved contact shall be supervised by an adult at all times. The contact addressed in this condition includes but is not limited to direct or indirect, personal, telephonic, written, and through a third party. If the defendant has any contact with any such minor not otherwise addressed in this condition, the defendant is required to immediately leave the situation and notify the probation officer.

(Continued on Page 6)

328

AO 245B    (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case

DEFENDANT:    JOHN STUART DOWELL
CASE NUMBER: DVAW511CR000045-001

Judgment-Page ___6___ of ___8___

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall not possess or have under his control any material depicting sexually explicit conduct involving adults or minors, child pornography, or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

The defendant shall not possess any sexually oriented material that, according to a qualified sex offender treatment provider, may interfere with an ongoing treatment regimen.

The defendant shall not possess any bindings, restraints, handcuffs, or other sadomasochistic paraphernalia.

The defendant shall not utilize by any means any social networking forums offering an interactive user network of friends, personal profiles, blogs, chat rooms, or other environments which allow for interaction with others without prior approval of the probation officer.

The defendant shall submit to unannounced examination by the probation officer of the defendant's computer equipment and electronic devices, which may include the retrieval and copying of all data from the equipment or devices, to ensure compliance with the conditions of supervision. If the probation officer has reasonable suspicion that the defendant has violated the terms and conditions of supervision, the defendant shall consent to the seizure of such equipment and devices for the purpose of conducting a more thorough investigation.

The defendant shall permit the probation officer to conduct periodic, unannounced examinations of any computer equipment the defendant uses or possesses, which includes all hardware and software related to online use. This computer equipment includes but is not limited to any internal or external peripherals, internet-capable devices, and data storage media. These examinations may include retrieval and copying of data related to online use and viewing of pictures and movies which may be potential violations of the terms of supervision. The relevant computer equipment may be removed by the probation officer for more thorough examination. The probation officer may use and install any hardware or software system that is needed to monitor the defendant's computer use.

The defendant is authorized contact with minor children who are relatives of the defendant, but the contact may occur only in the presence of another adult who has been previously approved by the probation officer.

AO 245B   (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
          Sheet 5 - Criminal Monetary Penalties

| | |
|---|---|
| DEFENDANT:  JOHN STUART DOWELL | Judgment - Page   7   of   8 |
| CASE NUMBER:  DVAW511CR000045-001 | |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 1,300.00 | $ | $ |

☒ The determination of restitution is deferred until   90 days  . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $0.00 | $0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 13, 1996.

330

AO 245B   (Rev. 9/11 - VAW Additions 6/05) Judgment in a Criminal Case
Sheet 6 - Schedule of Payments

DEFENDANT:   JOHN STUART DOWELL                              Judgment - Page  8  of  8
CASE NUMBER: DVAW511CR000045-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, the total criminal monetary penalties are due immediately and payable as follows:

A  ☒  Lump sum payment of $ 1300.00 _____ immediately, balance payable

    ☐  not later than _____ , or

    ☐  in accordance   ☐ C,   ☐ D,   ☐ E,   ☐ F or,   ☐ G below); or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D,   ☐ F, or   ☐ G below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  During the term of imprisonment, payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ , or _____ % of the defendant's income, whichever is  greater   , to commence _____ (e.g., 30 or 60 days) after the date of this judgment; AND payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ during the term of supervised release, to commence _____ (e.g., 30 or 60 days) after release from imprisonment.

G  ☐  Special instructions regarding the payment of criminal monetary penalties:



Any installment schedule shall not preclude enforcement of the restitution or fine order by the United States under 18 U.S.C §§ 3613 and 3664(m).

Any installment schedule is subject to adjustment by the court at any time during the period of imprisonment or supervision, and the defendant shall notify the probation officer and the U.S. Attorney of any change in the defendant's economic circumstances that may affect the defendant's ability to pay.

All criminal monetary penalties shall be made payable to the Clerk, U.S. District Court, P.O. Box 1234, Roanoke, Virginia 24006, for disbursement.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Any obligation to pay restitution is joint and several with other defendants, if any, against whom an order of restitution has been or will be entered.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.



☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:

    See attached order of forfeiture.



Payments shall be applied in the following order:  (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

United States District Court for the  Western

District of  Virginia

File Number  5:11-CR-45

UNITED STATES

            v.

JOHN STUART DOWELL

)
)     Notice of Appeal
)
)

     Notice is hereby given that  John Stuart Dowell                                    (plaintiffs) (defendants) in the above named case,* hereby appeal to the United States Court of Appeals for the    Fourth    Circuit (from the final judgment) (from the order (describing it)) entered in this action on the 25th  day of        July      , 20 13  .

(s) R. Darren Bostic, Esq.

Attorney for  Defendant

Address: 409 Virginia Avenue

Harrisonburg, VA 22802

* See Rule 3(c) for permissible ways of identifying appellants.

SCC
08/11/2011